# DECLARATION OF
# SETH D. RIGRODSKY

# Part 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JOEL GERBER, on behalf of himself and all )
others similarly situated, )
)
           Plaintiff, )
)
    v. )
)   C.A. No.     06 - 747
C. HARRY KNOWLES, RICHARD C. CLOSE, )
JANET H. KNOWLES, JOHN H. MATHIAS, )
STANTON L. MELTZER, HSU JAU NAN, )
WILLIAM RULON-MILLER, FRANCISCO )
PARTNERS, II, L.P., FP-METROLOGIC, LLC, )
METEOR HOLDING CORPORATION, )
METEOR MERGER CORPORATION, )
ELLIOTT ASSOCIATES, L.P., ELLIOTT )
INTERNATIONAL, L.P., METROLOGIC )
INSTRUMENTS, INC., )
)
         Defendants. )



### DECLARATION OF SETH D. RIGRODSKY IN SUPPORT
### OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, Seth D. Rigrodsky, declare as follows:

   1.    I am an attorney duly licensed to practice before all of the courts of the State of

Delaware. I am a member of the law firm of Rigrodsky & Long, P.A. attorney of record for

plaintiff in the above-entitled action. I have personal knowledge of the matters stated herein and,

if called upon, I could and would competently testify thereto.

   2.    I submit this Declaration in support of Plaintiff's Motion for Temporary

Restraining Order and Opening Brief in Support thereof to stop the shareholder vote that is

scheduled for December 20, 2006.

3.    I hereby incorporate all the facts set forth in the Class Action Complaint and the Motion and Opening Brief in support of the instant motion and certify them to be true to the best of my knowledge, information and belief.

4.    Attached are true and correct copies of the following exhibits:

Exhibit A:    Class Action Complaint filed by Joel Gerber on December 8, 2006.

Exhibit B:    Definitive Proxy Statement on Schedule 14A filed with the United States Securities and Exchange Commission by Metrologic Instruments, Inc. on November 29, 2006 without attachments.

I declare under penalty of perjury under the laws of the State of Delaware and the United States of America that the foregoing is true and correct.

Executed this 8th day of December, 2006, in Wilmington, Delaware.

Seth D. Rigrodsky (ID # 3147)

SWORN TO AND SUBSCRIBED before me this 8th day of December, 2006.

Notary Public

My Commission Expires: July 1, 2007

# EXHIBIT A

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Joel Gerber

## DEFENDANTS
C. Harry Knowles, et al.

**(b)** County of Residence of First Listed Plaintiff   QUEENS COUNTY, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Seth D. Rigrodsky, Esquire
Rigrodsky & Long, P.A., 919 N. Market Street, Suite 980
Wilmington, DE 19801

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excl. Veterans)<br>☐ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>  Liability<br>☐ 320 Assault, Libel &<br>  Slander<br>☐ 330 Federal Employers'<br>  Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>  Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>  Product Liability<br>☐ 360 Other Personal<br>  Injury | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational<br>  Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>  28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/<br>  Exchange<br>☐ 875 Customer Challenge<br>  12 USC 3410 |
| **REAL PROPERTY** | **PERSONAL INJURY**<br>☐ 362 Personal Injury -<br>  Med. Malpractice<br>☐ 365 Personal Injury -<br>  Product Liability<br>☐ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>  Property Damage<br>☐ 385 Property Damage<br>  Product Liability | **LABOR**<br>☐ 710 Fair Labor Standards<br>  Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting<br>  & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc.<br>  Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>☐ 871 IRS—Third Party<br>  26 USC 7609 | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information<br>  Act<br>☐ 900 Appeal of Fee Determination<br>  Under Equal Access<br>  to Justice<br>☐ 950 Constitutionality of<br>  State Statutes |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>  Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities -<br>  Employment<br>☐ 446 Amer. w/Disabilities -<br>  Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate<br>  Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original
    Proceeding

☐ 2 Removed from
    State Court

☐ 3 Remanded from
    Appellate Court

☐ 4 Reinstated or
    Reopened

☐ 5 Transferred from
    another district
    (specify)

☐ 6 Multidistrict
    Litigation

☐ 7 Appeal to District
    Judge from
    Magistrate
    Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. § 78n(a)

Brief description of cause:
Class action for violation of Section 14(a) of Fed. Exch. A

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
  UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE
12-8-06

SIGNATURE OF ATTORNEY OF RECORD
Brian D. Long   (#4347)

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOEL GERBER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>C. HARRY KNOWLES, RICHARD C. CLOSE, JANET H. KNOWLES, JOHN H. MATHIAS, STANTON L. MELTZER, HSU JAU NAN, WILLIAM RULON-MILLER, FRANCISCO PARTNERS, II, L.P., FP-METROLOGIC, LLC, METEOR HOLDING CORPORATION, METEOR MERGER CORPORATION, ELLIOTT ASSOCIATES, L.P., ELLIOTT INTERNATIONAL, L.P., METROLOGIC INSTRUMENTS, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff Joel Gerber ("Plaintiff"), by his attorneys, for his Class Action Complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based, *inter alia*, upon the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This is a class action complaint on behalf of Plaintiff and the other holders of Metrologic Instruments, Inc. ("Metrologic" or the "Company"), common stock against certain officers and/or directors of Metrologic, as well as certain other persons and entities described herein, alleging violations of Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 promulgated thereunder.

2.     This action arises out of the proposed sale (the "Proposed Transaction") of Metrologic to entities owned and affiliated with Francisco Partners II, L.P. ("Francisco"), C. Harry Knowles ("Harry Knowles"), the Company's Founder and Chairman of its Board of Directors, and Elliott Associates, L.P., and Elliott International, L.P (hereinafter collectively "Elliott"). Knowles and Elliott (collectively the "Knowles Group") are together controlling shareholders of Metrologic.

3.     Metrologic has announced that its Board of Directors has unanimously approved a definitive agreement pursuant to which Francisco, working with the Knowles Group, will acquire all of the Company's outstanding common stock for $18.50 per share in the Proposed Transaction. The Proposed Transaction is scheduled for a shareholder approval vote on December 20, 2006.

4.     Because of the Knowles Group's controlling equity position in the Company, the Proposed Transaction is subject to heightened scrutiny concerning the fairness of the price and the process by which the definitive agreement (the "Merger Agreement") was reached. As described herein, the Company has agreed to the Proposed Transaction at an entirely unfair price achieved through an unfair process designed to benefit the Knowles Group to the detriment of Plaintiff and the Class. Among other things, the so-called "Special Committee" formed to consider the Proposed Transaction (the "Special Committee") retained the Company's regular counsel to advise it on the deal. Moreover, no member of the Special Committee could impartially consider the Proposed Transaction because all of the Company's directors have a disabling financial conflict in that each stands to receive hundreds of thousands of dollars if the Proposed Transaction is consummated.

5.     In addition, the Proposed Transaction lacks many of the fundamental hallmarks of financial fairness. For example, the Proposed Transaction lacks a "majority-of-the-minority" provision and instead can be approved by a mere majority vote present at the special meeting of shareholders then entitled to vote. To that end, the Knowles Group has entered into agreements to

2

vote its shares in favor of the Proposed Transaction, thus insuring that at least 49% of Metrologic shares will be voted to approve the deal. Moreover, an undisclosed group of Metrologic directors and executive officers has also agreed to vote their shares in favor of the Proposed Transaction. These directors own approximately 1.1% of Metrologic's outstanding shares. As such, there can be no doubt that the "the fix is in" because 49% – nearly the requisite majority – are already contractually committed to approve the Proposed Transaction. Without this Court's timely intervention, Plaintiff and the Class will have no ability to use their votes to reject the deal. Defendants' decision to structure the Proposed the Transaction in this manner is entirely unfair and is violative of their fiduciary duties of loyalty and good faith.

6.    On October 5, 2006, Metrologic filed a Schedule 14A Preliminary Proxy Statement with the Securities Exchange Commission to solicit the shareholder vote on the Proposed Transaction, which was later supplemented on November 29, 2006 and labeled the Definitive Proxy Statement (collectively referred to as "the Proxy"). As alleged in detail herein, the Proxy is materially misleading and omits material facts. Among many other things, the Proxy fails to disclose that even though the Knowles Group will receive the same $18.50 per share consideration as the public shareholders, Knowles and Elliott will receive consideration worth an additional $3.66 for each of the Metrologic shares they plan to exchange for equity in the entity surviving the Proposed Transaction (the "Rollover Shares").

7.    In other words, the Knowles Group will receive $22.16 (including the $3.66 per share in hidden consideration) for their Rollover Shares – or a 19.8% per share premium to what Plaintiff and the Class will be entitled to receive. The Knowles Group and the other Defendants acting at their behest have violated their fiduciary duties of loyalty, good faith, due care and full and fair disclosure in negotiating and approving the Proposed Transaction and soliciting a shareholder vote

3

on the basis of a materially inaccurate and misleading Proxy. Indeed, the materially false and misleading Proxy is designed, in material part, to dissuade shareholders from exercising their right to seek an appraisal for their shares.

8.    Plaintiff seeks to recover damages caused by Defendants' breaches of fiduciary duty and an injunction ordering Defendants to comply with their fiduciary obligations and correct the materially false and misleading Proxy.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under §14(a) of the Exchange Act, 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty and unjust enrichment. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market. Plaintiff is, and was at all relevant times, a shareholder of Metrologic. This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C §1367.

## THE PARTIES

10.    Plaintiff is a Metrologic shareholder and has held shares in the Company since prior to the wrongs complained of herein. Plaintiff has certified this Complaint which is attached hereto and incorporated herein by reference.

11.    Defendant Metrologic is a corporation duly organized and existing under the laws of the State of New Jersey. The Company maintains its principal office in New Jersey at 90 Coles Road, Blackwood, New Jersey, 08012. Metrologic designs, manufactures, markets barcode scanning, and high-speed automated data capture solutions using laser, holographic and vision-based technologies. The Company offers an expertise in 1D and 2D barcode reading, portable data

4

collection, optical character recognition, image lift, and parcel dimensioning and singulation detection for customers in retail, commercial, manufacturing, transportation and logistics, and postal and parcel delivery industries. Additionally, through its wholly owned subsidiary, Adaptive Optics Associates, Inc., Metrologic develops, manufactures, markets, and distributes custom optical systems for the aerospace and defense industries. Metrologic shares trade on the NASDAQ under the symbol "MTLG." As of July 31, 2006, the Company had 22,687,000 shares of Common Stock outstanding.

12.     Defendant Francisco Partners, II, L.P. is a Delaware limited liability company.

13.     Defendant FP-Metrologic, LLC is a Delaware limited liability company, affiliated with Francisco Partners, II, L.P. (Francisco Partners, II, L.P. and FP-Metrologic are hereinafter collectively referred to as "Francisco").

14.     Defendant Meteor Holding Corporation is a Delaware corporation formed for purposes of effectuating the Proposed Transaction. FP-Metrologic, LLC is currently the sole shareholder of Meteor Holding Corporation.

15.     Defendant Meteor Merger Corporation is a New Jersey corporation formed by Meteor Holding Corporation to effect the Proposed Transaction.

16.     Defendant Elliott Associates, L.P. is a Delaware limited partnership. Elliott Associates, L.P. currently owns approximately 1,022,332 shares of Metrologic.

17.     Defendant Elliott International, L.P. is a Caymans Islands limited partnership. Elliott International, L.P. currently owns approximately 681,553 shares of Metrologic.

18.     Defendant Harry Knowles is, and at all relevant times has been, a director of the Company. According to the Company's most recent annual proxy statement on Form DEF 14A filed with the Securities and Exchange Commission on May 1, 2006 (the "2006 Proxy"), Knowles founded Metrologic and served as the Company's Chief Executive Officer from 1985 through June

2004. In addition, Harry Knowles served as Chief Technical Officer with responsibility for all of the Company's research from 1982 through 1985. Harry Knowles also has served as President of Metrologic from its inception through 1982 and again from 1985 through February 2000. Harry Knowles currently serves as Chairman of Metrologic's Board of Directors and its Interim Chief Executive Officer. Harry Knowles is married to Janet H. Knowles, the Vice President, Administration, Treasurer, Secretary and a director of the Company. Harry Knowles also holds or controls 9,675,412 million shares of Company common stock according to the 2006 Proxy - an amount equal to approximately 42.3 % of the Company's outstanding equity.

19.      Defendant Janet H. Knowles ("J. Knowles") is, and at all relevant times has been, a director of the Company, a position J. Knowles has held since 1986. As well as being a director, J. Knowles currently serves as Vice President, Administration, Treasurer, and Secretary of the Company. According to the 2006 Proxy, J. Knowles first served as a director of the Company from 1972 through 1984. J. Knowles served as Vice President, Administration, from 1976 through 1983 and again from 1984 through the present. J. Knowles has served as Treasurer since 1994 and as Secretary since March 2006. J. Knowles is married to Knowles. According to the 2006 Proxy, because J. Knowles is married to Harry Knowles, she possesses shared voting and investment power with respect to the 9,675,412 million shares of Company common stock owned or controlled by Knowles – an amount equal to approximately 42.3% of the Company's outstanding equity.

20.      Defendants Richard C. Close ("Close"), John H. Mathias ("Mathias"), Stanton L. Meltzer ("Meltzer"), Hsu Jau Nan ("Nan"), and William Rulon-Miller ("Rulon-Miller") (collectively with Harry Knowles and J. Knowles, the "Individual Defendants") are, and at all relevant times have been, directors of the Company.

21.    By virtue of their positions as directors and/or officers of the Company, the Individual Defendants owed and owe Plaintiff and the Company's other public shareholders fiduciary obligations of due care, loyalty, good faith, and full and fair disclosure and were and are required to: (a) act in furtherance of the best interests of Plaintiff and the class as shareholders of Metrologic; (b) maximize value on a sale of the Company; and (c) refrain from abusing their positions of control.

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23, on behalf of himself and all holders of Metrologic common stock (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants. This action is properly maintainable as a class action.

23.    The Class is so numerous that joinder of all members is impracticable. As of July 31, 2006, there were over 22.6 million shares of Metrologic common stock outstanding, owned by hundreds if not thousands of beneficial holders scattered throughout the United States.

24.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class members. The common questions include, inter alia, the following:

(a)    Whether the Proxies filed on October 5, 2006 and November 29, 2006 contained false and misleading statements regarding the Proposed Transaction;

(b)    Whether Defendants, by agreeing to the Proposed Transaction, have breached fiduciary duties owed by them to Plaintiff and the other members of the Class;

(c)    Whether the Proposed Transaction is grossly unfair to the Class;

(d)    Whether certain Defendants are favoring their own interests over those of Plaintiff and the Class; and

(e)    Whether Plaintiff and the other members of the Class would be irreparably damaged, were the transactions complained of herein consummated.

25.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

27.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

28.    On September 12, 2006, Metrologic announced a definitive agreement to be acquired for cash by Francisco with the participation of the Knowles Group. Pursuant to the proposed Merger Agreement, Meteor Merger Corporation will merge with and into Metrologic. Upon the completion of the Proposed Transaction, Metrologic will be the surviving corporation and a wholly owned subsidiary of Meteor Holding Corporation. Meteor Holding Corporation is currently indirectly owned by Francisco. If the Proposed Transaction is permitted to go forward as described below, the

8

Knowles Group will also own approximately 30.2% of Meteor Holding Corporation, and thus participate in Metrologic's future business and success.

**The Knowles Group Will
Receive a Secret Imbedded Deal Premium**

29.    The Proposed Transaction financially favors the Knowles Group to the detriment of Plaintiff and the Class. Under the terms of the Merger Agreement, Metrologic's public shareholders will receive $18.50 cash for each share of their Metrologic common stock. Unlike Plaintiff and the Class, however, the members of the Knowles Group are also buyers in the deal, and thus stand on both sides of the Proposed Transaction. The Proxy fails to disclose this material information.

30.    The Knowles Group has agreed to sell a portion of their Metrologic common shares to Meteor Holding Corporation immediately prior to the completion of the Proposed Transaction in exchange for shares of junior preferred stock and common stock of Meteor Holding Corporation. As a result of these contributions, immediately following the closing of the Proposed Transaction, Harry Knowles will own 15% of the junior preferred stock and 15% of the common stock of Meteor Holding Corporation, and Elliott will own approximately 15.2% of the junior preferred stock and approximately 15.2% of the common stock of Meteor Holding Corporation.

31.    The Proxy discloses that Harry Knowles and Elliott, respectively, own approximately 41.5% and 7.5% of Metrologic's outstanding shares of common stock. Of that amount, Harry Knowles will sell approximately 7,551,800 shares for $18.50 in the Proposed Transaction. Unlike Plaintiff and the Class, however, Harry Knowles will also buy approximately 15% of Meteor Holding Corporation in return for his ownership of approximately 1,680,578 Metrologic Rollover Shares.

32.    Similarly, Elliott will buy approximately 15.2% of Meteor Holding Corporation in return for its ownership of approximately 1,703,885 Rollover Shares. In addition, pursuant to the

9

terms of a letter agreement dated September 12, 2006, Elliott (or its affiliates) will also receive a portion of a $12 million payment Francisco will receive from Meteor Holding Corporation if the Proposed Transaction is consummated. Elliott will also receive quarterly payments from Francisco in connection with services it renders to Metrologic. In addition, as described below, Francisco will also share in any termination payment the Company is obligated to pay Meteor Holding Corporation in the event the Company accepts a superior acquisition offer from another potential acquirer.

33.    The Proxy does not disclose the fact that the Knowles Group will receive Meteor Holding Corporation shares worth $22.16 per share in exchange for their Rollover Shares. This additional $3.66 per share represents a 19.8% premium over the $18.50 being offered to the Company's public shareholders. This imbedded premium is calculated by subtracting expected post-transaction debt from the aggregate value of Metrologic pursuant to the terms of the Proposed Transaction. Accordingly, at the expense of Plaintiff and the Class, and in violation of their fiduciary duties of loyalty and good faith, the Knowles Group secretly diverted approximately $12.4 million of value to itself.

34.    Harry Knowles is also receiving substantial other benefits in the Proposed Transaction not to be shared by Plaintiff or the Class. Harry Knowles will become the CEO of the new Metrologic and will be paid an undisclosed salary. Knowles will also receive undisclosed new stock options and other financial benefits after the Proposed Transaction closes. Knowles (and Elliott) will receive the right to participate in future sales of Meteor Holding Corporation and future issuances of shares.

**The Proposed Transaction Is Unfair**

35.    Because Knowles and Elliott stand on both sides of the Proposed Transaction, the deal is subject to the requirements of entire fairness. The Proposed Transaction, however, fails to meet those rigorous standards because it is coercive, provides significant additional benefits to the

Knowles Group, and provides inadequate consideration to the Company's public shareholders – that is, the Proposed Transaction is fair neither in price nor in process. As discussed herein, the Knowles Group stands to gain at least $12 million more than Plaintiff and the Class, plus a significant opportunity to participate in the surviving entity going forward. The terms of the Proposed Transaction also reflect a preference for Knowles and Elliott and their participation in that the deal actually tilts the playing field in favor of Francisco.

**Defendants Have Assured Approval of the**
**Proposed Transaction by Locking up a Majority in its Favor**

36.    The Proposed Transaction lacks several critical indicia of fairness, considering that the entity taking the Company private includes the Company's controlling shareholders. The Proposed Transaction is patently unfair because it lacks an opportunity for the Company's public shareholders to have a meaningful voice in approving the deal. To be sure, the Proposed Transaction is a *fait accompli*, considering that the Knowles Group and Metrologic's directors and senior officers exercise dominion over a near majority of the Company, and that they stand on both sides of the deal. Nonetheless, the Merger Agreement fails to include a provision requiring separate approval by a majority of the Company's public shareholders – a so-called "majority-of-the-minority" approval provision.

37.    The Proposed Transaction is subject to a shareholder vote at a special shareholder meeting. According to the Proxy, an affirmative vote of a mere majority of the shares present and entitled to vote at that special shareholder meeting is necessary to secure approval of the Proposed Transaction. The Knowles Group already controls 49% of the vote. In addition, to further secure approval of the Proposed Transaction, it also has entered into agreements with Meteor Holding Corporation to vote their shares in favor of the Proposed Transaction. Moreover, according to the Proxy, an undisclosed group of Metrologic's board members and executive officers also has agreed

11

to vote their shares in favor of the Proposed Transaction. According to the Proxy, many of Metrologic's senior officers will continue with the Company after consummation of the Proposed Transaction and can expect to receive additional benefits including new stock option agreements. Metrologic's Board, as described below, are also financially interested in the deal. Accordingly, by failing to include a "majority-of-the-minority" provision, Defendants have assured themselves that this unfair transaction will be approved by those who unfairly stand to be enriched regardless of whether every single unaffiliated shareholder votes against the Proposed Transaction.

**The Proposed Transaction Is Locked-Up**

38.    The Proposed Transaction is unfair because the Individual Defendants took steps to ensure that no other bidder could possibly attempt to offer a superior priced transaction. The Individual Defendants impermissibly tilted the playing field in favor of the Knowles Group by implementing Draconian deal protection devices to ensure that no competing bids would arise. The Individual Defendants had a fiduciary obligation to: (a) undertake an appropriate evaluation of Metrologic's net worth as a merger/acquisition candidate; (b) act independently to protect the interests of the Company's public shareholders; (c) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of Metrologic's public shareholders; and (d) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of Metrologic.

39.    The Individual Defendants have breached their fiduciary duties because of the acts and transactions complained of herein, including their decision to enter into the Proposed Transaction without making the requisite effort to obtain the best transaction reasonably available.

40.    Before approving the Proposed Transaction, the Individual Defendants failed to contact other potential acquirers, despite having previously identified some. During the late summer

of 2005, the entire Metrologic Board (including Knowles) hired UBS Securities LLC ("UBS") to, among other things, canvass the market to assess whether other entities were interested in purchasing Metrologic. According to the Proxy, UBS contacted 94 potential buyers and only three parties, including defendant Francisco, emerged as potential bidders. Ultimately, by mid-January 2006, the Company decided not enter into a transaction with any of the three potential bidders.

41.     Then, in June 2006, at the behest of a representative of Elliott, defendant Harry Knowles began negotiations with Francisco. During the next month, the Individual Defendants allowed Harry Knowles to negotiate exclusively with Elliott and Francisco. The Individual Defendants further acquiesced to the wishes of the Knowles Group, the Company's controlling shareholders, by failing to contact any of the parties UBS previously identified or either of the other two previous potential bidders.

42.     In the Proxy, the Special Committee's unidentified members recite that they used the prior "market check" as a basis for their purported conclusion that the Proposed Transaction was fair to Plaintiff and the Class. Even if true, this flimsy excuse wholly fails to remedy the Individual Defendants' breaches of fiduciary duties to maximize shareholder value and not to unfairly favor a bidder aligned with Metrologic's majority shareholder and management.

43.     The Proxy offers no reason why the Special Committee or any of the Individual Defendants did not conduct another market check before approving the Proposed Transaction. The Proxy does not disclose why the Individual Defendants allowed Harry Knowles to enter into negotiations with Elliott and Francisco to the exclusion of any other potential buyers. The market check itself was fundamentally flawed because it was conducted by UBS. UBS could not have been expected to act in the best interests of the public Metrologic shareholders because it had been hired by the Company, which itself was dominated and controlled by the Knowles Group. The Proxy also

13

does not disclose whether UBS, in contacting other potential bidders, was offering the same or similar terms as those in the Proposed Transaction.

44.    In addition to the lack of a market check, the Individual Defendants approved certain terms of the Proposed Transaction that completely freezes out other bidders. For instance, while the Merger Agreement contains a so-called "fiduciary out" allowing the Board to enter into a superior priced deal under certain circumstances, the economics, and structure of the Proposed Transaction ensure that the "fiduciary out" is mere window-dressing.

45.    As described in the Proxy, Metrologic agreed that if it receives a superior proposal or an inquiry for non-public information in connection with such a proposal, it must provide Meteor Holding Company oral and written notice within 24 hours. Metrologic is obligated to disclose to Meteor Holding Company the material terms and conditions of any request or proposal, the identity of that party, and to keep Meteor informed on a current basis of the status of the request or proposal including providing Meteor with an actual copy of the request or proposal. This provision of the Merger Agreement will ensure that no alternative bidder will come forward as the material terms of its offer or inquiry will immediately be disclosed to its competition.

46.    According to the Merger Agreement, if among other things, Metrologic exercises the fiduciary out, the Company has to pay Francisco a "termination fee" $18.25 million. This amount, in excess of 4% of the deal price, is designed to discourage other bidders who will have to pay this huge sum in addition to offering a price in excess of $18.50.

47.    In violation of their fiduciary duties of loyalty and good faith, the Knowles Group has entered into agreements with Meteor Holding Corporation that practically render the "fiduciary out" provisions of the Merger Agreement meaningless. Knowles has agreed that even if the Company agrees to a superior offer, he will not vote a bloc of his stock representing 35% of Metrologic's

outstanding shares in favor of any such transaction for a period of ten months following termination of the Proposed Transaction.  Moreover, Knowles has agreed not to vote his shares in favor of any amendment to the corporate charter or any other proposal or transaction that "would in any manner delay, impede, frustrate, prevent or nullify" the Proposed Transaction. Meteor Holding Corporation has agreed to pay Knowles all of his out-of-pocket expenses in connection with entering into this agreement.

48.   Elliott entered into a similar agreement without any restriction as to the amount it can vote shares against the Proposed Transaction or any charter amendment.   Meteor Holding Corporation has also agreed to pay Elliott's out-of-pocket expenses in connection with entering into that agreement. Incredibly, and in violation of its fiduciary duties of loyalty, Elliott Associates, L.P., entered into a "letter agreement" with Meteor Holding Corporation dated September 12, 2006, in which, among other things, Meteor Holding Corporation has agreed to share an undisclosed portion of the termination payment with Elliott in the event that the Company accepts a superior offer. This payment is conditioned on Elliott voting against any other deal for at least three months following termination of the Merger Agreement.

49.   By allowing Knowles and Elliott to enter into agreements that bar approval of a superior transaction even in the exercise of the Board's so-called "fiduciary out," all of the Individual Defendants have stripped the Board of its non-delegable authority to manage the business and affairs of Metrologic.  Such conduct, constituting violations of the Individual Defendants' duties of loyalty and good faith, is *ultra vires* and impermissible.

**The "Special Committee" Acted Unfairly**

50.   The conduct of the Special Committee provides glaring examples of the unfair process undertaken to approve the Proposed Transaction. According to the Proxy, the Individual Defendants purportedly created a Special Committee of directors, which unanimously approved the

Proposed Transaction.    The Special Committee subsequently recommended approval of the Proposed Transaction.

51.    Regardless of the exact identity of the Committee members, their lack of independence and care is evident, thus invalidating their decision making process. The Special Committee's members each had a strong financial incentive to approve the Proposed Transaction because each member received a cash payment of $35,000, and its Chairman received $40,000, in addition to $1,500 for regular meeting fees and out-of-pocket expenses. According to the Proxy, the Special Committee met at least 32 times since August 15, 2005, garnering each member approximately $48,000. The Board approved these cash awards only after the Special Committee had recommended Board approval of the Proposed Transaction. The highly suspicious timing of the cash award to the Special Committee raises a reasonable inference that the Board, dominated by the Knowles Group, paid the Committee members an incentive fee to approve the Proposed Transaction.

52.    In addition, if the Proposed Transaction is consummated, all members of the Special Committee are financially interested because all of the Company' directors (except Harry and J. Knowles) will received hundreds of thousands of dollars in cash as a result of the buyout of options granted to them under the Company's 1994 and 2004 Equity Incentive Plans (the "Plans"). According to the Proxy, all options the Company granted to the Individual Defendants under the Plans with exercise prices below $18.50 will be cashed out in amounts calculated by the number of shares they would have been entitled to receive if they had exercised their options multiplied by the difference between the option exercise price and $18.50.  In addition, holders of options with an exercise price above $18.50 will receive $1 per share. The buyout formulas were determined by the Administrator of the Plans, which in 2006, was the Board's Incentive Compensation Committee, consisting of Knowles, J. Knowles, Close, Rulon-Miller, and Meltzer.  According to the Proxy,

16

# DECLARATION OF
# SETH D. RIGRODSKY

# Part 2

defendant Close will receive $417,886, defendant Nan will receive $906,822, defendant Mathias will receive $340,402, defendant Meltzer will receive $102,122, and defendant Rulon-Miller will receive $146,392. Accordingly, the Board set its own compensation and incentive fee in the Proposed Transaction with the affirmative participation of Harry and J. Knowles.

53.     The Special Committee also used an unfair process in approving the Proposed Transaction by failing to employ outside advisors that were sufficiently independent of the Company, which is controlled and dominated by the Knowles Group. The Special Committee failed to hire independent counsel but instead utilized the services of the Company's regular outside counsel, Ballard Spahr. In 2004, as discussed, the Special Committee used the services of UBS, which the Company retained. Needham & Company, LLC ("Needham"), which the Special Committee hired to render a fairness opinion, had previously participated with UBS in the failed sale process that ended in January 2006. Furthermore, before hiring both Ballard Spahr and Needham, the Special Committee did not contact or interview any other firms.

54.     Further, the Special Committee acted unfairly because it made no effort to value the Meteor Holding Company shares Knowles and Elliott are to receive in the deal. The Proxy is entirely silent with regard to whether the Special Committee knew about the 19.8% premium both Knowles and Elliott will receive for their Rollover Shares. There is no indication from the public filings that the Special Committee ever asked Needham or any other entity to value the Rollover Shares.

**The Deal Price Is Financially Unfair**

55.     The failure of the Individual Defendants to secure an adequate merger price and their betrayal of the interests of the Company's public shareholders also is apparent from the $18.50 per share consideration agreed to by the Individual Defendants. This proposed consideration is inadequate and unfair to Plaintiff and the Class because, in reality, it offers a very meager premium,

17

if any, and thereby deprives Plaintiff and the Class of the true and full value of their shares. In fact, the price unanimously agreed to by the Individual Defendants represents a premium of just 4.7 % over the Company's stock price on the last full day of trading before the Proposed Transaction was announced. Moreover, the consideration represents a mere 1.5% premium over the average trading price of the Company's stock over the last year.

56.     The consideration to be paid to Plaintiff and the Class in the Proposed Transaction also is unfair and grossly inadequate because, among other things: (a) the intrinsic value of Metrologic is materially in excess of the amount offered in the Proposed Transaction, giving due consideration to the Company's anticipated operating results, net asset value, cash flow profitability and established markets; and (b) the consideration is not the result of an appropriate evaluation of the value of Metrologic because the Individual Defendants approved the Proposed Transaction without undertaking steps to accurately ascertain Metrologic's transactional value through open bidding or at least a market check mechanism.

57.     The Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of Company's valuable and profitable business, and future growth in profits and earnings, at a time when the Company is poised to increase its profitability.

58.     The Proposed Transaction also is suspect because of its timing. A review of the Company's stock price trading history reveals that it had been trading as high as $23.10 per share – significantly above the consideration in the Proposed Transaction – on April 13, 2006, just more than five months before the announcement of the Proposed Transaction. Moreover, within the last twelve months, the Company's stock has actually traded as high as $24.49 per share. Based on that figure,

the Proposed Transaction actually represents a 25% discount to be received by Plaintiff and the Class.

59.    A comparison of Metrologic to other similar public companies shows that price multiples of EBITDA and EBIT are lower for the Company that for its peer group. According to Needham's September 11, 2006 presentation to the Board, the $18.50 price represents an 11.4 multiple to the last twelve month EBITDA compared to a 13.3 multiple for peer groups. The same presentation shows that the $18.50 price represents a 14.4 multiple compared to a 16.1 multiple for the peer group.

60.    An independent analysis using market information as of October 26, 2006, shows an even more dramatic shortfall. Since August, Metrologic's peer group has performed well in the market. The market price of Metrologic, however, has lagged because it is capped at $18.50 because the offering price and approval of the Proposed Transaction is a *fait accompli*. This updated analysis shows that Metrologic's EBITDA multiple is 10.85 compared to 17.06 for the peer group. Metrologic's EBIT multiple is 13.23 compared to 19.67 for the Company's peer group.

61.    The discounted cash flow valuation Needham presented to the Board on September 11, 2006, similarly demonstrates the inadequacy of the $18.50 offering price. According to Needham, using management projections Metrologic provided to Needham on July 31, 2006, a cash flow analysis in which the terminal value is calculated estimating 2010 EBITDA of $124,390,000 shows a per share range of $27.74 - $44.56. Needham also presented to the Board a "sensitivity case" cash flow analysis that was not based on any management projections but instead assumed a 10% growth rate. That analysis, based on dramatically lower financial projections resulting in 2010 estimated EBITDA of only $46,200,000 yielded a per share range of $12.09-$18.18.

62.     The Proxy makes clear, however, that Metrologic's management prepared two additional projections on August 16 and August 23, 2006. Those projections, buried away from the Needham analysis in the Proxy, show 2010 terminal EBITDA projections of $122,955,000 and $86,179,000 respectively. The Proxy discloses that only "some" of the management projections were provided to Needham, but that the projections were made available to Francisco during its due diligence of the Company. The Proxy gives no explanation why management's projections decreased so dramatically during the three weeks it modified the projections from a high 2010 EBITDA estimate of $124,390,000 (July 31, 2006) to a low of $86,179,000 (August 23, 2006).

63.     Moreover, the Proxy fails to disclose why Needham did not use the lower projections in its cash flow analysis included in the Board presentations, but instead decided to create a guesswork "sensitivity case." Based on Plaintiff's independent cash flow calculations, a fair price range using management's worst-case August 23, 2006, estimate of 2010 EBITDA, still yields a fair price range of $19.97-$31.55. Accordingly, it can be more than reasonably assumed that the Individual Defendants did not provide Needham with the more pessimistic updated management projections, as they would show that the $18.50 deal price was inadequate. These Individual Defendants did provide these more "real world" projections to Francisco and thereby gave it reasonable assurance that, even in a worst-case scenario, the buyers were still getting a bargain price for Metrologic. The Individual Defendant's failure to disclose the truth about the management projections, and their failure to disclose the true facts about the projection distribution and use, constitute violations of the Individual Defendants' fiduciary duties of care and full and fair disclosure.

64.     Recent analyst remarks also indicate that the Company is worth significantly more than the consideration being offered in the Proposed Transaction. As recently as July 26, 2006,

Raymond James set a $23 price target for the Company. On September 12, 2006, Raymond James issued a report on the Buyout Transaction calling the buyout premium "light." Specifically the report states: "Valuation on the transaction appears softer than expected, reflecting a P/E multiple of 17.5x our 2007 EPS estimate of $1.06 including options expense (group trading at 20.2x). On an MEV/EBITDAS basis (note – "S" indicates non-cash stock options expense), the transaction comes in at 7.2x our 2007 estimates (2007 estimated EBITDAS $12.2 million). On a more traditional MEV/EBITDA analysis (includes gross impact of options expense), the transaction values Metrologic at 7.9x our 2007 estimates vs. the current group mean valuation of 9.4x." Raymond James called the transaction premium "light" given Metrologic's projected growth trajectory (top-line growth of 19% and 14% in 2006 and 2007, respectively, with EPS growth of 8% and 20% over the same periods).

65.    Weeden & Co. set the same price on that date. In addition, analyst reaction to the Proposed Transaction has been negative. Ivan Feinseth, director of research at Matrix U.S.A. LLC ("Matrix"), a New York research house and investment bank, was quoted as stating, "We think it is kind of cheap." He went on to note that the Company's business has been improving. Not unlike Raymond James and Weeden & Co., Matrix values the Company's stock in the "mid-twenties," also having set a target of $23.

66.    For instance, in February of 2006, Metrologic announced that it was expanding its wireless barcode scanner offering:

> Metrologic Instruments, Inc. today introduces the MS1633 FocusBT hand held area imager, a wireless 2 dimensional (2D) bar code scanning solution, at the HIMSS healthcare tradeshow taking place in San Diego, CA. Worldwide availability of FocusBT is expected in the second half of 2006.
>
> Combining the performance of Metrologic's successful MS1690 Focus hand held area imager, which incorporates Omniplanar, Inc.'s SwiftDecoder software, with the flexibility of Bluetooth® wireless technology, FocusBT delivers aggressive decoding of 1D and 2D bar code symbologies omnidirectionally with wireless mobility. The

21

lightweight FocusBT, with its ergonomic form factor that fits comfortably in a user's hand, includes a rechargeable battery that delivers thousands of scans per charge, allowing for hours of uninterrupted operation.

"The use of 2D bar codes is increasing in many markets, including retail, supply chain, and healthcare. With the introduction of MS1690 Focus in 2005, Metrologic raised the bar on 2D bar code scanning performance. Customer feedback, coupled with Metrologic's commitment to develop products that meet the market's current needs and future expectations, indicated that the mobility offered by Bluetooth® technology was an important factor in addressing new opportunities in both existing markets and a number of new, developing markets", stated Nicholas Ciarlante, Hand Held Product Marketing Manager for Metrologic.

Greg DiNoia, Vice President, Metrologic The Americas, commented, "We are committed to innovation and leadership in image based scanners to satisfy the growing number of 2D scanning applications and a market trend toward aggressive image based scanners. We are pleased to introduce FocusBT at HIMSS and recognize the contribution we can make toward reducing medical errors and improving patient safety. FocusBT is a prime example of how we will continue to address our customers' needs for feature rich, cost effective, visionary scanning solutions."

67.   Furthermore, in May of 2006, the Company announced its acquisition of all of the

assets of Visible RF, LLC, a privately held start up company located in Needham, MA:

Metrologic Instruments, Inc., today announced the acquisition of all of the assets of Visible RF, LLC, a privately held start up company located in Needham, MA, whose advanced technology combines Radio Frequency communications with bi stable display materials.

"As part of our growth strategy, this transaction expands our market presence in RFID with unique differentiation," said C. Harry Knowles, Metrologic's Chairman. "This acquisition, coupled with our solid organic growth, will assist us in continuing to build our position as a leader in the Automatic Identification Data Capture Industry."

Mark Schmidt, Metrologic's Executive Vice President Strategic Initiatives, commented, "The acquisition of Visible RF, LLC, represents a significant addition to our technology portfolio. This technology combines the benefits of a paper label with the advantages of RFID to display visible information that is updated via a wireless signal. Thus, the technology provides users all the benefits of barcoding and RFID. There are applications for this acquired technology in several markets where Metrologic already has a presence, including Retail, Healthcare, Manufacturing, Logistics, and Public Transportation, just to name a few."

"Metrologic intends to utilize its extensive established world wide sales and distribution network to expand this new technology through its existing customer base. We also believe future generations of this technology potentially are applicable outside our traditional, addressable markets," continued Mr. Schmidt.

68.   Also in May of 2006, Metrologic announced the introduction of its new Radio

Frequency ID Readers:

Metrologic Instruments, Inc. (NASDAQNMS:MTLG) announced today it will introduce its initial line of Radio Frequency ID (RFID) Readers engineered to execute supply chain applications at the Fourth Annual RFID Journal LIVE conference and exhibition (Booth 200) hosted by the MGM Grand in Las Vegas (NV), May 1 3.

The SP5800 Series MAXIMUS is a rugged CE.NET mobile computer incorporating multifrequency RFID, a high-resolution imager, and an integrated fingerprint reader for state of the art flexibility and security for multiple supply chain solutions. The MR600 Series IMPULSE is an affordable, multi protocol, Gen 2 EPCglobal certified, fixed RFID solution for applications requiring only one set of antennas.

Both systems will be distributed commercially throughout North America during the second half of 2006.

"MAXIMUS is the first RFID mobile computer to contain such advanced, flexible features at a competitive price," said Andrew D'Amelio, senior director of industrial products and systems for Metrologic. "The power of the unit combined with its security features opens up a whole new set of supply chain applications.

"Our second product line, the IMPULSE, has advanced digital filtering technology and separate, configurable antennas to make it the ideal reader for fixed RFID applications such as truck mounted reading, certain conveyor applications and targeted work station interrogation zones. The streamlined and cost effective IMPULSE provides a great alternative to mobile units for compliance with RFID mandates and regulations without adding additional complexity."

The MAXIMUS RFID reader supports all common UHF (915 MHz) RFID applications and has the flexibility to handle emerging HF (13.56 MHz) RFID applications, including item level tagging or smart card reading. Its two megapixel digital imager employs Omniplanar's SwiftDecoder to decipher all 1D, 2D, and Postal bar codes. The imager also captures, stores and transmits high resolution images for data collection, identification and verification. The integrated fingerprint reader's login security increases both supply chain protection and productivity. The mobile computer's wireless connectivity (Bluetooth & 802.11b) allows unfettered short and long range communication with nearby peripherals and the host system. IMPULSE's multi protocol RFID reader supports EPC and ISO compliant UHF

RFID tags. Metrologic also makes IMPULSE available in an evaluation kit complete with all the essential materials needed to set up and test a full RFID system.

69.    Further, in July of 2006, Metrologic's scanners were ranked number one in a Vertical Systems Reseller ("VSR") Survey:

> In a recent survey of nearly 300 value added resellers published in the July issue of VSR, Metrologic Instruments, Inc. received the top cumulative score for point of sale bar code scanning products. Metrologic finished first overall in the survey's scanner category – ahead of Symbol, Hand Held Products and PSC. Metrologic scored 22.5 out of a possible 25 points.

*    *    *

> VSR stated, "Metrologic was the clear scanner category winner." It also added, "Those [companies] that ranked demonstrate a superior ability to deliver on the litmus test of customer satisfaction and are members of a very elite group of technology pioneers." Metrologic tied Touch Dynamic (category: integrated POS units) for the highest overall score by any vendor in any product category. The company also finished as the top ranked vendor overall for pricing. The average vendor cumulative score was 19 points.

70.    Metrologic's financial performance has been strong. For example, the Company's most recent Form 10-Q for the quarter ended June 30, 2006, Metrologic reported, "[s]ales increased 28.7% to $62.6 million in the three months ended June 30, 2006 from $48.6 million in the three months ended June 30, 2005."

71.    Metrologic's investment policies and acquisition growth strategy suggest that revenues will continue to increase in the future. Indeed, in May 2006, the Company publicly proclaimed that it had "solid organic growth." In addition, the Company has recently launched a series of new products expected to increase Metrologic's profitability in the future.

## THE PROXY IS MATERIALLY FALSE AND MISLEADING

72.    On November 29, 2006, Metrologic filed the Proxy in connection with seeking shareholder approval of the Proposed Transaction. As alleged herein, the Proxy fails to disclose highly significant and material information necessary for Metrologic's public shareholders to make

an informed decision regarding the Proposed Transaction. This decision is the most important in the life of this Company because under New Jersey law, which applies here, the shareholders will not have a right to seek a post-transaction appraisal to obtain fair value for their shares. The Individual Defendants' failure accurately to make material and non-misleading disclosures in the Proxy further renders the Proposed Transaction unfair and coercive.

73.    The Proxy, which contains the following materially misleading statements and omissions, is materially deficient and in the following respects:

(a)    The Proxy fails to disclose that, unlike the Plaintiff and the Class, the Knowles Group is receiving an extra $3.66 per share imbedded in the offering price for its Rollover Shares, representing a 19.8% premium over the $18.50 being offered to Plaintiff and the Class;

(b)    The Proxy fails to disclose whether the Special Committee or the Board, before they approved the Proposed Transaction, were aware of the September 12, 2006, letter agreement between Elliott and Meteor Holding Company giving Elliott a portion of any consulting and merger termination fees;

(c)    The Proxy fails to disclose the identity of the Special Committee members engaged when the Board sought to explore the sale of the Company in 2004;

(d)    The Proxy fails to describe what the authority, if any, the Special Committee had to negotiate or reject the Proposed Transaction;

(e)    The Proxy fails to disclose that the Special Committee members were paid an incentive fee to approve the Proposed Transaction or that they had handsomely awarded themselves additional compensation in connection with the decision to pay out options granted them under the 1994 and 2004 Plans;

(f)    The Proxy does not disclose that the Special Committee failed to consider hiring any advisors other than Ballard Spahr and Needham;

(g)    The Proxy fails to disclose the amounts that Ballard Spahr was paid by either the Company, Knowles, Elliott or any of the other Defendants in connection with services rendered during the past five years, or any amounts promised to be paid in the future and further fails to disclose if Needham was paid for past or future services by either Knowles, Elliott, or any of the other Defendants other than Metrologic;

(h)    The Proxy fails to disclose that the $18.50 offering price is only a 1.47% premium over the 52-week average market price for Metrologic's shares;

(i)    The Proxy fails to disclose why management's projections so dramatically decreased between July 31 and August 23, 2006, and fails to disclose why the projections prepared on August 16 and August 23, 2006 were given to Francisco but not to Needham;

(j)    The Proxy fails to disclose that Needham's cash flow analysis was fundamentally flawed. Needham incorrectly neglected to deduct amortization expense when calculating taxable income. This resulted in an overstatement of tax expense and a corresponding understatement of net income and free cash flow, which in turn understated the Company's equity value. In addition, Needham's discounting calculations reflect end-of-period discounting rather than mid-period discounting. End-of-period discounting, which reflects the implicit assumption that the business generates no cash flow during the year but receives it all in a year-end lump sum, understates the present value of future cash flows and thus Metrologic's equity value. Mid-period discounting, which accurately results in a higher present value relative to end-of-period discounting, appropriately reflects the implicit assumption that the business generates cash throughout the year such that, on average, the business' cash flow is received at the mid-point of the year;

(k)     In its analyses presented to the Board, Needham used an unusually broad range of discount rates, ranging from 10% to 20%. The Proxy, however, fails to give any indication of the methodology or assumptions Needham relied on to arrive at its range of discount rates;

(l)     The Proxy fails to disclose whether any of the other potential bidders contacted by UBS were willing to consider deal terms similar to those contained in the Proposed Transaction, including provisions providing for Knowles and Elliott to have a continuing equity participation;

(m)     The Proxy fails to disclose exactly what Elliott will be paid by Meteor Holding Corporation in the event the Company accepts a higher proposal and terminates the Proposed Transaction -- the Proxy also fails to disclose how much Elliott will receive from Francisco in connection with one-time and quarterly payments it will receive for providing services to Meteor Holding Corporation; and

(n)     The Proxy fails to disclose the sources of the options Metrologic is buying out from the Board, the extent to which those options are in or out "of the money," and by what amount.

74.     The Individual Defendants' agreement to the unfair terms of the Proposed Transaction, its timing, their failure to auction the Company and make any auction demonstrate a clear breach of fiduciary duties owed to Plaintiff and the Class. The Proposed Transaction is an attempt by the Knowles Group to benefit themselves at the expense of Plaintiff and the Class. The Proposed Transaction will, for inadequate consideration, deny Plaintiff and the other members of the Class the opportunity to share proportionately in the future success of the Company and its valuable assets, while wrongfully benefiting the Knowles Group.

## COUNT I

### Violations of § 14(a) of the Exchange Act Against All Defendants

75.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Proxy statements during the relevant period violated §14(a) and Rule 14a-9 because they omitted material facts, including those referenced in paragraph 73 above.

77.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

78.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

79.    The Company was damaged because of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Breach of the Fiduciary Duty of Disclosure

80.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

81.    The Defendants have already caused materially misleading and incomplete information to be disseminated to the Company's public shareholders. Having chosen to communicate publicly concerning the Proposed Transaction, Defendants had an obligation to be complete and accurate in their disclosures.

82.    The Proxy fails to disclose material financial information, including financial information and information necessary to prevent the statements contained therein from being misleading.

83.    The misleading omissions and disclosures by Defendants concerning information and analyses presented to and considered by the Special Committee, including the consideration to be received by the Knowles Group in connection with the Proposed Transaction, among other things, affirm the inadequacy of disclosures to the Company's shareholders. Because of Defendants' failure to provide full and fair disclosures, Plaintiff and the Class will be stripped of their ability to make an informed decision on whether to vote in favor of the Proposed Transaction, and thus damaged thereby.

### COUNT III

### Breach of Fiduciary Duty – Entire Fairness

84.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

85.    In unanimously approving the Proposed Transaction on behalf of Metrologic, the Individual Defendants and Elliott have not taken any steps to protect the interests of the Company's minority shareholders. Instead of utilizing procedural safeguards such as providing for approval of the Proposed Transaction by a majority of the Company's minority shareholders, the Individual Defendants and Elliott simply have agreed to seek approval from a simple majority of the Company's shareholders all financially interested in the Proposed Transaction thus assuring its approval.

86.    Because the Knowles Group stands on both sides of the Proposed Transaction, it is subject to the requirements of entire fairness. The deal, however, fails to meet that standard's rigorous requirements. To that end, Defendants are required to, but cannot, demonstrate the entire fairness of the Proposed Transaction because, among other things: (a) the Knowles Group is on both sides of the transaction; (b) the Knowles Group will receive enormous personal benefit as a result of the transaction significantly in excess of that to be received by the Company's public shareholders; (c) the Proposed Transaction calls for the payment of a price that is less than supported; and (e) the Proposed Transaction does not provide for any sort of meaningful procedural protections for the Company's public shareholders.

87.    Further, the Proposed Transaction is coercive. The Proposed Transaction is not conditioned on a "majority-of-the-minority" shares voting in its favor. The Company's public shareholders thus are left with no meaningful choice whatsoever.

88.    The unfairness of the terms of the Proposed Transaction is compounded by the gross disparity between the knowledge and information possessed by Defendants by virtue of their positions of control of Metrologic and the Knowles Group and that possessed by the Company's public shareholders.

89.    The inherent unfairness in the Proposed Transaction's consideration thus also is manifest in the uncertainty and inadequacy of the purchase price. The financial pressures that led the Special Committee to accept a structure that extends the right to equity participation and other benefits to the Knowles Group is evident. There was no urgency for selling the Company in a deal with a financial sponsor that does not offer any meaningful premium to minority shareholders.

90.    Because entire fairness applies to the Proposed Transaction, the Individual Defendants are obligated to explore all alternatives to maximize shareholder value. To accomplish this obligation, the Individual Defendants had a duty to:

(a)    Fully inform themselves of Metrologic's market value before taking, or agreeing to refrain from taking, action;

(b)    Act in the interests of the equity owners;

(c)    Maximize shareholder value;

(d)    Obtain the best financial and other terms when the Company's independent existence will be materially altered by the transaction; and

(e)    Act in accordance with the fundamental duties of loyalty, care, and good faith.

91.    Because of their respective positions with the Company, the Individual Defendants are also required to:

(a)    Independently to ensure that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer, or controlling shareholders;

(b)    Ensure that if there are conflicts of interest between the Defendants interests and their fiduciary obligations of loyalty, that they are resolved in the best interest of the Metrologic's public shareholders; and

(c)    Ensure that the Proposed Transaction is entirely fair to Metrologic's public shareholders.

92.    Because of the foregoing, Defendants have breached, and will continue to breach, their fiduciary duties owed to the public shareholders of Metrologic, and are engaging in, or

31

facilitating the accomplishment of, an unfair and self-interested transaction that is not entirely fair to the public shareholders of Metrologic.

93.     Plaintiff and the Class will suffer irreparable harm unless Defendants are enjoined from breaching their fiduciary duties and carrying out the aforesaid wrongful transaction.

94.     Plaintiff and the Class have been and will be damaged in that they not and will not receive a fair proportion of the value of Metrologic's assets and business and will be prevented from benefiting from a value-maximizing transaction.

95.     Plaintiff and the other Class members are immediately threatened by the acts and transactions complained of herein.

96.     Plaintiff lacks an adequate remedy at law.

## COUNT IV

### Aiding and Abetting Breaches of Fiduciary Duty

**(Against Francisco Partners, II, L.P., FP-Metrologic, LLC, Meteor Holding Corporation, Meteor Merger Corporation, Elliott Associates, L.P., and Elliot International, L.P.)**

97.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

98.     Because they were fiduciaries of the Corporation, the Individual Defendants and Elliott owed duties of due care, undivided loyalty, good faith, and truthful disclosure. The Individual Defendants and the Knowles Group violated and breached these duties.

99.     With the knowledge, approval, and participation of each of the Individual Defendants, as alleged herein, defendants Francisco Partners, II, L.P., FP-Metrologic, LLC, Meteor Holding Corporation, and Meteor Merger Corporation, were able to, and in fact did, knowingly render aid and assistance to the Individual Defendants in their breach of fiduciary duty. Francisco Partners, II, L.P., FP-Metrologic, LLC, Meteor Holding Corporation, and Meteor Merger Corporation, did so

knowingly, or but for their gross negligence would have known, of the Individual Defendants' and Elliott's fiduciary breaches.

100.    As a direct and proximate result of the aiding and abetting the Individual Defendants' and Elliott's breaches of fiduciary duty, Plaintiff and the Class have sustained, and will continue to sustain, substantial harm.

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a class action, and certifying Plaintiff as a class representative;

B.    Declaring that the Defendants and each of them have committed or participated in a breach of their fiduciary duty to Plaintiff and other members of the Class;

C.    Enjoining the Proposed Transaction and, if the transaction is consummated, rescinding the Proposed Transaction (or award damages);

D.    Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for Plaintiff's attorneys and experts' fees; and

E.    Granting such other and further relief as may be just and proper.

Dated: December 8, 2006

RIGRODSKY & LONG, P.A.

Seth D. Rigrodsky, Esquire (ID # 3147)
Brian D. Long, Esquire (ID # 4347)
919 N. Market Street, Suite 980
Wilmington, DE 19801
Tel: (302) 295-5310

OF COUNSEL:

*Attorneys for Plaintiff*

KIRBY, MCINERNEY & SQUIRE, LLP
Ira M. Press, Esquire
830 Third Avenue
New York, NY 10022
Tel: (212) 317-2300

33

## **VERIFICATION**

Joel Gerber verifies that he has reviewed the foregoing Class Action Complaint, and that the allegations as to himself and his own actions are true and correct and the other allegations upon information and belief are true and correct.

Dated: December 8, 2006

_____

JOEL GERBER

# EXHIBIT B

DEFM14A 1 a06-20630_1defm14a.htm DEFINITIVE PROXY STATEMENT RELATING TO MERGER OR ACQUISITION

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No.          )

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:
☐  Preliminary Proxy Statement
☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Pursuant to §240.14a-12

# METROLOGIC INSTRUMENTS, INC.

(Name of Registrant as Specified In Its Charter)

**N/A**

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
☐  No fee required.
☒  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
    (1)  Title of each class of securities to which transaction applies:
        Common Stock, par value $0.01 per share, of Metrologic Instruments, Inc. ("Metrologic common stock")
    (2)  Aggregate number of securities to which transaction applies:
        22,770,094 shares of Metrologic common stock, options to purchase 1,748,130 shares of Metrologic common stock and warrants to purchase 195,000 shares of Metrologic common stock(1)
    (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
        $18.50 per share of Metrologic common stock
        $18.50 minus weighted average exercise price of outstanding options of $4.00 per share subject to an option with an exercise price that is less than $18.50
        $1.00 per award for options with an exercise price that is greater than or equal to $18.50
        $18.50 minus exercise price of warrants of $3.47 per share subject to a warrant
    (4)  Proposed maximum aggregate value of transaction:
        $369,128,879(1)
    (5)  Total fee paid:
        $39,497(1)
☒  Fee paid previously with preliminary materials.
☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
    (1)  Amount Previously Paid:

(2)  Form, Schedule or Registration Statement No.:

_____

(3)  Filing Party:

_____

(4)  Date Filed:

_____

_____

(1) Pursuant to an Agreement and Plan of Merger by and between Meteor Holding Corporation, Meteor Merger Corporation and the Registrant dated as of September 12, 2006, Meteor Merger Corporation will merge with and into the Registrant and each outstanding share of common stock of the Registrant shall be converted into the right to receive $18.50, without interest, except for shares that are owned by the Registrant as treasury stock or owned by Meteor Holding Corporation or any wholly owned subsidiary of Meteor Holding Corporation or the Registrant, which will be cancelled without any payment therefor. Pursuant to Contribution and Voting Agreements between Meteor Merger Corporation and certain shareholders of the Registrant dated as of September 12, 2006, such shareholders will contribute an aggregate of 3,384,463 shares of common stock of the Registrant to Meteor Holding Corporation immediately prior to the merger in exchange for shares of Meteor Holding Corporation. Each holder of options to acquire the Registrant's common stock with an exercise price that is less than $18.50 per share shall be entitled to receive, in consideration of the cancellation of such stock options, an amount (net of applicable taxes) equal to the product of (i) the excess of $18.50 per share of common stock over the exercise price per share of common stock subject to such stock option, multiplied by (ii) the total number of shares subject to such stock option. Each holder of options with an exercise price that is greater than or equal to $18.50 per share will receive $1.00 per award. Each holder of warrants to acquire the Registrant's common stock shall be entitled to receive upon exercise an amount (net of applicable taxes) equal to the product of (i) the excess of $18.50 over the exercise price per share of common stock subject to such warrant, multiplied by (ii) the total number of shares subject to such warrant. As of October 2, 2006, there were 22,770,094 shares of common stock of the Registrant issued and outstanding, 521,630 shares of common stock of the Registrant subject to outstanding stock options with an exercise price that is less than $18.50 per share, with a weighted-average exercise price of $4.00 per share, 220 option awards covering 1,226,500 shares of common stock of the Registrant with an exercise price that is greater than or equal to $18.50 per share, and 195,000 shares of common stock of the Registrant subject to outstanding warrants, with an exercise price of $3.47 per share. The filing fee was determined by adding (w) the product of (i) the number of shares of Common Stock that are proposed to be acquired in the transactions (calculated by subtracting 3,384,463 from 22,770,094) and (ii) the transaction consideration of $18.50 per share of common stock, plus (x) the product of (1) the total number of shares of Metrologic common stock subject to outstanding stock options with an exercise price that is less than $18.50 per share multiplied by (2) the excess of $18.50 over the weighted average exercise price for such stock options, plus (y) the product of (1) the total number of option awards with an exercise price that is greater than or equal to $18.50 multiplied by (2) $1.00 plus (z) the product of (1) the total number of shares of Metrologic common stock subject to outstanding warrants multiplied by (2) the excess of $18.50 per share of common stock over the exercise price per share of common stock subject to such warrant ((w), (x), (y) and (z) together, the "Merger Consideration"). The filing fee was calculated in accordance with Regulation 240.0-11 under the Exchange Act, by multiplying the Merger Consideration by 0.000107.

# DECLARATION OF
# SETH D. RIGRODSKY

# Part 3



**METROLOGIC INSTRUMENTS, INC.**
90 Coles Road
Blackwood, New Jersey 08012
856-228-8100

November 28, 2006

Dear Fellow Shareholder:

You are cordially invited to attend the special meeting of shareholders (the "special meeting") of Metrologic Instruments, Inc. ("Metrologic," "we," "us," or "our"), which will be held on Wednesday, December 20, 2006, beginning at 10:00 a.m., local time, at Metrologic's principal executive offices at 90 Coles Road, Blackwood, New Jersey 08012.

At the special meeting, you will be asked to consider and vote upon a proposal to approve an agreement and plan of merger by and among Meteor Holding Corporation, Meteor Merger Corporation and Metrologic dated as of September 12, 2006 (the "merger agreement"), pursuant to which Meteor Merger Corporation will be merged with and into Metrologic, with Metrologic continuing as the surviving corporation. If the merger is completed, each share of Metrologic common stock issued and outstanding at the effective time of the merger will be converted into the right to receive $18.50 in cash, without interest, other than shares held by Metrologic as treasury stock or owned by Meteor Holding Corporation or any wholly owned subsidiary of Meteor Holding Corporation or Metrologic, which will be cancelled without payment.

If the merger is completed, Metrologic will continue its operations as a privately-held company and wholly owned subsidiary of Meteor Holding Corporation, which will be owned by FP-Metrologic, LLC, an entity affiliated with Francisco Partners II, L.P., a private equity firm, Elliott Associates, L.P. and Elliott International, L.P., two of our current shareholders, and me.

As a result of the merger, Metrologic's shares will no longer be quoted on the NASDAQ Global Select Market.

A special committee of our board of directors unanimously approved the merger agreement and the transactions contemplated by the merger agreement and determined the merger to be advisable and fair to, and in the best interests of, our unaffiliated shareholders. The special committee consists entirely of directors who are not officers or employees of Metrologic and who will not have an economic interest in Metrologic following the merger. Our board of directors, acting upon the recommendation of the special committee, unanimously approved the merger agreement and the transactions contemplated by the merger agreement and determined the merger to be advisable and fair to, and in the best interests of, our unaffiliated shareholders. **The special committee and the board of directors both recommend that you vote "FOR" the approval of the merger agreement.**

In reaching their decisions, the special committee and the board of directors considered, among other things, an opinion dated September 11, 2006, of Needham & Company, LLC, the financial advisor to the special committee, to the effect that, as of that date, and based upon and subject to the assumptions and other matters set forth in the opinion, the merger consideration of $18.50 in cash per share to be received by holders of shares of Metrologic common stock, other than Elliott Associates, L.P., Elliott International, L.P. and me, pursuant to the merger agreement was fair to those holders from a financial point of view. Needham & Company, LLC, did not cover Elliott Associates, L.P., Elliott International, L.P. and me in its opinion because we are contributing shares of our Metrologic common stock to Meteor Holding

Corporation prior to the consummation of the merger in exchange for shares of capital stock of Meteor Holding Corporation.

The proxy statement accompanying this letter provides you with information about the proposed merger and the special meeting. We encourage you to read the entire proxy statement carefully, including the merger agreement and the other documents annexed to the proxy statement. You may also obtain more information about Metrologic from documents we have filed with the Securities and Exchange Commission.

Your vote is very important. The merger cannot be completed unless the merger agreement is approved by the affirmative vote of a majority of the votes cast by the holders of Metrologic common stock present in person or represented by proxy at the special meeting and entitled to vote thereon.

**WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING, PLEASE SUBMIT A PROXY FOR YOUR SHARES. IF YOU RECEIVE MORE THAN ONE PROXY CARD BECAUSE YOU OWN SHARES THAT ARE REGISTERED DIFFERENTLY, PLEASE PROVIDE VOTING INSTRUCTIONS FOR ALL OF YOUR SHARES SHOWN ON ALL OF YOUR PROXY CARDS.**

Submitting a proxy will not prevent you from voting your shares in person if you subsequently choose to attend the special meeting.

Thank you for your cooperation and continued support.

Sincerely,

C. Harry Knowles
*Chairman and*
*Interim Chief Executive Officer*

**Neither the Securities and Exchange Commission nor any state securities regulatory agency has approved or disapproved of the merger, passed upon the merits or fairness of the merger or the merger agreement or passed upon the adequacy or accuracy of the information contained in the accompanying proxy statement. Any representation to the contrary is a criminal offense.**

The accompanying proxy statement is dated November 28, 2006 and is first being mailed to shareholders on or about November 30, 2006.

2



**METROLOGIC INSTRUMENTS, INC.**
90 Coles Road
Blackwood, New Jersey 08012
**856-228-8100**
**NOTICE OF SPECIAL MEETING OF SHAREHOLDERS**
**To be Held on December 20, 2006**

To Our Shareholders:

Notice is hereby given that a special meeting of shareholders of Metrologic Instruments, Inc., a New Jersey corporation ("Metrologic"), will be held on Wednesday, December 20, 2006, beginning at 10:00 a.m, local time, at Metrologic's principal executive offices at 90 Coles Road, Blackwood, New Jersey 08012, for the following purposes:

1. To consider and vote on a proposal to approve the agreement and plan of merger, by and between Meteor Holding Corporation, Meteor Merger Corporation and Metrologic, dated as of September 12, 2006 (the "merger agreement"), pursuant to which, upon the merger becoming effective, each share of common stock, par value $0.01 per share, of Metrologic will be converted into the right to receive $18.50 in cash, without interest, other than shares held by Metrologic as treasury stock or owned by Meteor Holding Corporation or any wholly owned subsidiary of Meteor Holding Corporation or Metrologic, which will be cancelled;

2. To approve the adjournment of the special meeting, if necessary, to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement; and

3. To act upon such other business as may properly come before the special meeting or any adjournment of the special meeting.

Only holders of Metrologic's common stock at the close of business on November 20, 2006 are entitled to notice of and to vote at the special meeting and any adjournment thereof.

You are cordially invited to attend the special meeting in person.

Your vote is important, regardless of the number of shares of Metrologic's common stock that you own. The approval of the merger agreement requires the affirmative vote of a majority of the votes cast by the holders of Metrologic common stock present in person or represented by proxy at the special meeting and entitled to vote thereon. The proposal to adjourn the special meeting, if necessary, to solicit additional proxies requires the affirmative vote of a majority of the votes cast by holders of Metrologic common stock present in person or represented by proxy and entitled to vote at the special meeting.

Even if you plan to attend the special meeting in person, please complete, sign, date and return the enclosed proxy card to ensure that your shares will be represented at the special meeting if you are unable to attend. If you sign, date and mail your proxy card without indicating how you wish to vote, your vote will be counted as a vote in favor of the approval of the merger agreement, in favor of the proposal to adjourn the special meeting, if necessary, to solicit additional proxies, and in accordance with the judgment of the named proxies on any other matters properly brought before the special meeting for a vote. If you fail to return your proxy card, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the special meeting and will not affect the outcome of the vote regarding the approval of the merger agreement or the vote regarding the adjournment of the special meeting, if necessary, to solicit additional proxies. If you are a shareholder of record and do attend the special meeting, you may vote in person.

By Order of the Board of Directors,

Janet H. Knowles
*Corporate Secretary*
Blackwood, New Jersey
November 28, 2006

# TABLE OF CONTENTS

|  | Page |
|---|---|
| SUMMARY TERM SHEET | 1 |
| The Merger and Related Matters | 1 |
| The Special Meeting and Related Matters | 6 |
| QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING | 9 |
| CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION | 13 |
| SPECIAL FACTORS | 14 |
| Background of the Merger | 14 |
| Recommendations of the Special Committee and the Board of Directors | 25 |
| Reasons for the Special Committee's Recommendation | 26 |
| Reasons for the Board's Recommendation | 30 |
| Opinion of Needham & Company, LLC | 30 |
| Position of C. Harry Knowles as to Fairness | 37 |
| Position of Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, LP, as to Fairness | 37 |
| Position of the Elliott Entities as to Fairness | 38 |
| Purposes, Reasons and Plans for Metrologic After the Merger | 39 |
| Certain Effects of the Merger | 40 |
| Effects on the Company if the Merger is Not Completed | 42 |
| Financing of the Merger | 43 |
| Interests of Certain Persons in the Merger | 47 |
| Material U.S. Federal Income Tax Consequences | 53 |
| Accounting Treatment | 55 |
| Regulatory Approvals | 55 |
| Fees and Expenses of the Merger | 56 |
| Litigation Related to the Merger | 56 |
| Certain Financial Projections | 57 |
| Provisions for Unaffiliated Shareholders | 59 |
| THE PARTIES TO THE MERGER | 60 |
| Metrologic Instruments, Inc. | 60 |
| Meteor Holding Corporation | 60 |
| Meteor Merger Corporation | 60 |
| CURRENT EXECUTIVE OFFICERS AND DIRECTORS OF THE COMPANY | 61 |
| THE SPECIAL MEETING | 64 |
| Time, Place and Purpose of the Special Meeting | 64 |
| Record Date, Quorum and Voting Power | 64 |
| Required Vote | 64 |
| Voting by Directors and Executive Officers | 65 |
| Proxies; Revocation | 65 |
| Proxy Solicitation; Expenses of Proxy Solicitation | 66 |
| Adjournments | 66 |
| THE MERGER AGREEMENT (PROPOSAL NO. 1) | 67 |
| Effective Time | 67 |
| Structure | 67 |
| Treatment of Stock, Options and Warrants | 67 |
| Exchange and Payment Procedures | 68 |
| Certificate of Incorporation and Bylaws | 69 |
| Directors and Officers | 69 |

Representations and Warranties                                                                    69
Conduct of Our Business Pending the Merger                                                        71
Financing                                                                                         74
No Solicitation of Transactions                                                                   74
Indemnification                                                                                   77
Resignations                                                                                      77
Employee Benefits                                                                                 77
Agreement to Take Further Action and to Use Commercially Reasonable Efforts                       78
Conditions to Completion of the Merger                                                            78
Termination                                                                                       80
Fees and Expenses                                                                                 81
Material Adverse Effect                                                                           82
Amendment and Waiver                                                                              83
OTHER AGREEMENTS RELATING TO OUR SECURITIES                                                       84
Contribution and Voting Agreements                                                                84
Confidentiality and Standstill Agreement                                                          86
SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA                                                   87
MARKET PRICES OF THE COMPANY'S COMMON STOCK                                                       89
DIVIDEND POLICY                                                                                   89
TRANSACTIONS IN THE COMPANY'S STOCK                                                               89
PERSONS OWNING MORE THAN FIVE PERCENT OF STOCK                                                    91
SECURITY OWNERSHIP BY MANAGEMENT                                                                  93
ADJOURNMENT OF THE SPECIAL MEETING (PROPOSAL NO. 2)                                               95
SHAREHOLDER PROPOSALS                                                                             95
OTHER MATTERS                                                                                     95
WHERE YOU CAN FIND ADDITIONAL INFORMATION                                                         96

Annex A—Agreement and Plan of Merger
Annex B—Needham & Company, LLC Opinion
Annex C-1—Knowles Contribution and Voting Agreement
Annex C-2—Elliott Contribution and Voting Agreement
Annex D—Annual Report on Form 10-K for the year ended December 31, 2005
Annex E—Quarterly Report on Form 10-Q for the quarter ended September 30, 2006
Annex F—Current Report on Form 8-K/A filed on November 21, 2006
Annex G—Current Report on Form 8-K filed on November 21, 2006

ii

# SUMMARY TERM SHEET

The following summary term sheet briefly describes the material terms of the proposed merger. However, because it is a summary, it may not contain all of the information that may be important to you. Accordingly, we encourage you to read carefully this entire proxy statement, its annexes and the documents referred to in this proxy statement. In this proxy statement, the terms "Metrologic," the "Company," "we," "our," "ours," and "us" refer to Metrologic Instruments, Inc. and its subsidiaries, taken together.

## The Merger and Related Matters

- **The Merger.** You are being asked to vote to approve an agreement and plan of merger by and between Meteor Holding Corporation, Meteor Merger Corporation and Metrologic, which provides for the merger of Meteor Merger Corporation with and into Metrologic. Upon the completion of the merger, Metrologic will be the surviving corporation and a wholly owned subsidiary of Meteor Holding Corporation, and the separate existence of Meteor Merger Corporation will cease. We refer to the agreement and plan of merger in this proxy statement as the "merger agreement." See "The Merger Agreement (Proposal No. 1)" beginning on page 67. A copy of the merger agreement is attached as Annex A to this proxy statement.

- **Parties to the Merger.** Metrologic is a New Jersey corporation that was incorporated in New Jersey on May 19, 1969. Metrologic is an expert in optical image capture and processing solutions. Metrologic utilizes its expertise to design, manufacture and market sophisticated imaging and scanning solutions serving a variety of point-of-sale, commercial and industrial applications. Metrologic's solutions utilize a broad array of laser, holographic and vision-based technologies designed to provide superior functionality and a compelling value proposition for our customers.

  Meteor Holding Corporation is a Delaware corporation that was incorporated on September 1, 2006. As of the date of this proxy statement, FP-Metrologic, LLC, an entity affiliated with Francisco Partners II, L.P., a private equity firm, is the sole stockholder of Meteor Holding Corporation. References in this proxy statement to Francisco Partners shall mean Francisco Partners II, L.P. and its affiliated funds. At the time of the merger, Meteor Holding Corporation will be owned by entities and individuals we refer to as the Investor Group. The Investor Group will consist of:

  - FP-Metrologic, LLC, which we refer to as the Francisco Partners Investor;

  - C. Harry Knowles, our founder, Chairman of our board of directors and our interim Chief Executive Officer; and

  - Elliott Associates, L.P. and Elliott International, L.P., multi-strategy hedge funds under common management that are current shareholders of Metrologic, which we collectively refer to as the Elliott Investors.

  Meteor Merger Corporation is a New Jersey corporation that was incorporated on August 31, 2006. Meteor Holding Corporation is the sole shareholder of Meteor Merger Corporation.

  Neither Meteor Holding Corporation nor Meteor Merger Corporation have participated in any activities to date other than activities incident to their formation and the transactions contemplated by the merger agreement.

  See "The Parties to the Merger" beginning on page 60.

- **Rollover Investors.** C. Harry Knowles and the Elliott Investors, who we collectively refer to as the Rollover Investors, have agreed, severally and not jointly, to contribute a portion of the shares of Metrologic common stock held by them to Meteor Holding Corporation immediately prior to the completion of the merger in exchange for shares of junior preferred stock and common stock of Meteor Holding Corporation. The number of shares of junior preferred stock and common stock that will be issued in exchange for the shares of Metrologic common stock contributed to Meteor Holding Corporation by the Rollover Investors will be equal to the aggregate value of the shares of

Metrologic common stock they contribute to Meteor Holding Corporation, based on the $18.50 per share merger price, divided by the price per share being paid by the Francisco Partners Investor for shares of junior preferred stock and common stock of Meteor Holding Corporation in connection with the financing of the merger. As a result of these contributions, immediately following the closing, Mr. Knowles will own 15% of the junior preferred stock and 15% of the common stock of Meteor Holding Corporation and the Elliott Investors will collectively own approximately 16.3% of the junior preferred stock and approximately 16.3% of the common stock of Meteor Holding Corporation. The shares of our common stock contributed by Mr. Knowles and the Elliott Investors will be cancelled and cease to exist at the effective time of the merger and no payment of the merger consideration shall be made in respect of those shares. See "Special Factors—Financing of the Merger" beginning on page 43, "Special Factors—Interests of Certain Persons in the Merger" beginning on page 47 and "Other Agreements Relating to our Securities—Contribution and Voting Agreements" beginning on page 84.

- **Payment for Common Stock.**  If the merger is completed, each share of Metrologic common stock issued and outstanding at the effective time of the merger will be converted into the right to receive $18.50 in cash, without interest, other than shares held by us as treasury stock or owned by Meteor Holding Corporation or any wholly owned subsidiary of Meteor Holding Corporation or Metrologic, which will be cancelled. See "The Merger Agreement (Proposal No. 1)—Treatment of Stock, Options and Warrants" beginning on page 67.

- **Treatment of Options.**  In connection with the merger, holders of stock options granted under our 2004 Equity Incentive Plan with an exercise price that is less than $18.50 per share will receive cash, without interest, in an amount equal to the product of (1) the total number of shares of Metrologic common stock subject to the option multiplied by (2) the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option, less any applicable taxes. Each holder of stock options granted under our 2004 Equity Incentive Plan with an exercise price that is greater than or equal to $18.50 per share will receive $1.00 per award. Metrologic commenced an offer, pursuant to a Schedule TO filed on November 21, 2006, to holders of options granted under our 1994 Incentive Plan to cancel all of their options in exchange for a cash payment, without interest, equal to the product of (1) the total number of shares of Metrologic common stock subject to the option multiplied by (2) the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option, less any applicable taxes. All of the options held by employees who will be eligible to participate in the offer have exercise prices that are less than $18.50 per share. See "The Merger Agreement (Proposal No. 1)—Treatment of Stock, Options and Warrants" beginning on page 67.

- **Treatment of Warrants.**  In connection with the merger, each warrant exercisable for Metrologic common stock will become exercisable for an amount of cash per share of Metrologic common stock issuable upon exercise of the warrant, without interest, equal to $18.50. See "The Merger Agreement (Proposal No. 1)—Treatment of Stock, Options and Warrants" beginning on page 67.

- **Employee Stock Purchase Plan.**  Holders of shares previously issued under the Company's Employee Stock Purchase Plan will be eligible to receive $18.50 per share in the merger. No further deductions will be made from employee paychecks in connection with the Employee Stock Purchase Plan and any contributions made during the third quarter of 2006 will be refunded. See "The Merger Agreement (Proposal No. 1)—Employee Benefits" beginning on page 77.

- **Purposes of the Merger.**  The purpose of the merger for Metrologic is to enable Metrologic's shareholders (other than the Rollover Investors to the extent of their contributions to Meteor Holding Corporation) to immediately realize the value of their investment in Metrologic through their receipt of the per share merger price of $18.50 in cash, without interest. For Meteor Holding

2

Corporation, the Francisco Partners Investor, Francisco Partners II, L.P., the Elliott Investors and Elliott International Capital Advisors, Inc., the investment manager for Elliott International, L.P., the primary purpose of the merger is to benefit from any future earnings and growth of Metrologic after Metrologic's common stock ceases to be publicly traded. The principal purpose of the merger for Mr. Knowles as it relates to him in his individual capacity is to enable him to realize the value of a substantial majority of his investment. A secondary purpose of the merger for Mr. Knowles as it relates to him in his individual capacity is to allow him, through his commitment to make an equity investment in Meteor Holding Corporation, to benefit from any future earnings and growth of Metrologic after its stock ceases to be publicly traded. See "Special Factors—Purposes, Reasons and Plans for Metrologic After the Merger" beginning on page 39.

- **Effect of the Merger on Metrologic.** If the merger is completed, Metrologic will continue its operations as a privately-held company owned by Meteor Holding Corporation, which in turn will be owned by the Investor Group. As a result of the merger, current shareholders of Metrologic, other than the Rollover Investors, will cease to have any direct or indirect interest in Metrologic and will not be able to participate in any future earnings or growth of Metrologic. After the merger, Metrologic's shares will no longer be quoted on The NASDAQ Global Select Market. In addition, the registration of Metrologic common stock under the Securities Exchange Act of 1934 will be terminated. As a result, Metrologic will no longer be required to file periodic or other reports with the Securities and Exchange Commission with respect to its common stock or to deliver proxy statements or information statements in connection with shareholders' meetings. In addition, this termination will result in Metrologic no longer being subject to the provisions of the Sarbanes-Oxley Act of 2002 or the liability provisions of the Securities Exchange Act of 1934 immediately following the merger and officers of Metrologic will no longer be required to publicly certify the accuracy and completeness of the financial statements and other information relating to Metrologic. See "Special Factors—Certain Effects of the Merger" beginning on page 40.

- **Special Committee.** Because certain members of our board of directors and management will have interests in Metrologic following the merger, our board of directors formed a special committee, consisting entirely of directors who are not officers or employees of Metrologic and who will not have an economic interest in Metrologic following the merger. The scope of the special committee's authority was to explore and evaluate the possibility of a going private transaction and to provide to the board of directors the results of its evaluations and recommendations with respect thereto. The special committee had the authority to advise the board of directors that the transaction was or was not in our best interest, although it was in the board of directors' discretion to ultimately accept or reject a transaction. In addition, at the time the special committee was appointed, it specifically received the right to request that the board of directors broaden its powers to encompass the ability to solicit additional acquirors should that have been deemed appropriate. No limitations were placed on the authority of the special committee to act on behalf of our unaffiliated shareholders. The special committee was charged with representing the interests of our unaffiliated shareholders and was actively involved in extended and numerous deliberations and negotiations regarding the merger on behalf of the unaffiliated shareholders. In this capacity, the special committee retained and received advice from Needham & Company, LLC, as financial advisor, and Ballard Spahr Andrews & Ingersoll, LLP, as legal advisor. The members of the special committee acted solely on behalf of the unaffiliated shareholders and did not retain an unaffiliated representative to act solely on behalf of the unaffiliated shareholders for purposes of negotiating the terms of the merger or to prepare a report concerning the fairness of the transaction. The members of the special committee were John Mathias, who acted as Chairman, Richard Close, Stanton Meltzer and William Rulon-Miller, all of whom were independent directors. The special committee members received remuneration for their service on the committee, including a retainer of $40,000 for the chairman and $35,000 for each other member of the special committee, $1,500 for each committee meeting,

3

which is our standard committee fee, $1,500 for any day where a substantial portion of the day was spent on committee-related tasks and reimbursement of reasonable fees and expenses. The special committee members did not receive any incentive fee for approving the transaction. To date, the following amounts have been earned by the special committee members for their service on the special committee: Mr. Mathias $61,500; Mr. Close $56,500; Mr. Meltzer $56,500; and Mr. Rulon-Miller $55,000. See "Special Factors—Background of Merger" beginning on page 14 and "Special Factors—Reasons for the Special Committee's Recommendation" beginning on page 26.

- **Special Committee Recommendation.**  The special committee unanimously recommends that Metrologic's shareholders vote "FOR" the approval of the merger agreement. See "Special Factors—Recommendations of the Special Committee and the Board of Directors" beginning on page 25.

- **Board of Directors Recommendation.**  Our board of directors unanimously recommends that Metrologic's shareholders vote "FOR" the approval of the merger agreement. See "Special Factors—Recommendations of the Special Committee and the Board of Directors" beginning on page 25.

- **Opinion of Financial Advisor.**  The special committee received an opinion on September 11, 2006, from Needham & Company, LLC, the financial advisor to the special committee, or Needham & Company, to the effect that, as of that date and based upon and subject to the assumptions and other matters set forth in its opinion, the merger consideration of $18.50 in cash per share to be received by holders of our common stock (other than the Rollover Investors) pursuant to the merger agreement was fair to those holders from a financial point of view. Metrologic has agreed to pay Needham & Company a maximum fee for its services of $1 million, none of which is contingent on the consummation of the merger. See "Special Factors—Opinion of Needham & Company, LLC" beginning on page 30. A copy of Needham & Company's opinion is attached as Annex B to this proxy statement.

- **Interests of Certain Persons in the Merger.**  In considering the proposed transactions, you should be aware that some Metrologic shareholders, directors, officers and employees have interests in the merger that may be different from, or in addition to, your interests as a Metrologic shareholder generally, including the following:

  - following completion of the merger, the Elliott Investors (acting together) and C. Harry Knowles will each be entitled to designate one  member to the board of Meteor Holding Corporation;

  - Meteor Holding Corporation and the members of the Investor Group will enter into a stockholders agreement in connection with the completion of the merger, which will provide Mr. Knowles and the Elliott Investors with certain rights, including rights to participate in future sales of shares of Meteor Holding Corporation by the Francisco Partners Investor and future issuances of shares by Meteor Holding Corporation and to require Meteor Holding Corporation to register shares held by Mr. Knowles and the Elliott Investors, as well as subject them to certain restrictions, including limitations on transfers of Meteor Holding Corporation stock;

  - C. Harry Knowles will serve as the initial Chief Executive Officer of Meteor Holding Corporation and will enter into an employment agreement;

  - certain of our current executive officers and members of management are expected to continue in their current positions after the merger, and to receive grants of stock options and participate in a cash retention program after completion of the merger; and

4

- current and former directors and officers of Metrologic will be entitled to continued indemnification and directors' and officers' liability insurance.

In addition, certain fees will be payable to parties in connection with, and following, the merger:

- Francisco Partners Management, LLC will enter into an advisory agreement with Meteor Holding Corporation in connection with the consummation of the merger pursuant to which Meteor Holding Corporation will agree to pay Francisco Partners Management, LLC a $12.0 million fee upon the successful consummation of the merger, and a quarterly fee equal to the greater of (i) $375,000 or (ii) 0.1625% of the consolidated revenue of Meteor Holding Corporation and its subsidiaries for the last twelve months preceding the quarterly payment, as consideration for ongoing advisory services to be provided to Meteor Holding Corporation following the consummation of the merger;

- each of Mr. Knowles and Elliott Associates, L.P. or its assignees will be entitled to receive a portion of the quarterly advisory fee paid to Francisco Partners Management, LLC or its assignee as described in the immediately preceding bullet point, and similar advisory and transaction fees, in each case based on their respective percentage ownership of Meteor Holding Corporation relative to the aggregate ownership of the Investor Group; and

- Elliott Associates, L.P. or its assignees will be entitled to receive a portion of the $12.0 million fee payable to Francisco Partners Management, LLC, in the event the merger is consummated, or a portion of the $18.25 million termination fee payable to Meteor Holding Corporation if the merger agreement is terminated under certain circumstances, in each case based on the ownership interest (or potential ownership interest had the merger been consummated, in the case of the termination fee), of the Elliott Investors in Meteor Holding Corporation relative to the aggregate ownership of the Elliott Investors and the Francisco Partners Investor.

Each of our directors and executive officers also will be entitled to receive the same consideration for their shares of common stock, options to acquire common stock and warrants to purchase common stock as our unaffiliated shareholders and optionholders.

See "Special Factors—Interests of Certain Persons in the Merger" beginning on page 47.

- **Financing of the Merger.**  Meteor Holding Corporation estimates that an aggregate of approximately $398.5 million will be required to pay the merger consideration of approximately $370.7 million and related fees and expenses. Meteor Holding Corporation expects this amount, together with the related working capital requirements of Metrologic following the completion of the merger, will be provided through a combination of the proceeds of the following:

- an aggregate cash equity investment by the Francisco Partners Investor of not less than $128.0 million;

- approximately $60.6 million in rollover equity financing from the Rollover Investors;

- a new $160.0 million senior secured first loan facility, consisting of a $125.0 million term loan facility and a $35.0 million revolving credit facility;

- a new $75.0 million senior secured second lien loan facility; and

- cash and fully liquid cash equivalents held by Metrologic.

See "Special Factors—Financing of the Merger" beginning on page 43.

- **Other Offers.**  The merger agreement restricts Metrologic's ability to, among other things, solicit or engage in discussions or negotiations with a third party regarding specified transactions involving Metrologic. However, under specified circumstances, the board of directors of Metrologic may

5

respond to unsolicited acquisition proposals and may terminate the merger agreement if Metrologic desires to accept an unsolicited superior proposal, as defined in the merger agreement, subject to the prior or concurrent payment of an $18.25 million termination fee to Meteor Holding Corporation or its designee. In the event that the merger agreement is terminated under certain circumstances, Mr. Knowles, Mrs. Knowles, family trusts for the benefit of the Knowles' children and charitable entities controlled by the Knowles agreed, with respect to shares of our common stock owned by Mr. Knowles and his related parties amounting to 35% of the total outstanding shares, to vote such shares against any alternative proposal to acquire us and to be subject to certain restrictions on transfer of such shares, in each case for a period of up to 10 months. In addition, in the event that the Elliot Investors fail to vote the shares of our common stock that they beneficially own against an alternative proposal to acquire Metrologic during the three-month period after the termination of the merger agreement, under certain circumstances the right of Elliott Associates, L.P. to receive a portion of any termination fee received by Meteor Holding Corporation in the merger, as described more fully elsewhere in this proxy statement, will be forfeited in whole or in part. See "Special Factors—Interests of Certain Persons in the Merger" beginning on page 47, "The Merger Agreement (Proposal No. 1)—No Solicitation of Transactions" beginning on page 74, "The Merger Agreement (Proposal No. 1)—Termination" beginning on page 80 and "Other Agreements—Contribution and Voting Agreements—Voting and Exclusivity" beginning on page 85.

- **Tax Consequences.** Generally, the consideration received in the merger will be taxable for U.S. federal income tax purposes. You will recognize taxable gain or loss in the amount of the difference between $18.50 and your adjusted tax basis for each share of Metrologic common stock that you own. However, special tax consequences may apply to the Rollover Investors who acquire an equity interest in Meteor Holding Corporation. See "Special Factors—Material U.S. Federal Income Tax Consequences" beginning on page 53.

- **Conditions.** The completion of the merger pursuant to the merger agreement is subject to (1) approval of the merger agreement by the affirmative vote of a majority of the votes cast by the holders of our common stock present in person or represented by proxy at the special meeting and entitled to vote thereon, (2) the receipt of debt financing by Meteor Holding Corporation, (3) the consummation of the contributions of Metrologic common stock by the Rollover Investors to Meteor Holding Corporation in exchange for shares of junior preferred stock and common stock of Meteor Holding Corporation and (4) specified other conditions. See "The Merger Agreement (Proposal No. 1)—Conditions to Completion of the Merger" beginning on page 78.

## The Special Meeting and Related Matters

- **Date, Time and Place.** The special meeting of Metrologic's shareholders will be held on Wednesday, December 20, 2006, beginning at 10:00 a.m., local time, at Metrologic's principal executive offices at 90 Coles Road, Blackwood, New Jersey 08012.

- **Record Date and Voting.** You are entitled to vote at the special meeting if you owned shares of Metrologic common stock at the close of business on November 20, 2006, the record date for the special meeting. Each outstanding share of our common stock on the record date entitles the holder to one vote on each matter submitted to shareholders for approval at the special meeting. As of the close of business on the record date, there were 22,859,491 shares of common stock of Metrologic outstanding and entitled to be voted at the special meeting. See "The Special Meeting—Record Date, Quorum and Voting Power" beginning on page 64.

- **Shareholder Vote Required to Approve the Merger Agreement.** For Metrologic to complete the merger, a majority of votes cast by holders of our common stock present in person or represented

6

by proxy at the special meeting and entitled to vote thereon must vote "FOR" the approval of the merger agreement. See "The Special Meeting—Required Vote" beginning on page 64.

- **Share Ownership of Directors and Executive Officers and Certain Shareholders.** As of October 31, 2006, the directors and executive officers of Metrologic hold and are entitled to vote, in the aggregate, 9,087,284 shares of our common stock, representing approximately 39.8% of the outstanding shares of our common stock as of that date. These shares include shares owned by Mr. Knowles, Mrs. Knowles and charitable entities controlled by the Knowles. As of October 31, 2006, Mr. Knowles and Mrs. Knowles collectively own and are entitled to vote 39.5% of the outstanding shares of our common stock, which includes shares owned by the Janet H. and C. Harry Knowles Foundation, Inc. (17.7%), the Knowles Charitable Foundation (2.8%), the C. Harry Knowles Charitable Remainder Annuity Trust No. 1 (2.8%), which are charitable entities controlled by Mr. and/or Mrs. Knowles, as well as shares owned by the C. Harry Knowles Grantor Retained Annuity Trust No. 1 (less than 1%). In addition, certain trusts for the benefit of family members of Mr. and Mrs. Knowles collectively own 376,214, or 1.6%, of our outstanding shares of common stock.

Pursuant to the terms of the contribution and voting agreement described elsewhere in this proxy statement, Mr. Knowles and his related parties, including the trusts for the benefit of family members of Mr. and Mrs. Knowles, have agreed to vote or consent, or cause to be voted or consented, all shares of our common stock that he or they own or control in favor of approving the merger agreement. In addition, the Elliott Investors, which collectively own 1,703,885 shares of our outstanding common stock as of October 31, 2006, representing approximately 7.5% of the outstanding common stock, also entered into a contribution and voting agreement with Meteor Holding Corporation pursuant to which they agreed to vote all of the shares that they beneficially own in favor of the merger agreement. Our other directors and executive officers have informed us that they intend to vote all of their shares of our common stock "FOR" the approval of the merger agreement. The approval of the merger agreement does not require the affirmative vote of a majority of the shares of common stock held by Metrologic's unaffiliated shareholders. If votes are cast with respect to all of our outstanding shares of common stock as of the record date, the approval of the merger agreement would require the affirmative vote of an additional 262,363 shares or 1.1% of our outstanding shares of common stock, other than those committed to vote in favor of the proposal pursuant to the contribution and voting agreements and those held by our directors and executive officers. See "The Special Meeting—Voting by Directors and Executive Officers" beginning on page 65. A copy of the contribution and voting agreements are attached as Annex C-1 and Annex C-2 to this proxy statement.

- **Appraisal or Dissenter's Rights.** Under New Jersey law, holders of Metrologic common stock are not entitled to appraisal or dissenter's rights in connection with the merger because Metrologic common stock is listed on the NASDAQ Global Select Market and because cash consideration is being paid for their shares in the merger.

- **Litigation Related to the Merger.** On September 13, 2006, an action, titled Savarese v. Close, et. al., was filed in the Superior Court of New Jersey Law Division: Camden County against Metrologic and all of the members of Metrologic's board of directors as defendants. On September 14, 2006, an action, titled Wilkenfeld v. Knowles, et. al., was filed in the Superior Court of New Jersey Chancery Division: Camden County against Metrologic and all members of Metrologic's board of directors as defendants and another action, titled Marcin v. Metrologic Instruments, Inc., et. al., was filed in the Superior Court of New Jersey Chancery Division: Gloucester County against Metrologic, all of the members of Metrologic's board of directors, Francisco Partners and Elliott Associates, L.P., as defendants. On September 15, 2006, an action, titled Gerber v. Metrologic Instruments, Inc., et. al., was filed in the Superior Court of New Jersey Law Division: Camden County against Metrologic, all

7

of the members of Metrologic's board of directors and Elliott Associates L.P., as defendants. On October 31, 2006, an amended class action complaint to the initial complaint, titled Wilkenfeld v. Knowles, et. al., was filed in the Superior Court of New Jersey Law Division: Camden County against Metrologic, all of the members of Metrologic's Board of Directors, Francisco Partners, II, LP, FP-Metrologic, LLC, Meteor Holding Corporation, Meteor Merger Corporation, Elliott Associates, LP, and Elliott International, LP.

The Savarese complaint alleges, among other things, that the merger consideration is inadequate, that certain defendants have timed and structured the transaction to allow themselves to capture the benefits of the Company's future potential without paying fair consideration to Metrologic's public shareholders, and that the directors breached their fiduciary duties by not making the requisite effort to obtain the best transaction available.

The original Wilkenfeld complaint alleged, among other things, that the defendants failed to maximize value on a change in control of Metrologic and that the merger consideration deprives plaintiffs of the true and full value of the shares, that the proposed merger is an attempt to engage in a self-dealing transaction and to deny the plaintiffs an opportunity to share in the future success of Metrologic and that the directors breached their fiduciary duties because the terms of the merger were determined without an adequate investigation of strategic alternatives.

The Marcin complaint alleges, among other things, that the shareholders have been denied a fair process and arm's length negotiated transaction, that the directors have structured a preferential deal to the detriment of the shareholders, thus denying the shareholders any participation in the future potential of Metrologic, and have failed to maximize shareholder value. The complaint further alleges that certain defendants have used their positions of power and control to engage in self-dealing and have breached their fiduciary duties of loyalty and good faith owed to the plaintiff. Finally, the complaint alleges that other defendants have knowingly participated in these breaches of fiduciary duties.

The Gerber complaint alleges, among other things, that the share price of Metrologic's stock had been artificially depressed since the removal of Mr. Benny Noens, the Company's former Chief Executive Officer and President, on April 20, 2006 and subsequent appointment of C. Harry Knowles as the interim Chief Executive Officer and President and that the board of directors has been slow in searching for a replacement. According to the complaint, these actions have created a management vacuum that resulted in a drop in the stock price and enabled certain defendants to engage in self dealing. The complaint further alleges that the merger agreement places an artificial lid on the stock price, allowing certain defendants to capture the benefits of Metrologic's future potential without paying fair consideration to Metrologic's public shareholders, and that the directors breached their fiduciary duties to the plaintiff.

The amended Wilkenfeld complaint generally alleges that the defendants breached their fiduciary duties in entering into the merger (and other defendants aided and abetted the alleged breaches) and further alleges, among other things, that the proxy statement filed on October 5, 2006 allegedly fails to disclose material information to the Company's shareholders in connection with the shareholder meeting which has yet to be scheduled. The amended Wilkenfeld complaint seeks class certification and certain forms of equitable relief, including enjoining the consummation of the merger, and damages.

The amended Wilkenfeld complaint certifies that a joint stipulation will be submitted to the court that will consolidate, coordinate and/or transfer three other pending actions relating to the same subject matter into the Wilkenfeld action. The parties have agreed to such stipulation, which provides for, among other things, expedited discovery and other pretrial proceedings.

See "Special Factors—Litigation Related to the Merger" beginning on page 56.

8

## QUESTIONS AND ANSWERS ABOUT THE MERGER AND THE SPECIAL MEETING

*Our board of directors is soliciting proxies for a special meeting of shareholders. The following questions and answers briefly address some commonly asked questions about the merger and the special meeting. They may not include all of the information that may be important to you. We urge you to read carefully this entire proxy statement, including the annexed documents and the other documents we refer to in this proxy statement.*

**Q:  What matters will I be asked to vote on at the special meeting?**

A:  You will be asked to vote on the following proposals:

- the approval of the merger agreement, which provides for the merger of Meteor Merger Corporation with and into Metrologic; and

- the approval of the adjournment of the special meeting, if necessary, to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement.

If the merger is completed, you will no longer own shares of Metrologic common stock.

**Q:  How do Metrologic's board of directors and the special committee recommend that I vote on the merger?**

A:  The special committee of our board of directors unanimously approved the merger agreement and the transactions contemplated by the merger agreement and determined the merger, on the terms and conditions set forth in the merger agreement, to be advisable and to be fair to and in the best interests of our unaffiliated shareholders. Our board of directors, acting upon the recommendation of the special committee, has unanimously approved the merger agreement and the transactions contemplated by the merger agreement and determined the merger, on the terms and conditions set forth in the merger agreement, to be advisable and fair to, and in the best interests of, our unaffiliated shareholders. **The special committee and the board of directors both recommend that you vote "FOR" the approval of the merger agreement.**

**Q:  Who can vote on the merger agreement?**

A:  Holders of our common stock at the close of business on November 20, 2006, the record date for the special meeting, may vote in person or by proxy on the merger agreement at the special meeting. Each outstanding share of our common stock on the record date entitles the holder to one vote on each matter submitted to shareholders for approval at the special meeting. As of the close of business on the record date, there were 22,859,491 shares of common stock of Metrologic entitled to be voted at the special meeting.

**Q:  When and where is the special meeting?**

A:  The special meeting will be held on Wednesday, December 20, 2006, beginning at 10:00 a.m., local time, at Metrologic's principal executive offices at 90 Coles Road, Blackwood, New Jersey 08012.

**Q:  What vote of shareholders is required to approve the merger agreement?**

A:  For Metrologic to complete the merger, a majority of the votes cast by the holders of our common stock present in person or represented by proxy at the special meeting and entitled to vote thereon must vote "FOR" the approval of the merger agreement.

**Q:** **What vote of shareholders is required for the proposal to adjourn the special meeting?**

**A:** The proposal to adjourn the special meeting, if necessary, to solicit additional proxies requires the affirmative vote of a majority of the votes cast by the holders of our common stock present in person or represented by proxy at the special meeting and entitled to vote at the special meeting.

**Q:** **What does it mean if I receive more than one proxy card?**

**A:** If you have shares of our common stock that are registered differently and are in more than one account, you will receive more than one proxy card. Please follow the directions for voting on each of the proxy cards you receive to ensure that all of your shares are voted.

**Q:** **How do I vote without attending the special meeting?**

**A:** If you hold shares in your name as the shareholder of record, then you received this proxy statement and a proxy card from us. If you hold shares in street name through a broker, bank or other nominee, then you received this proxy statement from the nominee, along with the nominee's form of proxy card which includes voting instructions. In either case, you may submit a proxy for your shares by mail without attending the special meeting. To submit a proxy by mail, mark, sign and date the proxy card and return it in the postage-paid envelope provided.

**Q:** **How do I vote in person at the special meeting?**

**A:** If you hold shares in your name as the shareholder of record, you may vote those shares in person at the special meeting by giving us a signed proxy card or ballot before voting is closed. If you want to do that, please bring proof of identification with you. Even if you plan to attend the special meeting, we recommend that you submit a proxy for your shares in advance as described above, so your vote will be counted even if you later decide not to attend.

If you hold shares in street name through a broker, bank or other nominee, you may vote those shares in person at the special meeting only if you obtain and bring with you a signed proxy from the necessary nominee giving you the right to vote the shares. To do this, you should contact your nominee.

**Q:** **Can I change my vote?**

**A:** After you submit a proxy for your shares, you may change your vote at any time before voting is closed at the special meeting. If you hold shares in your name as the shareholder of record, you should write to our Corporate Secretary at our principal offices, 90 Coles Road, Blackwood, New Jersey 08012, stating that you want to revoke your proxy and that you need another proxy card. If you attend the special meeting, you may vote by ballot as described above, which will cancel your previous vote. Your last vote before voting is closed at the special meeting is the vote that will be counted. If you hold your shares in street name through a broker, bank or other nominee, you should contact the nominee and ask for a new proxy card.

**Q:** **How are votes counted?**

**A:** For the proposal relating to the approval of the merger agreement, you may vote FOR, AGAINST or ABSTAIN. Abstentions will not count as votes cast on the proposal relating to approval of the merger agreement, but will count for the purpose of determining whether a quorum is present.

For the proposal to adjourn the special meeting, if necessary, to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement, you may vote FOR, AGAINST or ABSTAIN. Abstentions will not count as votes cast on the proposal to adjourn

10

the special meeting, if necessary, to solicit additional proxies, but will count for the purpose of determining whether a quorum is present.

If you sign your proxy card without indicating your vote, your shares will be voted "FOR" the approval of the merger agreement, "FOR" adjournment of the special meeting, if necessary, to solicit additional proxies, and in accordance with the recommendations of our board of directors on any other matters properly brought before the special meeting for a vote.

A broker non-vote generally occurs when a broker, bank or other nominee holding shares on your behalf does not vote on a proposal because the nominee has not received your voting instructions and lacks discretionary power to vote the shares. Broker non-votes will not count as votes cast on a proposal, but will count for the purpose of determining whether a quorum is present.

**Q: What happens if I do not respond?**

A: Any failure to respond by timely returning your proxy card will not count as a vote cast on the proposal to approve the merger agreement or the proposal to adjourn the special meeting, if necessary, to solicit additional proxies, unless you vote for either or both proposals in person at the special meeting. However, if your failure to respond causes your shares to be deemed to be a broker non-vote, your shares will count for determining whether a quorum is present for the special meeting to be held.

**Q: What is a quorum?**

A: A quorum of the holders of the outstanding shares of our common stock must be present for the special meeting to be held. A quorum is present if the holders of outstanding shares of our common stock entitled to cast a majority of the votes are present at the special meeting, either in person or represented by proxy. Abstentions and broker non-votes are counted as present for the purpose of determining whether a quorum is present.

**Q: If my shares are held in "street name" by my broker, will my broker vote my shares for me?**

A: Yes, but only if you provide instructions to your broker on how to vote. You should follow the directions provided by your broker regarding how to instruct your broker to vote your shares. Without those instructions, your shares will not be voted by your broker and your shares will be treated as broker non-votes.

**Q: Who will bear the cost of this solicitation?**

A: We will pay the cost of this solicitation, which will be made primarily by mail. Proxies also may be solicited in person, or by telephone, facsimile, Internet or similar means, by our directors, officers or employees without additional compensation. We will, on request, reimburse shareholders who are brokers, banks or other nominees for their reasonable expenses in sending proxy materials to the beneficial owners of the shares they hold of record.

**Q: When do you expect the merger to be completed?**

A: We are working to complete the merger as quickly as possible, and we anticipate that it will be completed in the fourth quarter of calendar year 2006. In order to complete the merger, we must obtain shareholder approval and the other closing conditions under the merger agreement must be satisfied or waived. See "The Merger Agreement (Proposal No. 1)—Conditions to Completion of the Merger" beginning on page 78 and "The Merger Agreement (Proposal No. 1)—Effective Time" beginning on page 67.

11

**Q:    How will I know whether the merger was approved?**

A:    We will report the results of the vote on the merger agreement in a press release and in an amendment to our Schedule 13E-3 filed with the Securities and Exchange Commission after the special meeting. You may obtain a copy of any document we file with the Securities and Exchange Commission from us, from the Securities and Exchange Commission or on the Internet. See "Where You Can Find Additional Information" on page 96.

**Q:    Should I send in my stock certificates now?**

A:    No. If the merger is completed, you will receive a letter of transmittal with instructions informing you how to send your stock certificates to the paying agent in order to receive the merger consideration. You should use the letter of transmittal to exchange Metrologic stock certificates for the merger consideration to which you are entitled as a result of the merger. If your shares are held in "street name" by your broker, you will receive instructions from your broker as to how to effect the surrender of your "street name" shares and receive cash for those shares. **DO NOT SEND ANY STOCK CERTIFICATES WITH YOUR PROXY.**

**Q:    Who can help answer my other questions?**

A:    The information provided above in the summary term sheet and in the "question and answer" format is for your convenience only and is merely a summary of the information contained in this proxy statement. You should carefully read this entire proxy statement, including the documents annexed to this proxy statement and the documents we refer to in this proxy statement. If you have more questions about the special meeting or the merger, you should contact Metrologic's Investor Relations Department at investor.relations@metrologic.com or 1-800-667-8400.

12

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION

This proxy statement, the annexes attached to this proxy statement and the documents to which we refer you in this proxy statement include "forward-looking statements" that reflect our current views as to future events and financial performance with respect to our operations. These statements can be identified by the fact that they do not relate strictly to historical or current facts. They use words such as "anticipate," "believe," "estimate," "expect," "intend," "plan," "seek" and other words and terms of similar meaning in conjunction with a discussion of future events and operating or financial performance.

These statements are subject to risks and uncertainties that could cause actual results to differ materially from those expressed or implied in the forward-looking statements. These factors include, but are not limited to;

- the occurrence of any event, change or other circumstances that could give rise to the termination of the merger agreement;

- the inability to complete the merger due to the failure to obtain shareholder approval or the failure to satisfy other conditions to the completion of the merger, including the receipt of required regulatory approvals;

- the failure to obtain the necessary debt financing set forth in a commitment letter received in connection with the merger;

- the failure of Metrologic to have the required amounts of cash and fully liquid cash equivalents to satisfy a condition to the closing of the merger;

- risks that the proposed transaction disrupts current plans and operations and the potential difficulties in employee retention as a result of the merger;

- the ability to recognize the benefits of the merger; and

- other risks that are set forth in the "Risk Factors," "Legal Proceedings" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections of and elsewhere in Metrologic's Securities and Exchange Commission filings.

Many of the factors that will determine the outcome of the subject matter of this proxy statement are beyond Metrologic's ability to control or predict. As a result of these risks and uncertainties, readers are cautioned not to place undue reliance on any forward-looking statements included herein or that may be made elsewhere from time to time by, or on behalf of, us.

Forward-looking statements speak only as of the date made. We undertake no obligation to update any forward-looking statements, including prior forward-looking statements, to reflect the events or circumstances arising after the date as of which they were made. Notwithstanding the foregoing, in the event of any material change in any of the information previously disclosed, we will (1) update such information through a supplement to this proxy statement and (2) amend the Transaction Statement on Schedule 13E-3 filed in connection with the merger, in each case, to the extent required by applicable law.

The safe harbor for forward-looking statements provided by the Private Securities Litigation Reform Act of 1995 does not apply to forward-looking statements made in connection with going private transactions such as the merger.

13

# SPECIAL FACTORS

## Background of the Merger

Over the last several years our board of directors and management have considered and discussed strategic alternatives for us, including potential business combinations and our sale to financial or strategic buyers.

In early 2004, our board of directors determined that it was in the best interest of our shareholders to consider a sale of the Company to a strategic buyer due to Mr. Knowles' expressed desire at that time to retire and our inability to identify a successor to run the Company following Mr. Knowles' retirement. Following that decision, on April 12, 2004, we hired UBS Securities LLC ("UBS") to serve as our financial advisor. As part of this engagement, UBS prepared a confidential memorandum and contacted potential strategic partners to assess their interest in us. Ultimately, only two companies expressed an interest in us, both at prices that our board of directors deemed to be inadequate at the time. As a result, we terminated all sale discussions and our engagement of UBS.

On August 9, 2005, C. Harry Knowles, our Chairman of the board of directors, informed the board of directors that he and his wife, Janet H. Knowles, also one of our directors, had concluded, in their individual capacities, that they wanted to dispose of all or a substantial portion of their shares of our common stock in an orderly manner. They advised the board of directors that they were willing to consider a variety of alternatives to accomplish this goal in a manner determined by the board of directors to be in our and the other shareholders' best interests and wanted to proceed expeditiously. In response to this decision of Mr. and Mrs. Knowles, our board of directors and management determined to pursue the sale of the Company to a financial or strategic buyer. Even though the 2004 attempt to sell the Company had been unsuccessful, the board and management believed that the marketplace would be more open to merger and acquisition transactions in our industry in mid-2005. The board of directors also considered various other alternatives to a sale of the Company to an outside third-party, including a management buy-out and a public offering of the shares owned and controlled by Mr. and Mrs. Knowles. A special committee of the board of directors comprised of four independent directors was formed to explore the alternatives available to us. The special committee had the duty and responsibility, in consultation with management and significant shareholders of the Company, including C. Harry Knowles to among other things, explore and evaluate the possibility of the Company being sold to a third party and negotiate on behalf of the Company the terms and conditions of any resulting transaction.

On August 12, 2005, the special committee met and decided to retain Ballard Spahr Andrews & Ingersoll, LLP ("Ballard Spahr") as its counsel. Prior to that time, Ballard Spahr had served as our regular outside counsel. At that meeting, a representative from Ballard Spahr led a discussion with the special committee members regarding their fiduciary duties in transactions of this nature. The special committee determined to contact UBS and to seek to negotiate an incentive payment arrangement with UBS designed to encourage consummating a transaction expeditiously. In addition, the special committee discussed the advantages of obtaining a fairness opinion from an independent investment bank whose compensation would not be tied to consummation of a transaction and decided to contact two investment banks to determine if they were independent and to interview them regarding a potential engagement.

On August 19, 2005, the special committee met with representatives from Ballard Spahr and decided to meet with UBS to discuss a number of issues related to the sale process and review the list of potential buyers UBS intended to contact.

On August 23, 2005, the special committee met with representatives from UBS and Ballard Spahr. The UBS representatives informed the special committee that they were currently updating the confidential information memorandum utilized in connection with the 2004 process to distribute to potential buyers who entered into confidentiality agreements. The UBS representatives then discussed a

14

list of approximately 80 potential buyers, both financial and strategic, that would be contacted and shared with the committee their view of the likelihood and level of interest from each party on the list.

Representatives of UBS worked with our management to update the confidential information memorandum, which was finalized on September 28, 2005. Prior to finalizing the confidential information memorandum, representatives of UBS contacted a number of potential buyers to ascertain their interest in a transaction with us.

On August 26, 2005, the special committee met to determine dates to meet with the potential independent investment banks regarding a possible engagement as financial advisor to the special committee and the delivery of a fairness opinion in connection with a potential transaction. Also present were representatives from Ballard Spahr.

On September 2, 2005, the special committee met and approved its charter. Also present were representatives from Ballard Spahr.

On September 6, 2005, we entered into an engagement letter with UBS to serve as our financial advisor in connection with exploring a possible sale of the Company, subject to the finalization of the terms of the incentive compensation that might be paid to UBS in connection with the engagement.

On September 9, 2005, the special committee met and discussed possible incentives for UBS. Also present were representatives from Ballard Spahr. The special committee also decided to meet with our management to review the financial forecasts that were prepared for the potential buyers and the assumptions underlying such forecasts.

On September 14, 2005, representatives of UBS began to initiate calls to potential buyers. From this point until the termination of the negotiations regarding a potential transaction, we entered into confidentiality agreements with approximately 26 parties who expressed an interest in a transaction with us.

On September 23, 2005, the special committee met with representatives of two independent investment banks to discuss their possible engagement to serve as financial advisor to the special committee and to render a fairness opinion on a potential transaction. Also present were representatives from Ballard Spahr.

On September 30, 2005, the special committee met with representatives from UBS to receive an update on UBS's progress. Also present were representatives from Ballard Spahr. Representatives of UBS advised the special committee that, to date, more than 70 potential buyers had been contacted and initial indications of interest based on preliminary due diligence being conducted by the 26 interested parties were due on October 20, 2005.

On October 3, 2005, the special committee met to discuss the attributes of the two independent investment banks it was considering. Also present were representatives from Ballard Spahr. The special committee decided to negotiate fee arrangements with both investment banks.

On October 5, 2005, Needham & Company was engaged by the special committee to serve as its independent financial advisor. The special committee believed that Needham & Company had significant expertise in advising technology companies and special committees and in rendering fairness opinions.

On that same date, UBS contacted Francisco Partners to determine whether it would be interested in evaluating a potential transaction with us. UBS provided Francisco Partners with a confidentiality agreement, which it subsequently executed, and preliminary due diligence materials.

On October 7, 2005, the special committee met and representatives from Needham & Company and Ballard Spahr were present. Based on discussions with UBS, Needham & Company informed the special

15

committee that seven potential buyers had signed confidentiality agreements and eleven others were being negotiated.

From the time the potential buyers signed confidentiality agreements and continuing through the termination of the process, the potential buyers conducted legal, financial and business due diligence on us.

On October 14, 2005, the special committee met to discuss the status of the process and representatives from Needham & Company and Ballard Spahr were present.

On October 21, 2005, the special committee met and representatives from Needham & Company and Ballard Spahr were present. The special committee discussed litigation that had been filed against us by one of our competitors and any potential impact it could have on the sale process. In that litigation, the competitor filed suit against us in the U.S. District Court in the Eastern District of Texas and before the International Trade Commission alleging patent infringement.

On October 27, 2005, our management engaged in a trial run of its presentation to potential buyers. Members of the special committee and representatives of UBS, Needham & Company and Ballard Spahr were present. After the presentation, representatives of UBS reported to those present that, as of that date, 25 confidential information memoranda had been sent out to potential buyers, each of whom had entered into confidentiality agreements.

On October 28, 2005, after its review of publicly available documents and preliminary due diligence materials provided by UBS, Francisco Partners provided UBS with a preliminary non-binding indication of interest at $20 per share, which was subject to the completion of detailed business, financial and accounting due diligence and other conditions.

On October 31, 2005, the special committee met and representatives from Needham & Company, UBS and Ballard Spahr were present. According to the UBS representatives, 94 potential buyers had been contacted, 26 confidential information memoranda had been distributed and two parties, one of which was Francisco Partners, had submitted initial indications of interest and would be continuing on to the next round of due diligence. The other party's indication of interest was at $20 to $21.50 per share.

On November 3, 2005, representatives of UBS contacted Francisco Partners to coordinate further due diligence and to schedule a meeting with our management. UBS also coordinated further due diligence and a management meeting with the other potential buyer.

On November 4, 2005, the special committee met and representatives from Needham & Company, UBS and Ballard Spahr were present. The UBS representatives informed the special committee that one additional potential buyer might submit an indication of interest. In addition, our valuation and the impact of the lawsuit that had been filed against us were discussed in broad terms.

On November 11, 2005, the special committee met and representatives from Needham & Company and Ballard Spahr were present. The special committee discussed the initial indications of interest it had received and decided to permit the third potential buyer to participate in the process provided it was informed that its indication was at the low end of the range as compared to the other two participants. The third potential buyer submitted an indication of interest at $19.75 to $20.50 per share. All of the indications of interest were subject to additional due diligence.

On November 15, 16 and 17, 2005, management presentations were held for the three potential buyers, including Francisco Partners. UBS informed the potential buyers that second round bids were due by December 15, 2005.

From November 15, 2005 through December 15, 2005, representatives of the three potential buyers, including Francisco Partners, and their respective advisors conducted preliminary business, financial and accounting due diligence, which included several due diligence calls with members of our management.

16

# DECLARATION OF
# SETH D. RIGRODSKY

## Part 4

On November 18, 2005, the special committee met and representatives from Needham & Company and Ballard Spahr were present. The next steps in the process were discussed, including refining the bids based on continuing due diligence and providing the potential buyers with a draft definitive merger agreement for their review and comment. The most material term in the draft merger agreement was that the transaction be structured as an all-cash acquisition.

On December 1, 2005, the special committee met and representatives from Needham & Company and Ballard Spahr were present. At that meeting Needham & Company reviewed the preliminary valuation models and financial analyses it would use to evaluate the indications of interest.

On December 9, 2005, the special committee met and representatives from Needham & Company and Ballard Spahr were present. One of the special committee members recounted a conversation earlier in the day with UBS where UBS had confirmed that all three potential buyers were still immersed in the due diligence process and that bids and a mark up of the agreement were still due on December 15, 2005.

On December 14, 2005, the special committee met and representatives from Needham & Company and Ballard Spahr were present. Discussions with UBS were recounted by representatives of Needham & Company, who noted that all three of the potential buyers, including Francisco Partners, had expressed concerns about valuation. One of the potential buyers had decided to drop out of the process, based on its due diligence on the Company and lack of interest in purchasing the Company, one indicated that it would need at least four more weeks for due diligence to be able to submit a second round bid but provided a preliminary verbal estimate of $18.50 to $19.25 per share and Francisco Partners provided a verbal indication of interest was $18.00 per share, which was less than the then current market price. On this date, the Company's common stock closed at $18.91 per share. The representatives from Needham & Company presented its preliminary financial analyses of the indications of interest and noted that the consideration in one indication of interest was at a price below the then current market price of our common stock. The Needham & Company representatives discussed with the special committee the advisability of entering into a transaction at a price below the then current market price of our common stock. In addition, it was unknown what impact, if any, the litigation filed by the competitor had on our stock price and the Needham & Company representatives advised the special committee that they were unaware of any rumors that may have impacted the stock price. The special committee concluded that it was inadvisable to enter into a transaction at an amount below the then current market price of our common stock.

On December 15, 2005, Francisco Partners submitted a written non-binding indication of interest of $18.00 per share to UBS, which was conditioned upon additional confirmatory due diligence and the joint development, with our management, of a revised operating and financial plan for the business.

On December 22, 2005, the special committee met and representatives from Ballard Spahr were present. Due to the failure of the sale process to produce a viable proposal to date, the special committee discussed other alternatives, including a recapitalization or the repurchase of the shares held by Mr. Knowles. The special committee decided to allow the sale process to continue while discussing other options internally in the event that a sale did not occur.

On January 10, 2006, the special committee met and representatives from Ballard Spahr were present. The special committee discussed the prospects of a potential transaction and determined to recommend to the board of directors that the sale process be halted since the process did not result in the receipt of any definitive offer or an indication of interest with respect to which the special committee, based in part on advice from Needham & Company, believed should be pursued.

On January 11, 2006, representatives of UBS contacted representatives of Francisco Partners and informed them that the indication of interest at $18.00 per share submitted by Francisco Partners was not acceptable to us, as it was both below our board of directors' expectations and the prevailing stock price at the time.

17

On January 13, 2006, the special committee met and Mr. and Mrs. Knowles, their legal counsel and representatives from Ballard Spahr were present. The special committee unanimously decided to terminate the UBS and Needham & Company engagements.

On January 18, 2006, the board of directors determined to end the sale process, based on the recommendation of the special committee and Mr. and Mrs. Knowles, in their individual capacities.

On January 22, 2006, the UBS engagement was terminated. On January 23, 2006, the Needham & Company engagement was terminated.

On June 15, 2006, at our annual shareholder meeting, Jesse A. Cohn from the Elliott Investors first approached Mr. Knowles and requested the opportunity to speak privately. At that time, Mr. Cohn suggested that Mr. Knowles consider pursuing a going-private transaction together with an appropriate equity sponsor and a contribution of the Elliott Investors' existing holdings in the company. Mr. Cohn explained that the Elliott Investors believed numerous reasons existed why it could be beneficial to consider taking us private, including Mr. Knowles' age, our trading discount to market, our long-term strategic vision, and the costs of being a public company. Mr. Cohn further stated that the Elliott Investors could assist us in finding an equity sponsor.

Following the annual shareholder meeting, Mr. Cohn contacted a representative of Deutsche Bank, whom Mr. Cohn knew from a prior transaction, to discuss potential equity sponsors for a transaction involving Metrologic. The Deutsche Bank representative suggested Francisco Partners as a possible sponsor. Deutsche Bank had an existing business relationship with Francisco Partners and had been approached by Francisco Partners to be a potential source of debt financing in connection with the indication of interest submitted by Francisco Partners in December 2005. Francisco Partners subsequently engaged Deutsche Bank as an advisor in connection with the merger.

On June 20, 2006, Mr. Knowles called Mr. Cohn and expressed a desire to learn more about what Mr. Cohn had expressed at the Annual Meeting. A meeting was arranged at the Elliott Investors' offices for Friday, June 23, 2006.

On June 23, 2006, representatives of Deutsche Bank coordinated an introductory conference call between Francisco Partners and Mr. Cohn. During the call, the participants discussed the possibility of exploring a transaction involving us.

After the Francisco call, Mr. Knowles, Mr. Cohn and Brian Miller of the Elliott Investors held a meeting in Elliott's offices. Mr. Miller provided to Mr. Knowles a description of Elliott's operations and history. Mr. Knowles expressed his personal interests in considering a possible sale of the Company.

On June 27, 2006, representatives of Francisco Partners and the Elliott Investors had a conference call. During the call, the representatives of the Elliott Investors and Francisco Partners further discussed the possibility of a potential transaction involving us. Subsequent to the call, Francisco Partners provided the Elliott Investors with additional information about Francisco Partners and a possible transaction involving us.

From June 29, 2006 through July 5, 2006, Mr. Cohn and Mr. Knowles spoke several times regarding the possibility of Mr. Knowles pursuing a going-private transaction with an appropriate equity sponsor and an equity contribution by the Elliott Investors.

On July 3, 2006, the Elliott Investors and an associated entity filed a Schedule 13D with the Securities and Exchange Commission reporting their aggregate ownership of our common stock as of such date.

On July 6, 2006, Mr. Cohn and Charles K. MacDonald of the Elliott Investors met with Mr. and Mrs. Knowles, in their individual capacities, at the Knowles' home. The parties discussed the benefits of our becoming a private company. Mr. Cohn introduced the idea of having Francisco Partners serve as the

18

equity sponsor for the transaction and explained some of Francisco Partners' history and expertise in the technology sector.

On July 11, 2006, our board of directors met at a regularly scheduled meeting and Mr. Knowles informed the board of directors of his discussion with Mr. Cohn and confirmed that no agreements, arrangements or understandings had been entered into with any parties in connection with any potential transaction. The board of directors authorized Mr. Knowles to continue the discussion, in his individual capacity, with the Elliott Investors and, if it were included, Francisco Partners, and also authorized a non-disclosure agreement between us and the Elliott Investors.

On July 12, 2006, we entered into a non-disclosure agreement with the Elliott Investors.

On July 13, 2006, Mr. Knowles, in his individual capacity, met with representatives from the Elliott Investors and representatives from Francisco Partners at the offices of Pepper Hamilton LLP ("Pepper Hamilton"), personal counsel to Mr. and Mrs. Knowles, to discuss preliminarily the potential requirements associated with his ongoing role and ownership if the Elliott Investors and Francisco Partners were to propose an acquisition of the Company. No agreements or understandings were reached on these matters, and Mr. Knowles was informed that there were no understandings or agreements between the Elliott Investors and Francisco Partners. The representatives of Francisco Partners indicated that they would need to update the due diligence review that had been conducted in 2005 before deciding whether to proceed with a potential transaction.

On July 19, 2006, the board of directors met and Mr. Knowles advised the board of directors of his July 13, 2006 meeting with the Elliott Investors and Francisco Partners. Mr. Knowles also informed the board of directors that he would be engaging Morgan Stanley and utilizing Pepper Hamilton as advisors with respect to his interests and those of his wife, Janet H. Knowles, and their related parties. The board of directors then adopted a resolution to form a special committee consisting of four independent directors and approved a charter for such special committee. The special committee had the duty and responsibility, in consultation with management and significant shareholders of the Company, including C. Harry Knowles, to, among other things, explore the possibility of the Company becoming a privately held company and negotiate on behalf of the Company the terms and conditions of any resulting transaction and present to the Board the results of the special committee's examinations and its recommendations with respect thereto. The special committee was given the authority to, among other things, engage its own advisors.

On July 20, 2006, the special committee met and determined to retain Ballard Spahr, our regular outside counsel, which had advised it in connection with the sale process during 2005. In addition, it discussed hiring a financial advisor to provide guidance and ultimately issue a fairness opinion, if needed. The special committee decided to approach Needham & Company, which had represented it in the 2005 process.

On July 24, 2006, the special committee met and representatives from Ballard Spahr were present. It was decided that, for efficiency, Needham & Company, the Elliott Investors and Francisco Partners would be permitted to simultaneously conduct their due diligence of us. On that same date, representatives of Francisco Partners and members of our management had a conference call to coordinate the due diligence review process, and scheduled a due diligence meeting at our headquarters to be held on August 1, 2006.

Beginning on July 24, 2006 and continuing through the announcement of the signing of the merger agreement, the Elliott Investors and Francisco Partners each conducted additional due diligence of us, including participating in meetings with various members of our senior management. During this same period, legal, tax and accounting advisors for Francisco Partners also conducted a due diligence review of us.

19

On August 1, 2006, representatives of Francisco Partners and the Elliott Investors met with Mr. Knowles and members of our management team at our headquarters for management presentations regarding our operations and strategy. Representatives of Needham & Company, Deutsche Bank and Morgan Stanley were also present at the meetings.

On August 4, 2006, the special committee formally engaged Needham & Company as its financial advisor.

On August 7, 2006, Mr. Knowles met, in his individual capacity, with another potential investor concerning the possibility of that investor acquiring us. At this meeting, the prospective investor informed Mr. Knowles that, based solely on the investor's review of publicly available information and without the benefit of a due diligence review of us, the investor estimated the value of our common stock at between $17.00 and $19.00 per share. Mr. Knowles subsequently informed the special committee about his discussions with the potential investor at this meeting. Based on the tentative and preliminary expression of interest from this investor at that meeting, the need for that investor to secure capital commitments from other parties in order to acquire us, and the  stage of our discussions with Francisco Partners, the special committee decided not to pursue further discussions with this potential investor.

On August 7, 2006, we had a conference call with representatives of Francisco Partners and its counsel, Wilson Sonsini Goodrich & Rosati, Professional Corporation ("WSGR"), to review existing patent infringement litigation involving us. Periodic calls and meetings regarding continuing patent due diligence occurred from this date through the signing of the merger agreement.

On August 9, 2006, members of our management held a conference call to review the historical and projected operating results of our product lines. Participants in the call included representatives of Francisco Partners, the Elliott Investors, Deutsche Bank, Morgan Stanley and Needham & Company.

On August 16, 2006, Mr. Knowles, in his individual capacity, along with his advisors Morgan Stanley and Pepper Hamilton, met again with representatives from the Elliott Investors and Francisco Partners, at which time the respective representatives of the Elliott Investors and Francisco Partners discussed with Mr. Knowles the results of their due diligence to date, as well as a potential transaction involving us. They also discussed the requirement that Mr. Knowles participate in a transaction through the rollover of a portion of his equity interests into the new privately held company that would result from a going-private transaction. While Mr. Knowles indicated that he would consider participating in such a transaction under acceptable terms and conditions if a transaction acceptable to the special committee and the board of directors were achieved, no agreement was reached regarding any party's participation in such a transaction. The representatives of Francisco Partners communicated that they would like to begin negotiations with the special committee and anticipated that they would be able to provide a price proposal in approximately two weeks, but that based on a preliminary review, they anticipated an initial all cash proposal of $18.00 per share. In determining to make its initial $18.00 offer, which was based on due diligence conducted to date, Francisco Partners considered numerous factors, including: the size of our market; our position in the market and potential growth opportunities; our recent financial results and financial forecasts; historical prices and trading levels of our common stock; the ability to obtain financing for an acquisition; our pending intellectual property litigation; and Mr. Knowles' age and the importance of developing a succession plan.  In addition to the price, Francisco Partners considered securing Mr. Knowles' participation in the transaction, including his agreement to vote in favor of the transaction and roll over his shares, and the ability to reach agreement on the terms of his ongoing relationship with Metrologic following the transaction, to be critical conditions to proceeding with a transaction. The Francisco Partners representatives indicated that, depending on the results of their due diligence review and negotiations with the special committee, a price of $18.50 might be possible.

20

On August 17, 2006, the special committee met and concluded that it would move forward with negotiations with Francisco Partners. It also gave us permission to send certain members of management to meet with Francisco Partners in Menlo Park, California. The special committee then discussed with representatives of Needham & Company the timing of the potential transaction. Later that day, the chairman of the special committee and representatives of Needham & Company and Ballard Spahr spoke with representatives of Francisco Partners on the timing of the potential transaction and the importance of having a binding proposal from Francisco Partners with few conditions. Francisco Partners and the special committee had both expressed an interest in entering into a definitive agreement quickly, with limited conditions to the consummation of the transaction. The representatives of Francisco Partners suggested to the special committee that they anticipated an all cash proposal of $18.00 per share, subject to continued due diligence and negotiation of an acceptable merger agreement. The chairman of the special committee and representatives of Francisco Partners agreed to have periodic telephone meetings to discuss progress and open items.

On August 18, 2006, the special committee met to review the discussion the day before with Francisco Partners. Also present were representatives from Ballard Spahr and Needham & Company. The Needham & Company representatives stated that they would begin preparing valuation models and financial analyses to evaluate the fairness, from a financial point of view, of a range of potential consideration. The special committee also briefly discussed with the Needham & Company representatives the financial factors it might consider in assessing the fairness of the proposal, including the proposed all cash consideration. The Needham & Company representatives noted that one significant factor was that we had completed a full market check seven months earlier involving almost 100 potential bidders without receiving any definitive bids or proposals.

On August 22, 2006, WSGR, counsel to Francisco Partners, sent an initial draft of the merger agreement to Ballard Spahr. From August 22, 2006 to September 12, 2006, the date of execution of the merger agreement, WSGR and Ballard Spahr negotiated the terms of the merger agreement through the exchange of written comments, revised document drafts and telephone conversations. Mr. Knowles did not participate in the negotiations regarding the terms of the merger.

On August 23, 2006, WSGR sent an initial draft of the contribution and voting agreement for Mr. Knowles and his related parties, along with a summary of stockholders agreement terms, to Pepper Hamilton. Pepper Hamilton responded with an initial set of comments to those documents on August 29, 2006. From that date until September 12, 2006, the terms of those agreements were negotiated through the exchange of written comments, revised document drafts and telephone conversations. Principal areas of negotiation between Francisco Partners and Mr. Knowles included the conditions to Mr. Knowles' obligation to roll over his shares; post-termination restrictions on the voting and transferability of the shares of Metrologic common stock held by Mr. Knowles, his affiliates and related parties; the relative governance rights of Mr. Knowles and Francisco Partners following the consummation of the merger, including whether Mr. Knowles would have veto rights with respect to certain actions; and post-merger liquidity of Mr. Knowles' shares of Meteor Holding Corporation capital stock, including the right of Mr. Knowles to put his shares back to Meteor Holding Corporation upon the occurrence of certain events.

On that same date, WSGR sent an initial draft of the contribution and voting agreement for the Elliott Investors and the stockholders agreement term sheet to their counsel, Paul Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"). Paul Weiss responded with an initial set of comments to those documents on August 25, 2006. From that date until September 12, 2006, the terms of those agreements were negotiated through the exchange of written comments, revised document drafts and telephone conversations. Principal areas of negotiation between Francisco Partners and the Elliott Investors included the conditions to the Elliott Investors' obligations to roll over their shares; the right of the Elliott Investors to share in certain fees payable to Francisco Partners in connection with and following the merger; the relative governance rights of the Elliott Investors and Francisco Partners following the

21

consummation of the merger, including whether the Elliott Investors would have veto rights with respect to certain actions; the drag-along and tag-along rights with respect to the shares of Meteor Holding Corporation capital stock; and post-merger liquidity of the Elliott Investors' shares of Meteor Holding Corporation capital stock.

Each of Mr. Knowles, on the one hand, and the Elliott Investors, on the other hand, negotiated the transaction agreements separately with Francisco Partners.

On August 23, 2006, the special committee met with representatives of Needham & Company for an informal preliminary valuation discussion. Also present were representatives from Ballard Spahr. Representatives of Needham & Company stated that, at that time, they believed that Needham & Company would be in a position, based on its analysis to date, to render an opinion as to the fairness, from a financial point of view, of consideration at $18.00 per share, but that this amount would be at the low end of the range of fairness. The Needham & Company representatives advised the special committee that their financial analyses assumed that Adaptive Optics Associates, Inc. ("AOA"), one of our subsidiaries, would be sold prior to closing.

On August 24, 2006, the special committee met to review a telephone conversation earlier in the day among representatives of Needham & Company, the chairman of the special committee and representatives of Francisco Partners. Representatives from Ballard Spahr were present at the meeting. The Francisco Partners' representatives indicated that they were still involved in due diligence and that WSGR had sent out a draft merger agreement to Ballard Spahr and a draft contribution and voting agreement for Mr. Knowles and his related parties to Pepper Hamilton. The Francisco Partners' representatives also indicated that they would need to negotiate a contribution and voting agreement with the Elliott Investors as well.

On August 24, 2006, we entered into a new non-disclosure agreement with Francisco Partners to permit Deloitte & Touche, Francisco Partners' accounting and tax diligence advisors, to perform additional due diligence.

On August 28, 2006, following distribution to its members of the draft merger agreement, the special committee met with representatives from Ballard Spahr and discussed the main provisions in the draft merger agreement, in addition to the mechanics of the proposed contribution and voting agreements and their impact on the merger agreement. The special committee stressed the importance that it have a meaningful termination right in the event that a more favorable acquisition proposal was made and that it be able to effectively exercise its fiduciary duties, especially in light of the voting obligations of Mr. Knowles and his related parties proposed by Francisco Partners in the draft contribution and voting agreement, as discussed below. In connection with the concerns raised at that meeting, Ballard Spahr negotiated, in addition to other terms, the right to terminate the merger agreement to accept a superior proposal. Also, the right to indemnification for our directors and officers was negotiated so that adequate directors' and officers' liability insurance would be provided for six years following the effective time of the merger.

On that same date, Mr. Knowles, by telephone, and Mark Schmidt and Joseph Sawitsky, members of our management, made a presentation to the investment committee of Francisco Partners at the offices of Francisco Partners. In addition, various sessions were held between members of our management and representatives of Francisco Partners, which included reviews of our sales, customers and distributors and our ongoing litigation.

On August 30, 2006, the special committee met to discuss our financial condition, and on August 31, 2006, the board of directors met to review our third and fourth quarter projected financial information. Also present at these meetings were representatives from Ballard Spahr.

22

On September 2, 2006, WSGR distributed the first draft of the stockholders agreement to Pepper Hamilton and Paul Weiss.

On September 4, 2006, the special committee met and discussed the mechanics of the proposed Knowles contribution and voting agreement and the potential impact it could have on the ability of the special committee to exercise its fiduciary duties. Representatives from Ballard Spahr were present at the meeting. In the original draft of the contribution and voting agreement, all shares owned by Mr. Knowles and his related parties, which amounted to approximately 41.5% of our then outstanding common stock, could not be transferred and would be required to be voted against any alternative proposal for one year following a termination of the merger agreement. The special committee expressed concern that it might not be able to effectively exercise its fiduciary duties and terminate the merger agreement for a superior proposal if such a substantial percentage of our common stock were locked up for such a long period of time. Following this discussion, Ballard Spahr contacted Mr. Knowles' counsel to discuss seeking the agreement of Francisco Partners' counsel to a decrease in the number of Mr. Knowles' shares that would be subject to certain exceptions following a termination of the merger agreement and in the length of the lock-up period. The committee members then further discussed the terms of the merger agreement, including the employee benefit provisions in the merger agreement. The parties negotiated such terms over the following days and ultimately, it was agreed that the shares held by Mr. Knowles and his related parties amounting to 35% of the total outstanding shares would be subject to voting and transfer restrictions for up to 10 months (subject to certain exceptions), rather than the entire 41.5% for one year. We were informed that the Elliott Investors' shares would not be locked up if the merger agreement was terminated. In addition, a reverse break-up fee was negotiated whereby if Francisco Partners terminated the merger agreement or was unable to close the transaction due to an inability to obtain financing, subject to certain exceptions, Meteor Holding Corporation would pay us a fee of $9,125,000.

On September 5, 2006, Francisco Partners indicated to us and the special committee that it had received formal approval from its partnership to move forward with the proposed merger at $18.00 per share. The $18.00 cash offer was submitted orally to the special committee. On that date, the special committee met with representatives from Ballard Spahr and Needham & Company to discuss the price.

On September 6, 2006, the special committee met to discuss the status of negotiations and next steps in the negotiation process with Francisco Partners. Also present were representatives from Ballard Spahr and Needham & Company. Needham & Company reviewed with the special committee its financial analyses, which had been updated to reflect the then current market data and valuation ranges. Needham & Company also advised the special committee that their analyses assumed that AOA would be sold prior to closing. Later on September 6, 2006, the special committee, after discussing the topic with Mr. Knowles, communicated to Francisco Partners his and the special committee's belief that the $18.00 price was too low and Francisco Partners stated that it would go back to the partnership to determine if it could increase the price.

On that same date, Mr. Knowles and a representative of Francisco Partners had a meeting at the offices of Pepper Hamilton. During the meeting, Mr. Knowles and the Francisco Partners representative discussed the business and operations of Metrologic. Later that day another meeting was held at the offices of Pepper Hamilton. Representatives of Francisco Partners and a representative of the Elliott Investors were present, along with representatives of Morgan Stanley and Pepper Hamilton. During this meeting, the parties discussed the potential terms of the rollover participation and negotiated the potential terms of Mr. Knowles' employment arrangements following the transaction, including the provision of health insurance to Mr. and Mrs. Knowles after termination of his employment, as well as the potential terms of a put agreement that would allow Mr. Knowles to cause Meteor Holding Corporation to repurchase his shares of Metrologic stock following the merger under various circumstances.

23

On September 7, 2006, members of the special committee met with representatives of Francisco Partners. The special committee members again advised the Francisco Partners' representatives that the proposed $18.00 per share price was inadequate. After discussion and negotiation, the Francisco Partners' representatives offered $18.50 per share. The representatives from Francisco Partners also advised the special committee members that they would not increase the offer beyond $18.50 per share and that it must be acted upon promptly. Also on September 7, WSGR and Ballard Spahr negotiated the provisions of the merger agreement dealing with the impact of the sale of AOA on the transaction, including the expected cash balance we would have as of the effective time of the merger in the event the AOA sale was consummated. In addition, the level of indemnification that we would need to provide to the buyer of AOA and the length of its survival in connection with the AOA sale transaction was negotiated. In the event the AOA sale was not consummated, Francisco Partners also indicated its willingness to complete the merger with us.

On September 7, 2006, the special committee met and discussed the new proposed price of $18.50 per share. Also present were representatives from Needham & Company and Ballard Spahr. The recent increase in the market price of our stock was discussed and the special committee expressed the belief that there had not been any change in our business or prospects and that the stock price increase was likely the result of market speculation about a potential transaction. Representatives of Needham & Company discussed with the special committee their preliminary analyses indicating that they would be in a position to render an opinion as to the fairness, from a financial point of view, of the proposed consideration. A representative from Ballard Spahr reviewed with the special committee its fiduciary obligations in transactions of this nature. The special committee discussed the steps that had been taken to assess the consideration, including efforts previously undertaken to explore alternative transactions, the rights negotiated by the special committee to terminate the proposed transaction with Francisco Partners to accept an alternative superior transaction under certain circumstances, the reverse break-up fee, and the efforts of the board of directors and the special committee to be informed and to analyze the fairness of the consideration to be received by our unaffiliated shareholders. The special committee resolved that, assuming the merger agreement was negotiated as discussed, the schedules to the merger agreement were finalized and Needham & Company delivered its fairness opinion, the proposed transaction was fair to and in the best interest of our unaffiliated shareholders and it would recommend the transaction to the board of directors. Needham & Company also noted that a full and complete market check had been completed within the past eight months, and noted our ability to terminate the merger agreement to accept a superior proposal. The special committee also discussed with Needham & Company that the price offered was in the best interests of shareholders at the time and that if we did not accept the proposal at the time, and instead sought to check the market, it was likely that Francisco Partners would abandon the transaction.

On that same date, Mr. Knowles and representatives of Francisco Partners met at the offices of Pepper Hamilton. During this meeting, the parties discussed the general status of the transaction and continued negotiations regarding certain matters, including the put agreement.

On September 8, 2006, WSGR distributed initial drafts of agreements relating to fee-sharing arrangements between Francisco Partners and the Elliott Investors to Paul Weiss. The parties negotiated the terms of those agreements through September 12, 2006. See "Special Factors—Interests of Certain Persons in the Merger—Elliott Interests—Fee Arrangements."

On September 9, 2006, WSGR distributed an initial draft of an agreement relating to fee-sharing arrangements between Francisco Partners and Mr. Knowles, and an initial draft of the put agreement between Meteor Holding Corporation and Mr. Knowles, to Pepper Hamilton. The parties negotiated the terms of those agreements through September 12, 2006. See "Special Factors—Interests of Certain Persons in the Merger—Knowles Interests—Equity Rollover; Put Right" and "—Advisory Fee Arrangements."

24

On September 11, 2006, the board of directors met. Also present were representatives from Needham & Company and Ballard Spahr. A representative from Ballard Spahr reviewed with the board its fiduciary obligations in transactions of this nature. The board of directors then discussed a number of factors, including: its fiduciary duties, the merits of the proposed transaction with Francisco Partners, the risks and merits of not pursuing the transaction or not entering into the proposed transaction and the intention of Francisco Partners to not make any substantial changes in our operations, including allowing our principal location to remain the same. A representative from Ballard Spahr reviewed with the board of directors the main provisions of the merger agreement, as finally negotiated based on the last draft the board of directors had reviewed. The representatives from Needham & Company then discussed the financial analyses Needham & Company had prepared and distributed in connection with the meeting. They reviewed with the board of directors the work completed to assess the fairness, from a financial point of view, of the consideration to be received in the proposed transaction and the assumptions made in the course of its financial analyses. Needham & Company then rendered its opinion to the special committee and the board of directors, that, as of September 11, 2006, and based on and subject to the assumptions and other matters described in its written opinion, the consideration of $18.50 per share to be received by the holders of our common stock, other than the Rollover Investors, pursuant to the proposed transaction with Francisco Partners is fair from a financial point of view to those holders. The members of the special committee began by noting that their conditions from the September 7, 2006 meeting were met, so they recommended the transaction to the board of directors. The members of the board of directors accepted the financial analyses and conclusion of Needham & Company set forth in its opinion, and unanimously approved the terms of the merger agreement and the transactions contemplated by the merger agreement and determined the merger, on the terms and conditions set forth in the merger agreement, advisable and to be fair to and in the best interest of our unaffiliated shareholders. The members of the board of directors based their conclusions as to the fairness of the merger to our unaffiliated shareholders in part on the criteria, valuations, methodologies and conclusions that were employed by Needham & Company in rendering its opinion. Other factors that were considered by the special committee and the board of directors in reaching their conclusions as to the fairness of the merger are described in "Special Factors—Reasons for the Special Committee's Recommendation" and "Special Factors—Reasons for the Board of Directors' Recommendation." Mr. Knowles, who voted as a member of the board of directors in favor of the merger agreement, has interests in the merger agreement and the transactions contemplated by the merger agreement that are different from, and/or in addition to, the interests of Metrologic shareholders generally. See "Special Factors—Interests of Certain Persons in the Merger."

On September 12, 2006, we executed the merger agreement with the entities formed by Francisco Partners, Meteor Holding Corporation and Meteor Merger Corporation, and issued a press release announcing the merger. Concurrent with the execution of the merger agreement, Mr. Knowles, on the one hand, and the Elliott Investors, on the other, each separately entered into their respective contribution and voting agreements with Meteor Holdings Corporation and the fee sharing letters discussed under "Special Factors—Interests or Certain Persons in the Merger" and "Other Agreements Related To Our Securities—Contribution and Voting Agreements."

On September 12, 2006, at a regularly scheduled board of directors meeting, the board of directors determined to pay each member of the special committee a retainer of $35,000 and $40,000 for the Chairman, in addition to regular fees for meetings and out of pocket expenses.

**Recommendations of the Special Committee and the Board of Directors**

The special committee of our board of directors unanimously approved the merger agreement and the transactions contemplated by the merger agreement and determined the merger, on the terms and conditions set forth in the merger agreement, to be advisable and fair to and in the best interests of our unaffiliated shareholders. The special committee unanimously recommended that the board of directors approve and declare advisable the merger and the merger agreement, submit the merger agreement to our

25

shareholders and recommend that our shareholders approve the merger agreement. The special committee considered a number of factors, as more fully described above under "Special Factors—Background of the Merger" and below under "Special Factors—Reasons for the Special Committee's Recommendation," in determining to recommend that the board of directors and shareholders approve the merger agreement. **The special committee unanimously recommends that you vote "FOR" the approval of the merger agreement.**

Our board of directors, acting upon the recommendation of the special committee, has unanimously approved the merger agreement and the transactions contemplated by the merger agreement and determined the merger, on the terms and conditions set forth in the merger agreement, to be advisable and fair to and in the best interests of our unaffiliated shareholders. The board of directors considered a number of factors, as more fully described above under "Special Factors—Background of the Merger" and below under "Special Factors—Reasons for the Board's Recommendation," in determining to recommend that the shareholders approve the merger agreement. **Our board of directors recommends that you vote FOR the approval of the merger agreement.**

## Reasons for the Special Committee's Recommendation

In reaching its conclusion regarding the fairness of the merger to the unaffiliated shareholders and its decision to approve the merger agreement and recommend its approval to the board of directors and our shareholders, the special committee considered the following factors, each of which the special committee believes supported its conclusion but which are not listed in any relative order of importance:

- the special committee's belief that we face several challenges in our efforts to increase shareholder value as an independent publicly-traded company, including:

  - competition from companies with substantially greater scale;

  - declining operating margins; and

  - long-term efforts to address these and other concerns are made more difficult by the short-term focus of the public equity markets on quarterly financial results;

- the special committee's knowledge of our business, financial condition, results of operations and prospects, including our recent financial performance, and the special committee's belief that the merger is more favorable to our shareholders at this time than any other alternative reasonably available to the company and our shareholders, including remaining as a standalone public company;

- the consideration to be received by our shareholders in the merger and a comparison to similar merger transactions;

- the belief that the terms of the merger agreement, including the parties' representations, warranties and covenants, and the conditions to their respective obligations, are reasonable and were the product of extensive negotiations between the special committee and its advisors and the Francisco Partners Investor and its advisors;

- financial analyses and other information with respect to Metrologic presented by Needham & Company to the special committee as discussed below under "Special Factors—Opinion of Needham & Company, LLC," including Needham & Company's opinion that, as of September 11, 2006 and subject to the assumptions and other matters set forth in the opinion, the merger consideration to be received by the holders of our common stock (other than the Rollover Investors) pursuant to the merger agreement was fair to those holders from a financial point of view;

- the commitments for debt financing and equity financing represented by the commitment letters described below under "Special Factors—Financing of the Merger", each of which the special committee believed reduced the risk that the merger would not be consummated;

26

- the fact that the merger consideration is all cash, so that the transaction allows our unaffiliated shareholders to immediately realize a fair value, in cash, for their investment and provides such shareholders certainty of value for their shares;

- the fact that the $18.50 per share price to be paid in the merger represented a 23% premium to the average closing prices of our common stock over the 30 trading day period prior to and including the date of the special committee's approval of the merger and, a 24% premium to the average closing prices of our common stock over the 60 trading day period prior to and including that date, and a 22% premium to the average closing prices of our common stock over the 90 day trading period prior to and including that date;

- the 22% increase in our stock price in the 12 trading days prior to the announcement of the transaction and the belief of the special committee that the increase may have resulted from rumors about a potential transaction;

- the fact that, despite efforts conducted during the last year by us or on our behalf to determine the interest of other potential financial buyers and strategic parties, during which 94 parties were contacted to explore a potential transaction with Metrologic, we received only three initial non-binding indications of interest and only one subsequent indication of interest that was at a price less than the then current market price of our common stock. Moreover, neither the special committee, the board of directors nor the executive officers of Metrologic were aware of any firm offers made by any other person during the prior two years for the merger or consolidation of us with or into another person, the sale or transfer of all or substantially all of our assets or the acquisition of a controlling interest of our common stock;

- the fact that, subject to compliance with the terms and conditions of the merger agreement, we are permitted to terminate the merger agreement prior to the completion of the merger in order to approve any alternative transaction proposed by a third party that is a "superior proposal," as defined in the merger agreement, upon the prior or concurrent payment to Meteor Holding Corporation or its designee of an $18.25 million termination fee;

- the fact that, subject to the terms and conditions of the merger agreement, Meteor Holding Corporation is obligated to pay Metrologic a $9.125 million termination fee if the merger agreement is terminated as a result of Meteor Holding Corporation's failure to obtain debt financing under certain circumstances;

- the failure of our succession plan to successfully indentify and engage a candidate to succeed our 78 year old founder;

- the fact that we have experienced significant turnover at the senior management level, including the resignations of Thomas E. Mills, IV on February 27, 2004 as President and Chief Operating Officer, Benny A. Noens on July 1, 2006 as Chief Executive Officer and President and Frank Zirnkilton on August 31, 2006 as Executive Vice President and Chief Administrative Officer (and, since the announcement of the merger, Jeffrey Yorsz on October 1, 2006 as Senior Vice President, Industrial Systems in connection with the sale of AOA and Kevin Bratton on November 3, 2006 as Chief Financial Officer); and

- the fact that the Francisco Partners Investor indicated that its current intention was to continue to conduct the operations of Metrologic substantially as they are currently conducted, to retain our current management and employees and to allow the principal location of the business to remain the same.

27

In addition, the special committee believed that sufficient procedural safeguards were and are present to ensure the fairness of the merger to the unaffiliated shareholders and to permit the special committee to represent effectively the interests of our unaffiliated shareholders. These procedural safeguards include the following:

- the special committee, which consisted entirely of directors who are not officers or employees of Metrologic and who will not have an economic interest in Metrologic following the merger, acted to represent solely the interests of the unaffiliated shareholders and to negotiate with the Francisco Partners Investor on behalf of such shareholders;

- the members of the special committee were adequately compensated for their services and that their compensation was in no way contingent on their approving the merger agreement and taking the other actions described in this proxy statement;

- the members of the special committee will not personally benefit from the completion of the merger in a manner different from our other shareholders (other than the Rollover Investors), except with respect to their right to receive customary indemnification and officer and director liability insurance coverage under the terms of the merger agreement;

- the special committee retained and received advice from Needham & Company, as financial advisor, and Ballard Spahr Andrews & Ingersoll, LLP, as legal advisor, each of which has extensive experience in transactions similar to the proposed merger;

- the special committee requested and received from Needham & Company an opinion that the consideration to be received by the holders of our common stock, other than the Rollover Investors, pursuant to the merger agreement was fair to those holders from a financial point of view;

- the special committee, with the assistance of its legal and financial advisors, conducted negotiations with the Francisco Partners Investor, which led to an increase in the merger consideration to be received by the unaffiliated shareholders from a price of $18.00 per share initially proposed by the Francisco Partners Investor to $18.50 per share. As a result of these negotiations, the special committee believed that $18.50 per share was the highest price the Francisco Partners Investor was willing to pay in the merger;

- the special committee was aware that it had no obligation to recommend any transaction, including the proposal put forth by the Investor Group; and

- our ability, subject to compliance with the terms and conditions of the merger agreement, to respond to unsolicited inquiries regarding alternative acquisition proposals and to terminate the merger agreement prior to the effectiveness of the merger in order to approve any alternative transaction proposed by a third party that is a "superior proposal," as defined in the merger agreement, upon the prior or concurrent payment to Meteor Holding Corporation or its designee of an $18.25 million termination fee.

The special committee believes that the merger is procedurally fair to the unaffiliated shareholders. Also, the special committee believes that it was not necessary to retain an unaffiliated representative to act solely on behalf of the unaffiliated shareholders or to require a separate vote of the unaffiliated shareholders because the special committee was charged with representing the interests of such unaffiliated shareholders, it engaged financial and legal advisors to act on its behalf and it was actively involved in extended and numerous deliberations and negotiations regarding the merger on behalf of the unaffiliated shareholders.

The special committee also considered a variety of potentially negative factors concerning the merger agreement and the merger, including the following factors, which are not listed in any relative order of importance:

- the possibility that the Francisco Partners Investor will be unable to obtain the debt financing necessary to consummate the merger;

28

- the risks and costs to us if the merger does not close, including the diversion of management and employee attention, employee attrition and the effect on business and customer relationships;
- the fact that our shareholders, other than the Rollover Investors, will have no ongoing equity participation in Metrologic following the merger, and that such shareholders will cease to participate in Metrologic's future earnings or growth, if any, or to benefit from increases, if any, in the value of Metrologic's common stock, and will not participate in any potential future sale of Metrologic to a third party;
- the fact that certain of our directors and executive officers and the Elliott Investors have interests in the transaction that are different from, or in addition to, those of other shareholders of the company;
- the merger agreement's limitations on our ability to solicit other offers;
- the fact that Meteor Holding Corporation's obligation to consummate the merger is subject to conditions outside of our control;
- the fact that, pursuant to the terms of the contribution and voting agreements, Mr. Knowles, certain related parties and the Elliott Investors agreed to vote all of the shares of our common stock that they beneficially own, which represented approximately 49% of our then outstanding common stock, (a) in favor of the merger agreement and the related transactions and any matter required to effect those transactions and (b) against alternative acquisition proposals;
- the fact that if the merger agreement is terminated under certain circumstances, the voting obligations of Mr. Knowles and certain related parties with respect to 35% of our outstanding common stock will survive the termination of the agreement for a period of up to 10 months;
- the fact that our shareholders are not entitled to dissenter's or appraisal rights under New Jersey law;
- the restrictions on the conduct of our business prior to the completion of the merger, requiring us to conduct our business in the ordinary course, subject to specific limitations, may delay or prevent us from undertaking business opportunities that may arise pending completion of the merger; and
- the fact that Metrologic is entering into a merger agreement with newly formed corporations with essentially no assets and, accordingly, that any remedy in connection with a breach of the merger agreement by Meteor Holding Corporation or Meteor Merger Corporation could be limited.

The special committee also considered the requirement in the merger agreement that the Company have certain cash balances at closing depending on whether the sale of AOA had been consummated. Although this was one of the factors considered by the special committee at the time the merger agreement was entered into, the Company currently believes it is likely that this condition will be satisfied as of the closing of the merger.

In the course of reaching its conclusion regarding the fairness of the merger to the unaffiliated shareholders and its decision to approve the merger, the special committee considered analyses presented by Needham & Company relating to the going concern value of Metrologic. These analyses are summarized below under "Special Factors—Opinion of Needham & Company, LLC." The special committee considered our historical stock prices and premiums in reaching its conclusion regarding the fairness of the merger to the unaffiliated shareholders. The special committee noted that our historical stock prices during the preceding 12 months had exceeded the merger consideration from time to time, but based on the foregoing factors concluded that the merger was fair to our unaffiliated shareholders at the time it approved the merger and the merger agreement. The special committee did not consider the liquidation value of our assets because it considers us to be a viable going concern business and views the trading history of our common stock as an indication of our value as such. The special committee believes that, due to the fact that we are being sold as a going concern, the liquidation value is irrelevant to a determination as to whether the merger is fair to the unaffiliated shareholders. Further, the special

29

committee did not consider net book value as a factor because it believed that net book value, which is an accounting concept, is not a material indicator of the value of Metrologic as a going concern but rather is indicative of historical costs. Our net book value per share as of September 30, 2006 was $7.97. This value is substantially below the $18.50 per share cash merger consideration.

The foregoing discussion of the information and factors considered by the special committee is not intended to be exhaustive, but includes all material information and factors considered by the special committee. In view of the wide variety of factors considered by the special committee, the special committee did not find it practicable to, and did not, quantify or otherwise assign relative weights to the foregoing factors in reaching its conclusion. In addition, individual members of the special committee may have given different weights to different factors and may have viewed some factors more positively or negatively than others. The special committee approved and recommends the merger agreement and recommends that our shareholders vote to approve the merger agreement based upon the totality of the information presented to and considered by it.

### Reasons for the Board's Recommendation

In reaching its conclusion regarding the fairness of the merger to our unaffiliated shareholders and its decision to approve the merger agreement and recommend the approval of the merger agreement by our shareholders, the board of directors relied on the special committee's recommendations and the factors examined by the special committee as described above. In view of the wide variety of factors considered in connection with its evaluation of the proposed merger, the board of directors did not find it practicable to, and did not, quantify or otherwise assign relative weights to the foregoing factors in reaching its conclusion. In addition, individual members of the board of directors may have given different weights to different factors and may have viewed some factors more positively or negatively than others. Rather, the board of directors viewed its position as being based on the totality of the information presented to and considered by it. As part of its determination with respect to the merger, the board of directors adopted the conclusion of the special committee and the analysis underlying the conclusion, based upon its view as to the reasonableness of that conclusion and analysis.

### Opinion of Needham & Company, LLC

We retained Needham & Company to act as financial advisor to the special committee of our board of directors in connection with the exploration of sale alternatives for us and to render an opinion as to the fairness, from a financial point of view, to the holders of our common stock (other than the Rollover Investors) of the merger consideration to be received by those holders pursuant to the merger agreement. The merger consideration was determined through negotiations between the special committee and the Francisco Partners Investor, and not by Needham & Company, although Needham & Company provided advice to the special committee during these negotiations.

On September 11, 2006, Needham & Company delivered to the special committee of our board of directors and to our board of directors its written opinion, dated September 11, 2006, that, as of that date and based upon and subject to the assumptions and other matters described in the opinion, the merger consideration of $18.50 in cash per share to be received by the holders of our common stock (other than the Rollover Investors) pursuant to the merger agreement was fair to those holders from a financial point of view. **The Needham & Company opinion is addressed to the special committee of our board of directors and our board of directors, relates only to the fairness, from a financial point of view, of the merger consideration to the holders of our common stock (other than the Rollover Investors) as of the date of the opinion, and does not constitute a recommendation to any shareholder as to how that shareholder should vote or act on any matter relating to the merger.**

The complete text of the Needham & Company opinion, which sets forth the assumptions made, matters considered, and limitations on and scope of the review undertaken by Needham & Company, is attached to this proxy statement as Annex B. The summary of the Needham & Company opinion set forth

30

in this proxy statement is qualified by reference to the Needham & Company opinion. **You should read the Needham & Company opinion carefully and in its entirety for a description of the procedures followed, the factors considered, and the assumptions made by Needham & Company.**

In arriving at its opinion, Needham & Company, among other things:

- reviewed a draft of the merger agreement dated September 10, 2006;
- reviewed certain publicly available information concerning us and certain other relevant financial and operating data concerning us furnished to Needham & Company by us;
- reviewed the historical stock prices and trading volumes of our common stock;
- held discussions with members of our management concerning our current operations and our future business prospects;
- reviewed certain financial forecasts with respect to our company prepared by our management and held discussions with members of our management concerning those forecasts;
- reviewed certain research analyst projections with respect to our company and held discussions with members of our management concerning those projections;
- compared certain publicly available financial data of companies whose securities are traded in the public markets and that Needham & Company deemed relevant to similar data for our company;
- reviewed the financial terms of certain other business combinations that Needham & Company deemed generally relevant; and
- performed and considered such other studies, analyses, inquiries and investigations as Needham & Company deemed appropriate.

In connection with its review and in arriving at its opinion, Needham & Company did not independently verify, nor did Needham & Company assume responsibility for independent verification of, any of the information reviewed by or discussed with it and assumed and relied on the accuracy and completeness of that information. Needham & Company assumed that the financial forecasts for our company provided to it by our management were reasonably prepared on bases reflecting the best currently available estimates and judgments of our management, at the time of preparation, of our future operating and financial performance. Needham & Company assumed, based upon discussions with our management, that the research analyst projections with respect to our company represent reasonable estimates as to our future financial performance. Needham & Company did not assume any responsibility for or make or obtain any independent evaluation, appraisal or physical inspection of our assets or liabilities. Needham & Company's opinion states that it was based on economic, monetary and market conditions existing as of its date. Needham & Company expressed no opinion as to the price at which our common stock will actually trade at any time. In addition, Needham & Company was not asked to consider, and the Needham & Company opinion does not address, our underlying business decision to engage in the merger or the relative merits of the merger as compared to other business strategies that might be available for us.

We imposed no limitations on Needham & Company with respect to the investigations made or procedures followed by Needham & Company in rendering its opinion.

In preparing its opinion, Needham & Company performed a variety of financial and comparative analyses. The following paragraphs summarize the material financial analyses performed by Needham & Company in arriving at its opinion. The order of analyses described does not represent relative importance or weight given to those analyses by Needham & Company. Some of the summaries of the financial analyses include information presented in tabular format. The tables are not intended to stand alone, and in order to more fully understand the financial analyses used by Needham & Company, the tables must be read together with the full text of each summary. The following quantitative information, to the extent it is based on market data, is, except as otherwise indicated, based on market data as it existed on or prior to September 11, 2006, and is not necessarily indicative of current or future market conditions.

31

*Selected Company Analysis.* Using publicly available information, Needham & Company compared selected historical and projected financial and market data ratios for us to the corresponding data and ratios of publicly traded companies that Needham & Company deemed relevant because their businesses may be considered similar to our business. Specifically, Needham & Company selected companies that sell imaging and scanning products that are competitive with our products. These companies, referred to as the selected companies, consisted of the following:

Datalogic SpA
Intermec, Inc.
NCR Corporation
Symbol Technologies, Inc.
Zebra Technologies Corporation

The following table sets forth information concerning the following multiples for the selected companies and for us:

- enterprise value as a multiple of last 12 months, or LTM, revenues;
- enterprise value as a multiple of projected calendar year 2006 revenues;
- enterprise value as a multiple of projected calendar year 2007 revenues;
- enterprise value as a multiple of LTM earnings before interest, taxes, depreciation and amortization, or EBITDA;
- enterprise value as a multiple of projected calendar year 2006 EBITDA;
- enterprise value as a multiple of projected calendar year 2007 EBITDA;
- enterprise value as a multiple of LTM earnings before interest and taxes, or EBIT;
- price as a multiple of LTM earnings per share, or EPS;
- price as a multiple of projected calendar year 2006 EPS; and
- price as a multiple of projected calendar year 2007 EPS.

32

Needham & Company calculated multiples for the selected companies based on the closing stock prices of those companies on September 8, 2006 and calculated multiples for us based on the merger consideration of $18.50 per share. The columns in the table below under the heading "Metrologic Merger Consideration" represent multiples calculated based on the merger consideration and research analyst projections and multiples calculated based on the merger consideration and forecasts by our management. In calculating these multiples, Needham & Company excluded the forecasted financial results of Adaptive Optics Associates, Inc. ("AOA") that were provided by our management and assumed, based on our management's estimates, the receipt of approximately $35 million of net cash proceeds from the sale of AOA. Our management's estimate of the net cash proceeds from the sale of AOA reflected the deduction of estimated taxes and transaction expenses from the $40.25 million contractual cash purchase price. LTM multiples for our company were based on financial forecasts provided by our management for the 12 months ending September 30, 2006. Needham & Company noted that all of the calculated multiples for us under the $18.50 per share merger consideration were within the ranges of multiples for the selected companies, other than the multiples calculated using our management's forecasts of enterprise value to projected calendar year 2007 EBITDA and price to projected calendar year 2007 EPS.

|  | Selected Companies | | | | Metrologic Merger Consideration | |
|  | High | Low | Mean | Median | Using Analysts Estimates | Using Management Estimates |
|---|---|---|---|---|---|---|
| Enterprise value to LTM revenues | 2.5x | 1.0x | 1.7x | 1.7x | 1.7x | 1.7x |
| Enterprise value to projected calendar year 2006 revenues | 2.4x | 1.0x | 1.5x | 1.6x | 1.6x | 1.6x |
| Enterprise value to projected calendar year 2007 revenues | 2.2x | 0.9x | 1.5x | 1.5x | 1.4x | 1.3x |
| Enterprise value to LTM EBITDA | 19.5x | 8.7x | 13.3x | 13.3x | 11.4x | 11.4x |
| Enterprise value to projected calendar year 2006 EBITDA | 19.5x | 8.6x | 12.8x | 11.5x | N/A | 11.2x |
| Enterprise value to projected calendar year 2007 EBITDA | 14.3x | 7.6x | 10.5x | 10.1x | N/A | 6.8x |
| Enterprise value to LTM EBIT | 22.3x | 11.7x | 16.6x | 16.1x | 14.4x | 14.4x |
| Price to LTM EPS | 33.0x | 13.2x | 22.2x | 21.2x | 19.5x | 19.5x |
| Price to projected calendar year 2006 EPS | 36.9x | 18.0x | 26.5x | 26.4x | 24.5x | 25.0x |
| Price to projected calendar year 2007 EPS | 26.1x | 15.2x | 20.2x | 19.7x | 19.0x | 14.5x |

***Stock Price Premium Analysis.***   Needham & Company analyzed publicly available financial information for 55 merger and acquisition transactions that represent transactions involving publicly-traded technology and technology-enabled services companies completed since September 8, 2005 with transaction values of between $100 million and $1 billion. None of the precedent transactions was a going-private transaction or a leveraged buyout. In examining these transactions, Needham & Company analyzed the premium of consideration offered to the acquired company's stock price one trading day, five trading days, 30 trading days, 60 trading days and 90 trading days prior to the announcement of the transaction.

Needham & Company calculated premiums for our company as of September 8, 2006 based on the merger consideration of $18.50 for each share of our common stock. The following table sets forth information concerning the stock price premiums in the selected transactions and the stock price premium implied by the merger.

33

| | Selected Transactions | | Metrologic Merger at $18.50 |
| | Mean | Median | |
| One trading day stock price premium | 20% | 17% | 13% |
| Five trading day stock price premium | 23% | 18% | 15% |
| 30 trading day stock price premium | 31% | 27% | 31% |
| 60 trading day stock price premium | 34% | 32% | 29% |
| 90 trading day stock price premium | 35% | 33% | 12% |

Needham & Company noted that our one trading day stock price premium reflected increases in our stock price, which it believed were driven by rumors regarding a possible transaction involving us. Needham & Company noted that the five trading day, 30 trading day and 60 trading day stock price premiums for our company were within the ranges of stock price premiums for the selected transactions and, in the case of the 30 trading day stock price premium, above the median for the selected transactions. Needham & Company noted that the 90 trading day stock price premium was significantly below the mean and median for the selected transactions, but noted our stock price at that time was in the process of trending downward. Needham & Company believed that this trend was the result of the effects of takeover speculation from our prior sale process as speculative investors unwound their positions upon realizing no transaction would be forthcoming and the effects of the announcement seven trading days earlier of the resignation of our President and Chief Executive Officer. Needham & Company also noted that our subsequent earnings release on May 9, 2006 had a negative effect on our stock price and, accordingly, believed that the 30 and 60 trading day premiums appeared to better reflect the ongoing trading prices of our stock.

*Selected Transaction Analysis.*  Needham & Company analyzed publicly available financial information for the following selected merger and acquisition transactions, which represent transactions completed since January 1, 2000 that involved target companies that were involved in the display, vision and imaging business and with transaction values between $10 million and $500 million:

| Acquirer | Target |
| Singulus Technologies AG | Rag AG |
| Datalogic SpA | PSC Inc. |
| Cognex Corporation | DVT Corp. |
| Axsys Technologies, Inc. | Diversified Optical Products, Inc. |
| Datalogic SpA | Informatics Inc. |
| Cypress Semiconductor Corporation | SMal Camera Technologies, Inc. |
| Metrologic Instruments, Inc. | Omniplanar, Inc. |
| Danaher Corporation | Accu-Sort Systems, Inc. |
| Danaher Corporation | Willett International |
| Littlejohn & Co., LLC | PSC Inc. |
| Metrologic Instruments, Inc. | Adaptive Optics Associates |
| Zebra Technologies Corporation | Comtec Information |

In examining the selected transactions, Needham & Company analyzed, for the selected transactions and for the merger,

- enterprise value as a multiple of LTM sales;

- enterprise value as a multiple of LTM EBITDA;

- enterprise value as a multiple of LTM EBIT; and

- equity value to LTM net income.

34

Needham & Company calculated multiples for our company based on the merger consideration of $18.50 for each share of our common stock, excluding the forecasted financial results of AOA and assuming the receipt of estimated net cash proceeds from the sale of AOA. LTM multiples for our company were based on financial forecasts provided by our management for the 12 months ending September 30, 2006.

The following table sets forth information concerning the multiples described above for the selected transactions and the same multiples implied by the merger.

|  | Selected Transactions | | | | Metrologic Merger |
|---|---|---|---|---|---|
|  | High | Low | Mean | Median |  |
| Enterprise value to LTM sales | 6.4x | 0.1x | 2.1x | 1.0x | 1.7x |
| Enterprise value to LTM EBITDA | 16.2x | 5.9x | 11.1x | 9.0x | 11.4x |
| Enterprise value to LTM EBIT | 22.2x | 8.9x | 16.6x | 17.7x | 14.4x |
| Equity value to LTM net income | 28.0x | 9.2x | 20.7x | 25.0x | 19.6x |

Needham & Company noted that all of the calculated multiples for us based on the $18.50 per share merger consideration were within the ranges of multiples for the selected transactions.

**Discounted Cash Flow Analysis.**  Needham & Company performed illustrative discounted cash flow analyses to determine indicators of illustrative implied equity values for Metrologic and illustrative implied equity values per share of our common stock based on our management's forecasts, excluding the forecasted financial results of AOA and assuming, based on our management's estimates, approximately $35 million of net cash generated from the sale of AOA. Needham & Company calculated ranges of estimated terminal values by multiplying calendar year 2010 estimated EBITDA of approximately $124 million by selected multiples ranging from 8.0x to 10.0x, and adding to that net cash. The amounts were discounted to present value using discount rates of 10% to 20%. This analysis indicated the following implied per share equity reference range for Metrologic, as compared to the per share merger consideration:

| Illustrative Implied Per Share Equity Reference Range for Metrologic | Per Share Merger Consideration |
|---|---|
| $27.74 - $44.56 | $18.50 |

Needham & Company noted that our management's longer-term forecasts did not appear to be consistent with our historical performance. Accordingly, Needham & Company also performed illustrative sensitivity analyses that applied a 10% long term revenue growth rate to determine indicators of illustrative implied equity values and illustrative implied equity values per share to those forecasts. The 10% long term revenue growth rate was chosen because it approximated the 2006 to 2007 revenue growth rate estimated by consensus research analyst projections. Needham & Company then calculated ranges of estimated terminal values by multiplying adjusted calendar year 2010 EBITDA of approximately $46 million by the same multiples ranging from 8.0x to 10.0x, and adding to that net cash. The amounts were discounted to present value using discount rates of 10% to 20%. Based on the foregoing, the analysis indicated the following implied per share equity reference range for Metrologic, as compared to the per share merger consideration:

| Illustrative Sensitivity Case Implied Per Share Equity Reference Range | Per Share Merger Consideration |
|---|---|
| $12.09 - $18.18 | $18.50 |

35

No company, transaction or business used in the "Selected Company Analysis," "Stock Price Premium Analysis," or "Selected Transaction Analysis" as a comparison is identical to our company or the merger. Accordingly, an evaluation of the results of these analyses is not entirely mathematical; rather, it involves complex considerations and judgments concerning differences in the financial and operating characteristics and other factors that could affect the acquisition, public trading or other values of the selected companies or selected transactions or the business segment, company or transaction to which they are being compared.

The preparation of a fairness opinion is a complex analytical process involving various determinations as to the most appropriate and relevant quantitative and qualitative methods of financial analyses and the application of those methods to the particular circumstances and, therefore, such an opinion is not readily susceptible to summary description. Accordingly, Needham & Company believes that its analyses must be considered as a whole and that selecting portions of its analyses or the factors it considered, without considering all analyses and factors, could create a misleading or incomplete view of the process underlying its analyses and opinion. Needham & Company did not attribute any specific weight to any factor or analysis considered by it. The fact that any specific analysis has been referred to in the summary above is not meant to indicate that such analysis was given greater weight than any other analysis.

In performing its analyses, Needham & Company made numerous assumptions with respect to industry performance, general business and economic and other matters, many of which are beyond the control of our company. Any estimates contained in these analyses are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable. Additionally, analyses relating to the values of businesses or assets do not purport to be appraisals or necessarily reflect the prices at which businesses or assets may actually be sold or the prices at which any securities have traded or may trade at any time in the future. Accordingly, these analyses and estimates are inherently subject to substantial uncertainty. Needham & Company's opinion and its related analyses were only one of many factors considered by the special committee of our board of directors in their evaluation of the proposed merger and should not be viewed as determinative of the views of the special committee, our board of directors or management with respect to the merger consideration or the merger.

Under the terms of the special committee's engagement letter with Needham & Company, we have paid or agreed to pay Needham & Company a $25,000 retainer, a monthly advisory fee of $25,000 until the termination or closing of the merger, and a nonrefundable fee of $450,000 for rendering its opinion, up to a maximum total amount of $1,000,000. Whether or not the merger is consummated, we have agreed to reimburse Needham & Company for its out-of-pocket expenses and to indemnify Needham & Company against certain liabilities relating to or arising out of services performed by Needham & Company as financial advisor to the special committee.

Needham & Company is a nationally recognized investment banking firm. As part of its investment banking services, Needham & Company is regularly engaged in the evaluation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of securities, private placements and other purposes. Needham & Company was retained by the special committee of our board of directors to act as its financial advisor in connection with the merger based on Needham & Company's experience as a financial advisor in mergers and acquisitions as well as Needham & Company's familiarity with us and the technology industry generally. Needham & Company provided financial advisory services to us in connection with the sale of AOA, for which services Needham & Company received fees of $295,000, and provided financial advisory services to the special committee from October 2005 through January 2006, for which services Needham & Company received fees of $375,000. The amount of the fees paid to Needham & Company were determined by negotiations between Needham & Company and the special committee, in the case of services provided to the special committee, or our management, in the case of services provided to us. Needham & Company has had no other investment banking relationship with us during the past two years. In the normal course of its

36

business, Needham & Company may actively trade our equity securities for its own account or for the account of its customers and, therefore, may at any time hold a long or short position in our securities. Needham & Company has consented to the inclusion of and references to its opinion in this proxy statement.

## Position of C. Harry Knowles as to Fairness

Under the rules of the Securities and Exchange Commission, C. Harry Knowles is required to provide certain information regarding his position as to the fairness of the merger to the unaffiliated shareholders of Metrologic. Mr. Knowles is making the statements included in this section solely for purposes of complying with such requirements. Mr. Knowles's views as to the fairness of the merger should not be construed as a recommendation to any shareholder as to how that shareholder should vote on the proposal to approve the merger agreement.

Mr. Knowles has interests in the merger different from, and in addition to, the other shareholders of Metrologic. These interests are described under "Special Factors—Interests of Certain Persons in the Merger."

Mr. Knowles engaged Morgan Stanley & Co. Incorporated to advise him in connection with the merger, but did not undertake a formal evaluation of the fairness of the merger to him or receive advice from the special committee's legal or financial advisors in his individual capacity as to the fairness of the merger to him. Mr. Knowles believes that the merger agreement and the merger are substantively and procedurally fair to the unaffiliated shareholders of Metrologic and has adopted the analyses of the special committee based upon the reasonableness of the special committee's analyses and conclusions and Mr. Knowles' knowledge of Metrologic, as well as the factors considered by, and the findings of, the special committee with respect to the fairness of the merger to such shareholders (see "Special Factors—Recommendation of the Special Committee and Board of Directors" and "Special Factors—Reasons for the Special Committee's Recommendation").

Although Mr. Knowles is a director of Metrologic, because of his differing interests in the merger, he was not appointed to the special committee, did not participate in the negotiation of the merger agreement and did not participate in the special committee's deliberations and evaluation of the merger agreement and the merger. For these reasons, Mr. Knowles does not believe that his interests in the merger influenced the decision of the special committee with respect to the merger agreement or the merger. Mr. Knowles believes the merger agreement and the merger are substantively and procedurally fair to the unaffiliated shareholders of Metrologic due in part to the establishment of the special committee and the authorization of the special committee to negotiate, deliberate and evaluate, and seek independent legal and financial advice with respect to, the merger agreement and the merger.

The foregoing discussion of the information and factors considered and given weight by Mr. Knowles in connection with the fairness of the merger agreement and the merger is not intended to be exhaustive but is believed to include all material factors considered by Mr. Knowles. Mr. Knowles did not find it practicable to, and did not, quantify or otherwise assign relative weights to the individual factors considered in reaching his position as to the fairness of the merger agreement and the merger. Rather, Mr. Knowles' fairness determination was made after consideration of all of the foregoing factors as a whole, and after such consideration, Mr. Knowles believes that these factors as a whole provide a reasonable basis for his belief that the merger is fair to the unaffiliated shareholders of Metrologic.

## Position of Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. as to Fairness

Under a potential interpretation of the rules governing "going private" transactions under Rule 13e-3 of the Exchange Act, Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. may be deemed to be engaged in a "going private" transaction and

37

required to express their beliefs as to the fairness of the merger to our unaffiliated shareholders. Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. are making the statements included in this section solely for purposes of complying with the requirements of Rule 13e-3 and related rules under the Exchange Act. The views of Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. as to fairness of the proposed merger to Metrologic's unaffiliated shareholders should not be construed as a recommendation to any shareholder as to how such shareholder should vote on the proposal to approve the merger agreement.

Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. attempted to negotiate the terms of a transaction that would be most favorable to themselves, and not to shareholders of Metrologic, and, accordingly, did not negotiate the merger agreement with the goal of obtaining terms that were fair to Metrologic's unaffiliated shareholders. Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. did not participate in the deliberations of Metrologic's board of directors or the special committee regarding, or receive advice from Metrologic's or the special committee's legal or financial advisors as to, the substantive and procedural fairness of the proposed merger, nor did Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor or Francisco Partners II, L.P. undertake any independent evaluation of the fairness of the proposed merger to Metrologic's unaffiliated shareholders or engage a financial advisor for such purposes. Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. believe, however, that the proposed merger is substantively and procedurally fair to Metrologic's unaffiliated shareholders based upon the same factors considered by the special committee with respect to the fairness of the proposed merger to such shareholders, which factors Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. adopt. See "Special Factors—Reasons for the Special Committee's Recommendation".

The factors considered and given weight by Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. in connection with the fairness of the merger are not intended to be exhaustive but are believed to include all material factors considered by Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P., Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. did not find it practicable to assign, and did not assign, relative weights to the individual factors considered in reaching their conclusions as to the fairness of the proposed merger. Rather, their fairness determinations were made after consideration of all of the foregoing factors as a whole.

**Position of the Elliott Entities as to Fairness**

Under a potential interpretation of the rules governing "going private" transactions under Rule 13e-3 of the Exchange Act, the Elliott Investors and Elliott International Capital Advisors, Inc., the investment manager for Elliott International, L.P., may be deemed to be engaged in a "going private" transaction and required to express their beliefs as to the fairness of the merger to our unaffiliated shareholders. We refer to the Elliott Investors and Elliott International Capital Advisors, Inc. collectively as the Elliott Entities. The Elliott Entities are making the statements included in this section solely for purposes of complying with the requirements of Rule 13e-3 and related rules under the Exchange Act. The views of the Elliott Entities as to fairness of the proposed merger to Metrologic's unaffiliated shareholders should not be construed as a recommendation to any shareholder as to how such shareholder should vote on the proposal to approve the merger agreement.

38

# DECLARATION OF SETH D. RIGRODSKY

## Part 5

The Elliott Entities did not participate in the deliberations of Metrologic's board of directors or the special committee regarding, or receive advice from Metrologic's or the special committee's legal or financial advisors as to, the substantive and procedural fairness of the proposed merger, nor did the Elliott Entities undertake any independent evaluation of the fairness of the proposed merger to Metrologic's unaffiliated shareholders or engage a financial advisor for such purposes. The Elliott Entities believe, however, that the proposed merger is substantively and procedurally fair to Metrologic's unaffiliated shareholders based upon the same factors considered by, and the analysis and conclusions of, the special committee with respect to the fairness of the proposed merger to such shareholders, which factors, analysis and conclusions the Elliott Entities adopt. See "Special Factors—Reasons for the Special Committee's Recommendation".

The factors considered and given weight by the Elliott Entities in connection with the fairness of the merger are not intended to be exhaustive but are believed to include all material factors considered by the Elliott Entities. The Elliott Entities did not find it practicable to assign, and did not assign, relative weights to the individual factors considered in reaching their conclusions as to the fairness of the proposed merger. Rather, their fairness determinations were made after consideration of all of the foregoing factors as a whole.

## Purposes, Reasons and Plans for Metrologic After the Merger

The purpose of the merger for Metrologic is to enable its shareholders (other than the Rollover Investors, to the extent of their contributions under the contribution and voting agreements) to immediately realize the value of their investment in Metrologic through their receipt of the per share merger price of $18.50 in cash, without interest. In this respect, the special committee and the board of directors believed that the merger was more favorable to such shareholders than any other alternative reasonably available to Metrologic and its shareholders because of the uncertain returns to such shareholders in light of the company's business, operations, financial condition, strategy and prospects, as well as the risks involved in achieving those prospects, and general industry, economic and market conditions, both on a historical and on a prospective basis. In particular, the special committee and the board believe that we face several challenges in our efforts to increase shareholder value as an independent publicly-traded company, including:

- competition from companies with substantially greater scale;
- declining operating margins; and
- long-term efforts to address these and other concerns are made more difficult by the short-term focus of the public equity markets on quarterly financial results.

For these reasons, and the other reasons discussed under "Special Factors—Reasons for the Special Committee's Recommendation," and "Special Factors—Reasons for the Board's Recommendation," the special committee and the board of directors each have determined that the merger agreement and the merger, upon the terms and conditions set forth in the merger agreement, are advisable and fair to and in the best interests of our unaffiliated shareholders.

For Meteor Holding Corporation, the Francisco Partners Investor, Francisco Partners II, L.P. and the Elliott Entities, the primary purpose of the merger is to benefit from any future earnings and growth of Metrologic after the merger of Meteor Merger Corporation with and into Metrologic, making Metrologic a privately held company wholly owned by Meteor Holding Corporation.

For Mr. Knowles, the principal purpose of the merger as it relates to him in his individual capacity is to immediately realize in cash the value of the substantial majority of his investment in Metrologic through his receipt of the per share merger price of $18.50 in cash, without interest. A secondary purpose of the merger for Mr. Knowles as it relates to him in his individual capacity is to allow him, through his commitment to make an equity investment in Meteor Holding Corporation, to benefit from any future earnings and growth of Metrologic after its stock ceases to be publicly traded. Mr. Knowles also believes that the merger will provide Metrologic with flexibility to pursue opportunities to enhance value for the

39

Rollover Investors and new equity holders that it would not have as a public company, including the ability to pursue transactions meeting the collective risk-profiles of the Investor Group without focusing on the reaction of the market or of Metrologic's public shareholders to such transactions or the collective risk tolerance of such public shareholders as it relates to such transactions.

The transaction has been structured as a cash merger in order to provide the unaffiliated shareholders of Metrologic (and Mr. Knowles to the extent that he receives cash in the merger) with cash for all of their shares and to provide a prompt and orderly transfer of ownership of Metrologic in a single step, without the necessity of financing separate purchases of Metrologic's common stock in a tender offer or implementing a second-step merger to acquire any shares of common stock not tendered into any such tender offer, and without incurring any additional transaction costs associated with such activities.

Metrologic decided to proceed with the merger and going private transaction at this time because we believe that the merger is more favorable to the unaffiliated shareholders of Metrologic than any other alternative reasonably available to Metrologic and its shareholders at this time, including remaining as a standalone public company. Another factor that led to our decision to pursue the transaction at this time is the recent significant increase in the costs and burdens associated with being a public company.

It is expected that, upon consummation of the merger, the operations of Metrologic will be conducted substantially as they currently are being conducted, except that Metrologic will not be subject to the obligations and constraints, and the related direct and indirect costs and personnel requirements, associated with having publicly-traded equity securities. In addition, on September 19, 2006, Metrologic and certain of its subsidiaries entered into a stock purchase agreement with Essex Corporation, which provides for the sale 100% of the shares of Adaptive Optics Associates, Inc. ("AOA"), an indirect subsidiary of Metrologic, to Essex Corporation for $40,250,000 in cash, as adjusted to reflect changes in working capital as of the closing date of the transaction. AOA designs, develops and manufactures a wide variety of standard and custom electro-optic and opto-mechanical products. This transaction closed as of October 1, 2006. As a result, the operations of AOA will no longer be consolidated with those of Metrologic.

The Francisco Partners Investor and the Elliott Entities have each advised Metrologic that they do not have any current plans or proposals that relate to or would result in an extraordinary corporate transaction following completion of the merger involving Metrologic's corporate structure, business or management, such as a merger, reorganization, liquidation, relocation of any operations or sale or transfer of a material amount of assets. We expect, however, that following the merger, Metrologic's management, the Francisco Partners Investor and the Elliott Entities will continuously evaluate and review Metrologic's business and operations and may develop new plans and proposals that they consider appropriate for Metrologic.

## Certain Effects of the Merger

If the merger agreement is approved by our shareholders and the other conditions to the closing of the merger are either satisfied or waived, Meteor Merger Corporation will be merged with and into Metrologic, with Metrologic being the surviving corporation and a wholly owned subsidiary of Meteor Holding Corporation. Upon the effectiveness of the merger, each share of Metrologic common stock issued and outstanding immediately prior to the effective time of the merger (other than shares held in the treasury of Metrologic, owned by Meteor Holding Corporation or any wholly owned subsidiary of Meteor Holding Corporation or Metrologic, which will be cancelled) will be converted into the right to receive $18.50 in cash, without interest.

Following the merger, the entire equity interest in Metrologic will be owned by Meteor Holding Corporation, which in turn will be owned by the Investor Group. If the merger is completed, Metrologic's current shareholders, other than the Rollover Investors, will cease to have any direct or indirect ownership interest in Metrologic or rights as shareholders of Metrologic. As a result, those shareholders of Metrologic will not participate in any future earnings or growth of Metrologic and will not benefit from any appreciation in value of Metrologic.

40

Following the merger, the entire interest in Metrologic's net book value and net earnings will be held by Meteor Holding Corporation. The beneficial ownership of each member of the Investor Group of the capital stock of Meteor Holding Corporation is expected to be the following after the completion of the merger:

|  | Expected Beneficial Ownership of Meteor Holding Corporation Capital Stock Post-Merger (%) | |
| --- | --- | --- |
|  | Junior Preferred | Common |
| FP-Metrologic, LLC | 68.7% | 68.7% |
| C. Harry Knowles | 15.0 | 15.0 |
| Elliott Associates, L.P. | 6.5 | 6.5 |
| Elliott International, L.P. | 9.8 | 9.8 |

The table below sets forth the direct and indirect interests of the Rollover Investors in Metrologic's net book value and net earnings as of and for the nine months ended September 30, 2006, respectively, prior to and immediately after the merger.

|  | Ownership Prior to the Merger(1) | | | | Ownership After the Merger(2) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | Net Book Value | | Earnings | | Net Book Value | | Earnings | |
|  | $ | % | $ | % | $ | % | $ | % |
| C. Harry Knowles | $ 72,678,841 | 40.0 | $ 4,945,994 | 40.0 | $ 27,228,150 | 15.0 | $ 1,852,950 | 15.0 |
| Elliott Associates, L.P. | $ 5,412,275 | 3.0 | $ 368,320 | 3.0 | $ 11,810,091 | 6.5 | $ 803,709 | 6.5 |
| Elliott International, L.P. | $ 8,118,433 | 4.5 | $ 552,482 | 4.5 | $ 17,715,179 | 9.8 | $ 1,205,566 | 9.8 |

(1) Based upon beneficial ownership of Metrologic common stock as of October 31, 2006.

(2) Based upon the expected beneficial ownership of Meteor Holding Corporation junior preferred stock and common stock immediately after completion of the merger.

The merger agreement provides that all outstanding options to acquire Metrologic common stock issued pursuant to the 2004 Equity Incentive Plan will automatically be cancelled immediately prior to the effective time of the merger. Options with an exercise price that is less than $18.50 per share will be converted into the right to receive an amount in cash (without interest), less applicable taxes, equal to the product of (1) the number of shares of our common stock subject to each option, as of the effective time of the merger, multiplied by (2) the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option. Holders of options granted under the 2004 Equity Incentive Plan with an exercise price that is equal to or greater than $18.50 per share will receive $1.00 per award in exchange for the cancelled options. Metrologic commenced an offer, pursuant to a Schedule TO filed on November 21, 2006, to holders of options granted under our 1994 Incentive Plan to cancel all of their options in exchange for a cash payment, without interest, equal to the product of (1) the total number of shares of Metrologic common stock subject to the option multiplied by (2) the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option, less any applicable taxes. All of the options held by employees who will be eligible to participate in the offer have exercise prices that are less than $18.50 per share. In the event that any of the options under the 1994 Incentive Plan are not cancelled prior to the merger, then such outstanding options will be subject to adjustment upon completion of the merger pursuant to the terms set forth in the 1994 Incentive Plan.

Metrologic's common stock is currently registered under the Securities Exchange Act of 1934 and is quoted on The NASDAQ Global Select Market under the symbol "MTLG." As a result of the merger, Metrologic will become a privately held corporation, and there will be no public market for its common stock. After the merger, the common stock will cease to be quoted on The NASDAQ Global Select Market, and price quotations with respect to sales of shares of common stock in the public market will no longer be available. In addition, the registration of our common stock under the Securities Exchange Act of 1934 will be terminated. This termination will make certain provisions of the Exchange Act, such as the requirement of filing periodic and other reports with the Securities and Exchange Commission and

41

furnishing a proxy or information statement in connection with shareholders' meetings, no longer applicable to Metrologic on account of its common stock. In addition, this termination will result in Metrologic no longer being subject to the provisions of the Sarbanes-Oxley Act of 2002 or the liability provisions of the Securities Exchange Act of 1934 immediately following the merger and officers of Metrologic will no longer be required to publicly certify the accuracy and completeness of the financial statements and other information relating to Metrologic.

The directors and officers of Meteor Merger Corporation immediately prior to the effective time of the merger will be the initial directors and officers of the surviving corporation. The certificate of incorporation of Metrologic will be amended as set forth in an exhibit to the merger agreement. The bylaws of Meteor Merger Corporation in effect immediately prior to the effective time of the merger will become the bylaws of the surviving corporation.

In connection with the merger, the Rollover Investors will receive benefits and be subject to obligations in connection with the merger that are different from, or in addition to, the benefits and obligations of Metrologic shareholders generally. These incremental benefits and additional obligations include the right and obligation of the Rollover Investors to exchange a portion of their Metrologic shares for shares of junior preferred stock and common stock of Meteor Holding Corporation and certain additional economic and governance rights with respect to Meteor Holding Corporation after the merger. In addition, certain members of Metrologic's management, other than Mr. Knowles, are currently expected to continue in their current positions after the merger, to receive grants of stock options pursuant to a new equity incentive plan that will be adopted by Meteor Holding Corporation and to be eligible to participate in a cash retention program. For a description of the interests of the Rollover Investors and management, see "—Interests of Certain Persons in the Merger."

The principal benefit of the merger to the Investor Group is that our future earnings and growth will be for their benefit and not for the benefit of our other current shareholders. In addition, we expect that the surviving corporation will be able to use certain of our net operating loss carryforwards and credit carryforwards after the merger. The detriments of the merger to the Investor Group are the lack of liquidity for Metrologic's capital stock following the merger, the fact that equity interests of Metrologic following the merger will be subject to a stockholders agreement that impose restrictions on those equity interests, the risk that Metrologic will decrease in value following the merger, the incurrence by Metrologic of significant additional debt as described below under "Special Factors—Financing of the Merger" and the payment by it of approximately $27.8 million in estimated fees and expenses related to the merger and financing transactions. See "Special Factors—Financing of the Merger" and "Special Factors—Fees and Expenses of the Merger."

The benefit of the merger to our shareholders (other than the Rollover Investors, to the extent of their contributions under the contribution and voting agreements) is the right to receive $18.50 in cash per share, without interest, for all of their shares of Metrologic common stock. The detriments of the merger to our shareholders, other than the Rollover Investors, are that they will cease to participate in our future earnings and growth, if any, and that the receipt of the payment for their shares will be a taxable transaction for federal income tax purposes. See "Special Factors—Material U.S. Federal Income Tax Consequences."

### Effects on the Company if the Merger is Not Completed

In the event that the merger agreement is not approved by Metrologic's shareholders or if the merger is not completed for any other reason, our shareholders will not receive the payment for their shares contemplated by the merger agreement. Instead, Metrologic will remain an independent public company and its common stock will continue to be listed and traded on The NASDAQ Global Select Market. In addition, if the merger is not completed, we expect that management will continue to operate Metrologic's business in a manner similar to that in which it is being operated today, with the exception of changes to the operations that will result from the divestiture of AOA discussed elsewhere in this proxy statement. As

a result, Metrologic shareholders will continue to be subject to the same risks and opportunities as they currently are, including, among other things, general industry, economic and market conditions. Accordingly, if the merger is not consummated, there can be no assurance as to the effect of these risks and opportunities on the future value of your Metrologic shares. From time to time, Metrologic's board of directors will evaluate and review, among other things, the business operations, properties, dividend policy and capitalization of Metrologic, make such changes as are deemed appropriate and continue to seek to identify strategic alternatives to maximize shareholder value. If the merger agreement is not approved by Metrologic's shareholders or if the merger is not consummated for any other reason, there can be no assurance that any other transaction acceptable to Metrologic will be offered or occur or that the business, prospects or results of operations of Metrologic will not be adversely affected.

If the merger agreement is terminated under certain circumstances, Metrologic will be obligated to pay a termination fee of $18.25 million to Meteor Holding Corporation or its designee. Under other circumstances, Meteor Holding Corporation will be obligated to pay a termination fee of $9.125 million to Metrologic. See "The Merger Agreement—Fees and Expenses."

## Financing of the Merger

The obligation of Meteor Holding Corporation and Meteor Merger Corporation to complete the merger is subject to a debt financing condition, which is described in "The Merger Agreement (Proposal No. 1)—Conditions to Completion of the Merger." Meteor Holding Corporation estimates that approximately $398.5 million will be the total amount of funds required to pay the merger consideration of $370.7 million and related fees and expenses. Meteor Merger Corporation expects this amount, together with the related working capital requirements of Metrologic following the completion of the merger, to be provided through a combination of the proceeds of the following:

- an aggregate cash equity investment by the Francisco Partners Investor of not less than $128.0 million;
- approximately $60.6 million in rollover equity financing from the Rollover Investors;
- a new $160.0 million senior secured first loan facility, consisting of a $125.0 million term loan facility and a $35.0 million revolving credit facility;
- a new $75.0 million senior secured second lien loan facility; and
- cash and fully liquid cash equivalents held by Metrologic.

Meteor Merger Corporation has received the equity and debt commitments described below.

### Equity Financing

Meteor Merger Corporation received an equity commitment letter from the Francisco Partners Investor, pursuant to which the Francisco Partners Investor agreed to contribute, or cause to be contributed, not less than $128.0 million in immediately available funds. The obligations of the Francisco Partners Investor under the equity commitment letter are conditioned upon the satisfaction or waiver of each of the conditions to the obligations of Meteor Holding Corporation and Meteor Merger Corporation to consummate the merger, except the debt financing condition and the condition that the Rollover Investors make their contributions pursuant to the contribution and voting agreements.

Under the terms of the contribution and voting agreement entered into with C. Harry Knowles and certain of his related family trusts and charitable entities, Mr. Knowles agreed to contribute 1,680,578 shares of our common stock that he beneficially owns to Meteor Holding Corporation immediately prior to the closing of the merger in exchange for approximately 15% of the junior preferred stock and approximately 15% of the common stock of Meteor Holding Corporation. The number of shares of our common stock contributed by Mr. Knowles, and the number of shares of junior preferred stock and common stock of Meteor Holding Corporation issued in exchange therefor, will be adjusted as appropriate to allow Mr. Knowles to own 15% of the outstanding shares of junior preferred stock and 15% of the outstanding shares of common stock of Meteor Holding Corporation immediately following the closing of

43

the merger. Based on the expected equity contributions of the Investor Group as of the date of this proxy statement, Meteor Holding Corporation currently expects that the number of shares to be contributed by Mr. Knowles will be adjusted to 1,571,320 shares. Similarly, pursuant to the contribution and voting agreement entered into with the Elliott Investors, the Elliott Investors have agreed to contribute an aggregate of 1,703,885 shares of our common stock that they beneficially own to Meteor Holding Corporation immediately prior to the closing of the merger in exchange for approximately 16.3% of the junior preferred stock and approximately 16.3% of the common stock of Meteor Holding Corporation. The shares of our common stock contributed by Mr. Knowles and the Elliott Investors pursuant to the contribution and voting agreements will be cancelled and cease to exist at the effective time of the merger and no payment of merger consideration shall be made in respect thereof.

### *Debt Commitment Letter*

Meteor Holding Corporation has entered into a commitment letter, dated as of September 11, 2006, which we refer to in this proxy statement as the "debt commitment letter," with Morgan Stanley Senior Funding, Inc. Pursuant to, and subject to the terms and conditions of, the debt commitment letter, Morgan Stanley Senior Funding, Inc. has committed to provide to Metrologic (x) senior secured first lien loan facilities of up to $160.0 million, consisting of a seven-year $125.0 million term B loan facility and a five-year $35.0 million revolving credit facility and (y) a senior secured second lien loan facility, consisting of an eight-year $75.0 million term loan facility.

The commitments to provide the senior secured first lien loan facilities and the senior secured second lien loan facility are subject to customary conditions for financings of these types, including the absence of a material adverse effect as contemplated by the merger agreement; the reasonable satisfaction of Morgan Stanley Senior Funding, Inc. with the final structure of the merger, the sources and uses of proceeds used to consummate the merger and the terms and provisions of the documents related to the merger; the reasonable satisfaction of the lenders with the documents related to the senior secured loan facilities; completion of the equity financing and the proceeds received therefrom constituting at least 30% of the total cost of the merger, including all related costs and expenses; and receipt of reasonably satisfactory evidence that the ratio of (x) total consolidated debt to (y) consolidated earnings before interest, taxes, depreciation and amortization (calculated in a manner reasonably satisfactory to Morgan Stanley Senior Funding, Inc. and Metrologic and including customary adjustments) is not greater than 5.2:1.0.

The commitments under the debt commitment letter will terminate on March 31, 2007 if the closing of the financing transactions has not occurred by such date.

### *Senior Secured First Lien Loan Facilities*

*General.* The borrower under the senior secured first lien loan facilities will be Metrologic. The senior secured term B loan facility will provide for a loan in the amount of $125.0 million, and is expected to have a term of seven years from the closing of the merger and amortize at a rate of 1.00% per year on a quarterly basis for the first six and three-quarters years after the closing date, with the balance paid at maturity. The senior secured revolving loan facility will provide for loans in an aggregate amount of up to $35.0 million, which will include a letter of credit subfacility and a swing line subfacility, and is expected to have a term of five years from the closing of the merger. Proceeds of the senior secured term B loan facility will be used, together with the other sources of funds described in this proxy statement, to finance the merger, to refinance indebtedness of Metrologic and to pay fees and expenses incurred in connection with the merger. Proceeds of the senior secured revolving credit facility will be used for working capital and general corporate purposes of the borrower.

*Interest Rates and Fees.* The loans under the senior secured term B loan facility are expected, at the option of the borrower, to bear interest at the following rates:

- the base rate, which will be the higher of (a) the prime rate of interest and (b) the federal funds rate plus 0.50%, in each case plus an applicable margin of 2.00%, if the senior secured credit facilities

44

receive ratings of B2 (stable) or higher from Moody's Investors Service, Inc. and B (stable) or higher from Standard & Poor's Rating Services, respectively, and otherwise, 2.50%; or

- a rate equal to the Eurodollar Rate (adjusted for maximum reserves) as determined by the Agent, plus an applicable margin of 3.00%, if the senior secured credit facilities receive ratings of B2 (stable) or higher from Moody's Investors Service, Inc. and B (stable) or higher from Standard & Poor's Rating Services, respectively, and otherwise, 3.50%.

The loans under the senior secured revolving loan facility are expected, at the option of the borrower, to bear interest at the following:

- the base rate, which will be the higher of (a) the prime rate of interest and (b) the federal funds rate plus 0.50%, in each case plus an applicable margin of 2.00%, if the senior secured credit facilities receive ratings of B2 (stable) or higher from Moody's Investors Service, Inc. and B (stable) or higher from Standard & Poor's Rating Services, respectively, and otherwise, 2.50%, for the first two full fiscal quarters after the closing of the facilities, and thereafter in accordance with step-downs to be based on the borrower's leverage ratio; or

- a rate equal to the Eurodollar Rate (adjusted for maximum reserves) as determined by the Agent, plus an applicable margin of 3.00%, if the senior secured credit facilities receive ratings of B2 (stable) or higher from Moody's Investors Service, Inc. and B (stable) or higher from Standard & Poor's Rating Services, respectively, and otherwise, 3.50%, for the first two full fiscal quarters after the closing of the facilities, and thereafter in accordance with step-downs to be based on the borrower's leverage ratio.

The senior secured revolving loan facility is expected to bear an annual commitment fee of 0.50% on the undrawn portion of that facility commencing on the date of execution and delivery of the credit agreement.

*Prepayments.* At the option of the borrower (1) amounts outstanding under the senior secured term B loan facility may be voluntarily prepaid and (2) the unutilized portion of the commitments under the senior secured revolving loan facility may be reduced and loans under such facility may be voluntarily repaid, subject to requirements as to minimum amounts and multiples, at any time in whole or in part without premium or penalty, except that any prepayment of Eurodollar rate loans other than at the end of the applicable interest periods will be made with reimbursement for any funding losses of the lenders resulting from the prepayment. Loans under the senior secured first lien loan facilities are expected to be subject to mandatory prepayment with (a) 50% of annual excess cash flow with certain step-downs based on the borrower's leverage ratio, (b) 100% of proceeds of permitted, non-ordinary course asset sales and casualty or condemnation proceeds, subject to various reinvestment rights of borrower and certain other exceptions, and (c) 100% of proceeds of the sale or issuance of debt securities subject to certain exceptions, and (d) 50% of proceeds of the sale or issuance of equity securities, subject to certain exceptions.

*Guarantors.* All obligations under the senior secured first lien loan facilities are expected to be guaranteed by Meteor Holding Corporation, which is required to be the direct or indirect holder, after giving effect to the merger, of at least 96% of the equity interest of the borrower, and by each direct and indirect wholly-owned material U.S. subsidiary of Meteor Holding Corporation, other than the borrower.

*Security.* All obligations of the borrower and each guarantor under the senior secured first lien loan facilities are expected to be secured by the following:

- a first priority lien on, and pledge of, (a) the capital stock and intercompany debt of each present and future direct and indirect U.S. subsidiary of Meteor Holding Corporation and (b) 66⅔% of the capital stock of each present and future direct and indirect first-tier foreign subsidiary owned by the borrower, subject to certain exceptions; and

45

- a first priority lien on, and security interest in, substantially all of the tangible and intangible property and assets of the borrower and each guarantor, subject to agreed upon exceptions.

*Covenants, Representations and Warranties.* The senior secured first lien loan facilities are expected to contain customary representations and warranties and customary affirmative and negative covenants, including, among other things, restrictions on liens, indebtedness, mergers and consolidations, sales of assets, investments, dividends and other distributions, repurchases of capital stock and capital expenditures. The senior secured first lien loan facilities are expected to contain financial covenants, including a maximum leverage ratio and a minimum interest coverage ratio.

*Events of Default.* Events of default under the senior secured first lien loan facilities are expected to include, among others, nonpayment of principal or interest, a material inaccuracy of representations or warranties, covenant defaults, cross-defaults to other indebtedness, bankruptcy and insolvency events and a change of control.

### Senior Secured Second Lien Loan Facility

*General.* The borrower under the senior secured second lien loan facility will be Metrologic. The senior secured second lien loan facility will provide for a term loan in the amount of $75.0 million, and is expected to have a term of eight years from the closing of the merger and will be payable in full at maturity. Proceeds of the senior secured second lien loan facility will be used, together with the other sources of funds described in this proxy statement, to finance the merger, to refinance indebtedness of Metrologic and to pay fees and expenses incurred in connection with the merger.

*Interest Rates and Fees.* The loans under the senior secured second lien loan facility are expected, at the option of the borrower, to bear interest at the following rates:

- the base rate, which will be the higher of (a) the prime rate of interest and (b) the federal funds rate plus 0.50%, in each case plus an applicable margin of 6.00%; or

- a rate equal to the Eurodollar Rate (adjusted for maximum reserves) as determined by the Agent, plus an applicable margin of 7.00%.

*Prepayments.* At the option of the borrower, and after repayment of the senior secured first lien term B loan facility, amounts outstanding under the senior secured second lien loan facility may be voluntarily prepaid, subject to requirements as to minimum amounts and multiples, at any time in whole or in part without premium or penalty, except that any prepayment of Eurodollar rate loans other than at the end of the applicable interest periods will be made with reimbursement for any funding losses of the lenders resulting from the prepayment. Loans under the senior secured second lien loan facility are expected to be subject to mandatory prepayment, after repayment of the senior secured first lien term B loan facility, with (a) 50% of annual excess cash flow with certain step downs based on the borrower's leverage ratio, (b) 100% of proceeds of permitted, non-ordinary course asset sales and casualty or condemnation proceeds, subject to various reinvestment rights of borrower and certain other exceptions, (c) 100% of proceeds of the sale or issuance of debt securities subject to certain exceptions, and (d) 50% of proceeds of the sale or issuance of equity securities, subject to certain exceptions.

*Guarantors.* All obligations under the senior secured second lien loan facility are expected to be guaranteed by Meteor Holding Corporation, which is required to be the direct or indirect holder, after giving effect to the merger, of at least 96% of the equity interest of the borrower, and by each direct and indirect wholly-owned material U.S. subsidiary of Meteor Holding Corporation, other than the borrower.

*Security.* All obligations of the borrower and each guarantor under the senior secured second lien loan facility are expected to be secured by the following:

- a second priority lien on, and pledge of, (a) the capital stock and intercompany debt of each present and future direct and indirect U.S. subsidiary of Meteor Holding Corporation and (b) 66⅔% of the

46

capital stock of each present and future direct and indirect first-tier foreign subsidiary owned by the borrower, subject to certain exceptions; and

- a second priority lien on, and security interest in, substantially all of the tangible and intangible property and assets of the borrower and each guarantor, subject to agreed upon exceptions.

*Covenants, Representations and Warranties.* The senior secured second lien loan facility is expected to contain customary representations and warranties and customary affirmative and negative covenants, including, among other things, restrictions on liens, indebtedness, mergers and consolidations, sales of assets, investments, dividends and other distributions, repurchases of capital stock and capital expenditures. The senior secured second lien loan facility is expected to contain financial covenants, including a maximum leverage ratio and a minimum interest coverage ratio.

*Events of Default.* Events of default under the senior secured second lien loan facility are expected to include, among others, nonpayment of principal or interest, a material inaccuracy of representations or warranties, covenant defaults, cross-acceleration to the senior secured first lien loan facilities and cross-defaults to other indebtedness, bankruptcy and insolvency events and a change of control.

## Interests of Certain Persons in the Merger

In considering the recommendations of the special committee and the board of directors, you should be aware that certain of our directors, executive officers and shareholders have interests in the transaction that are different from, and/or in addition to, the interests of Metrologic shareholders generally. The members of the special committee and the board of directors were aware of these differing interests and considered them, among other matters, in evaluating and negotiating the merger agreement and the merger and in recommending to the shareholders that the merger agreement be approved.

### *Knowles Interests*

*Equity Rollover; Put Right.* Pursuant to the terms of the contribution and voting agreement among Meteor Holding Corporation, C. Harry Knowles and certain of his related family trusts and charitable entities, which we refer to collectively as the Knowles Parties, Mr. Knowles agreed to contribute 1,680,578 shares of our common stock that he beneficially owns, which represents approximately 17.9% of the shares beneficially owned by the Knowles Parties, to Meteor Holding Corporation immediately prior to the closing of the merger in exchange for approximately 15% of the junior preferred stock and approximately 15% of the common stock of Meteor Holding Corporation. The number of shares of our common stock contributed by Mr. Knowles, and the number of shares of junior preferred stock and common stock of Meteor Holding Corporation issued in exchange therefor, will be adjusted as appropriate to allow Mr. Knowles to own 15% of the outstanding shares of junior preferred stock and 15% of the outstanding shares of common stock of Meteor Holding Corporation immediately following the closing of the merger. Based on the expected equity contributions of the Investor Group as of the date of this proxy statement, Meteor Holding Corporation currently expects that the number of shares to be contributed by Mr. Knowles will be adjusted to 1,571,320 shares. All other shares of our common stock beneficially owned by the Knowles Parties will be converted into the right to receive the $18.50 per share cash consideration payable to our shareholders in the merger.

In connection with the closing of the merger, Mr. Knowles will enter into an agreement with Meteor Holding Corporation and the Francisco Partners Investor pursuant to which Mr. Knowles will have the one-time right to cause Meteor Holding Corporation to repurchase all of the shares of junior preferred stock and common stock issued to him pursuant to the contribution and voting agreement upon the first to occur of the following, which we refer to as the trigger event: Mr. Knowles' removal as the chief executive officer or a director of Meteor Holding Corporation by the board of directors; the appointment of a new chief executive officer if Mr. Knowles votes against the appointment; the appointment or election of an independent director if Mr. Knowles, or any transferee of his shares, votes against the appointment; and Mr. Knowles' death. The purchase price for such shares will be the cost of the shares if the trigger event

47

occurs during the first year following the closing, or the lesser of cost or fair market value of the shares if the trigger event occurs thereafter. The foregoing put right can only be exercised once and will expire if unexercised by Mr. Knowles upon the earliest to occur of (i) 90 days following the trigger event, (ii) the closing of an initial public offering involving the common stock of Meteor Holding Corporation, (iii) a sale of Meteor Holding Corporation and (iv) the third anniversary of the closing date of the merger. In the event Mr. Knowles exercises the put right, the Francisco Partners Investor has agreed to repurchase Mr. Knowles' shares in the event Meteor Holding Corporation is unable to fulfill its repurchase obligations for a period of 90 days for certain reasons, including if the purchase would violate applicable law or the terms of its outstanding indebtedness.

*Voting Arrangements.* Pursuant to the terms of the contribution and voting agreement among Meteor Holding Corporation and the Knowles Parties, the Knowles Parties agreed to vote or cause to be voted all shares of our common stock beneficially owned by them in favor of the approval of the merger agreement and against any alternative proposal to acquire us and not to sell, transfer, grant any proxies, enter into any voting agreement or otherwise dispose of such shares. As of October 31, 2006, the Knowles Parties owned approximately 41.1% of the outstanding shares of our common stock. In the event that the merger agreement is terminated under certain circumstances, the Knowles Parties have agreed, with respect to shares of our common stock owned by the Knowles Parties amounting to 35% of the total outstanding shares, to vote such shares against any alternative proposal to acquire us and to be subject to certain restrictions on transfer of such shares, in each case for a period of up to 10 months.

*Expense Reimbursement.* Pursuant to the terms of the contribution and voting agreement among Meteor Holding Corporation and the Knowles Parties, Meteor Holding Corporation agreed to reimburse the Knowles Parties for their reasonable out-of-pocket expenses in connection with the transactions contemplated by the agreement, unless Mr. Knowles fails to contribute his shares of Metrologic common stock as required by the terms of the agreement.

*Stockholders Agreement and Post-Closing Governance.* Meteor Holding Corporation and the Investor Group will enter into a stockholders agreement in connection with the closing of the merger, which we refer to in this proxy statement as the stockholders agreement. Pursuant to the terms of the stockholders agreement, Mr. Knowles and his permitted transferees will have the right to:

- designate one member of the board of directors of Meteor Holding Corporation following the closing of the merger;

- acquire their pro rata share of additional shares of equity securities issued by Meteor Holding Corporation, subject to certain exceptions;

- participate on a pro rata basis in sales of equity securities of Meteor Holding Corporation by the Francisco Partners Investor and its permitted transferees; and

- cause Meteor Holding Corporation to register shares of common stock held by them under certain circumstances.

In addition, Mr. Knowles and his permitted transferees will be subject to certain restrictions on the transfer of shares of capital stock of Meteor Holding Corporation, and may be compelled to sell the shares of capital stock of Meteor Holding Corporation held by them in certain sales effected by the Francisco Partners Investor and its permitted transferees. The rights of Mr. Knowles and his permitted transferees to elect directors, participate in subsequent equity issuances and sales, and cause Meteor Holding Corporation to effect the registration of their shares will generally expire at such time as their ownership of capital stock of Meteor Holding Corporation, calculated on an as-converted to common stock basis, is less than five percent.

48

*Employment Arrangements.*  Pursuant to a letter agreement to be entered into by and between Meteor Holding Corporation and C. Harry Knowles, Mr. Knowles will serve as the initial Chief Executive Officer of Meteor Holding Corporation following the merger. Mr. Knowles will receive an annual base salary of $350,000 together with certain fringe benefits, and he will be eligible to participate in all employee benefit plans, policies and arrangements. In addition, Meteor Holding Corporation will provide Mr. Knowles and his wife, Janet H. Knowles, with medical insurance coverage commensurate with the medical insurance coverage provided to each of them as of September 12, 2006 for the remainder of each of their lives whether or not Mr. or Mrs. Knowles remains employed by Meteor Holding Corporation.

*Advisory Fee Arrangements.*  Francisco Partners Management, LLC will enter into an advisory agreement with Meteor Holding Corporation in connection with the consummation of the merger pursuant to which Meteor Holding Corporation will agree to pay Francisco Partners Management, LLC a $12.0 million fee upon the successful consummation of the merger, and a quarterly fee equal to the greater of (i) $375,000 or (ii) 0.1625% of the consolidated revenue of Meteor Holding Corporation and its subsidiaries for the last twelve months preceding the quarterly payment, as consideration for ongoing advisory services to be provided to Meteor Holding Corporation following the consummation of the merger. In connection with the entry into the contribution and voting agreement by the Knowles Parties, Francisco Partners Management, LLC entered into a letter agreement with Mr. Knowles that provides for the payment to Mr. Knowles of a portion of the quarterly advisory fee paid to Francisco Partners Management, LLC or its assignee, any similar fees payable to Francisco Partners Management, LLC or its affiliates and any fees payable to Francisco Partners Management, LLC or its affiliate in connection with a merger, asset sale, recapitalization, sale of securities or similar transaction involving Meteor Holding Corporation or its subsidiaries (other than in connection with an acquisition of another company), in each case based on his percentage ownership of Meteor Holding Corporation relative to the aggregate ownership of the Investor Group. Mr. Knowles is not entitled to receive any portion of the $12.0 million fee payable to Francisco Partners Management, LLC upon the consummation of the merger.

### Elliott Interests

*Equity Rollover.*  Pursuant to the terms of the contribution and voting agreement among Meteor Holding Corporation and the Elliott Investors, the Elliott Investors have agreed to contribute an aggregate of 1,703,885 shares of our common stock that they beneficially own to Meteor Holding Corporation immediately prior to the closing of the merger in exchange for approximately 16.3% of the junior preferred stock and approximately 16.3% of the common stock of Meteor Holding Corporation.

*Voting Arrangements.*  Pursuant to the terms of the contribution and voting agreement among Meteor Holding Corporation and the Elliott Investors, the Elliott Investors agreed to vote or cause to be voted all shares of our common stock beneficially owned by them in favor of the approval of the merger agreement and against any alternative proposal to acquire us and not to sell, transfer, grant any proxies, enter into any voting agreement or otherwise dispose of such shares. The Elliott Investors beneficially own approximately 7.5% of the outstanding shares of our common stock as of the date of this proxy statement.

*Expense Reimbursement.*  Pursuant to the terms of the contribution and voting agreement among Meteor Holding Corporation and the Elliott Investors, Meteor Holding Corporation agreed to reimburse the Elliott Investors for their reasonable out-of-pocket expenses in connection with the transactions contemplated by the agreement or any related agreement, unless the Elliott Investors fail to contribute their shares of Metrologic common stock as required by the terms of the agreement.

*Stockholders Agreement and Post-Closing Governance.*  Pursuant to the terms of the stockholders agreement, the Elliott Investors and their permitted transferees will have the right to:

- designate one member of the board of directors of Meteor Holding Corporation following the closing of the merger;

49

- acquire their pro rata share of additional shares of equity securities issued by Meteor Holding Corporation, subject to certain exceptions;

- participate on a pro rata basis in sales of equity securities of Meteor Holding Corporation by the Francisco Partners Investor and its permitted transferees; and

- cause Meteor Holding Corporation to register shares of common stock held by them under certain circumstances.

In addition, the Elliott Investors and their permitted transferees will be subject to certain restrictions on the transfer of shares of capital stock of Meteor Holding Corporation, and may be compelled to sell the shares of capital stock of Meteor Holding Corporation held by them in certain sales effected by the Francisco Partners Investor and its permitted transferees. The rights of the Elliott Investors and their permitted transferees to elect directors, participate in subsequent equity issuances and sales, and cause Meteor Holding Corporation to effect the registration of their shares will generally expire at such time as their ownership of capital stock, calculated on an as-converted to common stock basis, is less than five percent.

*Fee Arrangements.* If the merger agreement is terminated under certain circumstances, Metrologic will be obligated to pay a termination fee of $18.25 million to Meteor Holding Corporation or its designee. See "The Merger Agreement—Fees and Expenses." In connection with the execution of the contribution and voting agreement by the Elliott Investors, Meteor Holding Corporation entered into a letter agreement with Elliott Associates, L.P. pursuant to which Elliott Associates, L.P. or its assignee will, subject to the terms of the letter agreement, be entitled to receive a portion of the termination fee determined by multiplying the termination fee, less the fees and expenses incurred by Meteor Holding Corporation and the Investor Group in connection with the merger, the merger agreement and the transactions contemplated by the merger agreement and the related agreements, by a fraction, the numerator of which is the value of the shares that the Elliott Investors agreed to contribute to Meteor Holding Corporation pursuant to the contribution and voting agreement (based on the $18.50 per share merger price), and the denominator of which is the sum of the value of such shares and the amount of the equity investment of the Francisco Partners Investor. A portion of any termination fee payable to Elliott Associates, L.P. or its assignee will be forfeited under certain circumstances in the event that the Elliott Investors fail to vote their shares of our common stock against an alternative proposal to acquire us during the three-month period after a termination of the merger agreement.

As disclosed above, Francisco Partners Management, LLC will enter into an advisory agreement with Meteor Holding Corporation in connection with the consummation of the merger pursuant to which Meteor Holding Corporation will agree to pay Francisco Partners Management, LLC a $12.0 million fee upon the successful consummation of the merger, and a quarterly fee equal to the greater of (i) $375,000 or (ii) 0.1625% of the consolidated revenue of Meteor Holding Corporation and its subsidiaries for the last twelve months preceding the quarterly payment, as consideration for ongoing advisory services to be provided to Meteor Holding Corporation following the consummation of the merger. In connection with the execution of the contribution and voting agreement by the Elliott Investors, Francisco Partners Management, LLC entered into a letter agreement with Elliott Associates, L.P. pursuant to which Elliott Associates, L.P. or its assignees will be entitled to receive a portion of the $12.0 million fee payable to Francisco Partners Management, LLC from Meteor Holding Corporation upon the consummation of the merger, based on the Elliott Investors percentage ownership of Meteor Holding Corporation relative to the aggregate ownership of the Elliott Investors and the Francisco Partners Investor. The letter agreement further provides for the payment to Elliott Associates, L.P. of a portion of the quarterly advisory fee paid to Francisco Partners Management, LLC or its assignee, any similar fees payable to Francisco Partners Management, LLC or its affiliates and any fees payable to Francisco Partners Management, LLC or its affiliate in connection with a merger, asset sale, recapitalization, sale of securities or similar transaction

involving Meteor Holding Corporation or its subsidiaries (other than in connection with an acquisition of another company), in each case based on the Elliott Investors' percentage ownership of Meteor Holding Corporation relative to the aggregate ownership of the Investor Group.

### *Metrologic Stock Options*

All options granted under Metrologic's 2004 Equity Incentive Plan, whether or not vested, will automatically be cancelled immediately prior to the effective time of the merger. Options with an exercise price that is less than $18.50 per share will be converted into a right to receive an amount in cash, without interest, less applicable taxes, equal to the product of the number of shares of our common stock subject to each option, as of the effective time of the merger, multiplied by the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option. Holders of options granted under the 2004 Equity Incentive Plan with an exercise price that is equal to or greater than $18.50 per share will receive $1.00 per award in exchange for the cancelled options. With respect to options granted under Metrologic's 1994 Incentive Plan, Metrologic commenced an offer, pursuant to a Schedule TO filed on November 21, 2006, to holders of options granted under our 1994 Incentive Plan to cancel all of their options, whether or not vested, in exchange for a cash payment, without interest, equal to the product of (1) the total number of shares of Metrologic common stock subject to the option multiplied by (2) the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option, less any applicable taxes. All of the options held by employees who will be eligible to participate in the offer have exercise prices that are less than $18.50 per share.

The table below sets forth, as of October 31, 2006, for any person who has been a director or executive officer of Metrologic at any time since January 1, 2006, (a) the number of shares subject to options for Metrologic common stock and (b) the value of such options, calculated by multiplying (1) the excess of $18.50 over the per share exercise price of the option by (2) the number of shares subject to the option, and without regard to deductions for income taxes and other withholding.

| Executive Officers and Directors | Options | |
| --- | --- | --- |
| Name | Shares | Value |
| Benny A. Noens(1) | — | — |
| Kevin Bratton(2) | 15,750 | $ 153,182 |
| Richard C. Close | 50,204 | $ 417,886 |
| Gregory DiNoia | 30,300 | $ 102,122 |
| Dale M. Fischer | 24,300 | $      2 |
| Bruce Harrison | — | — |
| C. Harry Knowles | 25,200 | $      2 |
| Janet H. Knowles | 25,200 | $      2 |
| John H. Mathias | 45,200 | $ 340,402 |
| Stanton L. Meltzer | 31,200 | $ 102,122 |
| Hsu Jau Nan | 81,200 | $ 906,822 |
| William Rulon-Miller | 33,950 | $ 146,392 |
| Mark Ryan | 24,300 | $      2 |
| Joseph Sawitsky | 60,000 | $      2 |
| Mark Schmidt | 72,000 | $ 204,242 |
| Jeffrey Yorsz(3) | 12,750 | $      2 |
| Frank C. Zirnkilton, Jr.(4) | — | — |

(1) Mr. Noens resigned effective June 30, 2006.

51

(2) Mr. Bratton resigned effective November 3, 2006. In addition to the shares listed in the table above, Mr. Bratton holds unvested options to purchase 23,250 shares that will terminate prior to the effective time of the merger.

(3) Mr. Yorsz ceased to be an executive officer of Metrologic effective October 1, 2006 due to the sale of AOA.

(4) Mr. Zirnkilton resigned as an executive officer of Metrologic effective August 31, 2006.

All directors and executive officers will receive cash in respect of their options in the amounts set forth above, less applicable taxes.

### Indemnification and Insurance

For a period of six years following the effective time of the merger, Metrologic will indemnify and hold harmless all past and present officers and directors of the company for acts or omissions occurring at or prior to the effective time of the merger to the fullest extent provided by New Jersey or other applicable law or provided under our certificate of incorporation or bylaws, subject to applicable law.

The merger agreement requires that the surviving corporation maintain in effect, for a period of six years after the effective time of the merger, "tail" directors' and officers' insurance policies in an amount and scope at least as favorable as our existing policies for claims arising from acts or omissions existing or occurring at or prior to the effective time of the merger, subject to a maximum annual premium of 200% of our current annual premium. If a tail policy with such terms is not available at a cost not greater than 200% of our current annual premium, the surviving corporation must obtain a policy with the greatest coverage available for a cost not exceeding 200% of the current annual premium paid by us.

The obligations described above regarding directors' and officers' indemnification and insurance must be assumed by any successor entity or assign Metrologic as a result of any consolidation, merger or transfer of all or substantially all properties and assets.

### Management Arrangements

As of the date of this proxy statement, except for the arrangements with Mr. Knowles described above, no member of our management has entered into any amendments or modifications to existing employment agreements or arrangements with us or our subsidiaries in connection with the merger. In addition, as of the date of this proxy statement, except for the arrangements with Mr. Knowles described above, no member of our management has entered into any agreement, arrangement or understanding with Meteor Holding Corporation or its affiliates regarding employment with, or the right to purchase or participate in the equity of, Meteor Holding Corporation. Meteor Holding Corporation has informed us that it is its intention to retain members of our existing management team after the merger is completed, but that it does not expect that new employment agreements will be entered into with them. In addition, Meteor Holding Corporation has informed us of its intention to implement a management retention program, which will provide for the aggregate payment of up to $2.0 million to certain members of management following the consummation of the merger, subject to their continued employment for specified periods of time and other terms and conditions of the program.

In connection with the proposed merger, Meteor Holding Corporation also intends to adopt an equity incentive plan under which certain employees, including members of our management team, will be eligible to receive options to acquire the common stock of Meteor Holding Corporation. The new option plan will permit the grant of options covering approximately 10% of the common equity of Meteor Holding Corporation as of immediately following the merger. Meteor Holding Corporation currently expects that a portion of the options will be granted to current members of our management following the completion of the merger, that a portion of the options will be reserved for grants to new hires, and that a

52

portion of the options will be granted as performance-based compensation awards in the future. The employees who will receive grants, and the terms of the grants, have not yet been determined.

### Special Committee Compensation

The special committee members received remuneration for their service on the committee, including a retainer of $40,000 for the chairman and $35,000 for each other member of the special committee, $1,500 for each committee meeting, which is the Company's standard committee fee, $1,500 for any day where a substantial portion of the day was spent on committee-related tasks and reimbursement of reasonable fees and expenses. Accordingly, the following amounts will be received by the special committee members for their service on the special committee to date: Mr. Mathias $61,500; Mr. Close $56,500; Mr. Meltzer $56,500; and Mr. Rulon-Miller $55,000. The special committee members did not receive any incentive fee for approving the transaction. In recommending and approving the compensation package for the special committee, the compensation committee and the board of directors considered, among other things, the complexities added to the transaction by the involvement of Mr. Knowles and the Elliott Investors, the time expected to be required by the special committee members and chairman and the publicly reported compensation of the special committees of the boards of other companies.

In addition, Mr. Close, a member of the special committee, received $200,000 as compensation for consulting services provided in connection with the sale of AOA, which was a separate transaction from the merger.

## Material U.S. Federal Income Tax Consequences

The following discusses, subject to the limitations stated below, the material U.S. federal income tax consequences of the merger to U.S. holders of our common stock whose shares of our common stock are converted into the right to receive cash in the merger, as well as the material U.S. federal income tax consequences of the merger to Metrologic and (to the extent described below) the Rollover Investors who acquire an equity interest in Meteor Holding Corporation. Non-U.S. holders of our common stock may have different tax consequences than those described below and are urged to consult their tax advisors regarding the tax treatment to them under U.S. and non-U.S. tax laws. We base this summary on the provisions of the Internal Revenue Code of 1986, or the "Code," applicable current and proposed U.S. Treasury Regulations, judicial authority, and administrative rulings and practice, all of which are subject to change, possibly on a retroactive basis.

### U.S. Holders

For purposes of this discussion, we use the term "U.S. holder" to mean a beneficial owner of Metrologic common stock that is:

- a citizen or individual resident of the U.S. for U.S. federal income tax purposes;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the U.S. or any State or the District of Columbia;

- a trust if it (1) is subject to the primary supervision of a court within the U.S. and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person; or

- an estate the income of which is subject to U.S. federal income tax regardless of its source.

The U.S. federal income taxes of a partner in a partnership or a shareholder of an S corporation holding our common stock will depend on the status of the partner and the activities of the partnership or

53

the shareholder and the activities of the S corporation. Partners in a partnership and shareholders in an S corporation holding shares of our common stock should consult their own tax advisors.

This discussion assumes that you hold the shares of our common stock as a capital asset within the meaning of Section 1221 of the Code (generally, property held for investment). This discussion does not address all aspects of U.S. federal income tax that may be relevant to you in light of your particular circumstances, or that may apply to you if you are subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, dealers in securities or foreign currencies, tax-exempt organizations, financial institutions, mutual funds, partnerships or other pass through entities for U.S. federal income tax purposes, non-U.S. persons, shareholders who hold shares of our common stock as part of a hedge, straddle, constructive sale or conversion transaction, shareholders who acquired their shares of our common stock through the exercise of employee stock options or other compensation arrangements or shareholders who hold (actually or constructively) an equity interest in the surviving corporation after the merger). In addition, the discussion does not address any tax considerations under state, local or non-U.S. laws or U.S. federal laws other than those pertaining to the U.S. federal income tax that may apply to you. **We urge you to consult your own tax advisor to determine the particular tax consequences to you, including the application and effect of any state, local or non-U.S. income and other tax laws, of the receipt of cash in exchange for our common stock pursuant to the merger.**

The receipt of cash in the merger by U.S. holders of our common stock will be a taxable transaction for U.S. federal income tax purposes (and may also be a taxable transaction under applicable state, local and foreign tax laws). In general, for U.S. federal income tax purposes, a U.S. holder of our common stock will recognize gain or loss equal to the difference between:

- the amount of cash received in exchange for such common stock and

- the U.S. holder's adjusted tax basis in such common stock.

Such gain or loss will be capital gain or loss. If the holding period in our common stock surrendered in the merger is greater than one year as of the date of the merger, the gain or loss will be long-term capital gain or loss. The deductibility of a capital loss recognized on the exchange is subject to limitations under the Code. Certain U.S. holders, including individuals, are eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. If you acquired different blocks of our common stock at different times and different prices, you must calculate your gain or loss and determine your adjusted tax basis and holding period separately with respect to each block of our common stock.

Under the Code, as a U.S. holder of our common stock, you may be subject to information reporting on the cash received in the merger unless an exemption applies. Backup withholding may also apply (currently at a rate of 28%) with respect to the amount of cash received in the merger, unless you provide proof of an applicable exemption or a correct taxpayer identification number, and otherwise comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be refunded or credited against your U.S. federal income tax liability, if any, provided that you furnish the required information to the Internal Revenue Service in a timely manner. Each U.S. holder should consult its own tax advisor as to the qualifications for exemption from backup withholding and the procedures for obtaining such exemption.

*Metrologic and Rollover Investors*

Under general U.S. federal income tax principles, the merger should not be a taxable event in which gain is recognized by Metrologic for U.S. federal income tax purposes. The merger will cause an "ownership change" of Metrologic for purposes of Section 382 of the Code. As a result, Metrologic's use of pre-merger tax net operating losses, credits and certain other tax attributes, if any, will be subject to limitations following the merger. As described above in "Special Factors— Interests of Certain Persons in

54

the Merger", the Rollover Investors will acquire equity interests in Meteor Holding Corporation by contributing shares of Metrologic common stock to Meteor Holding Corporation. The U.S. federal tax treatment of these transactions may depend on the particular facts relating to the Rollover Investor, and therefore Rollover Investors are urged to discuss their tax treatment with their own tax advisors.

**Accounting Treatment**

The merger is intended to be accounted for as a purchase under U.S. generally accepted accounting principles. Accordingly, it is expected that the basis of Metrologic in its assets and liabilities will be adjusted to fair market value on completion of the merger, including the establishment of goodwill.

**Regulatory Approvals**

The Hart-Scott-Rodino Antitrust Improvements Act of 1976 and related rules, or the HSR Act, provide that transactions such as the merger may not be completed until certain information has been submitted to the Federal Trade Commission and the Antitrust Division of the U.S. Department of Justice and specified waiting period requirements have been satisfied. Metrologic, Meteor Holding Corporation and Meteor Merger Corporation have made the required filings with the Antitrust Division and the Federal Trade Commission. On October 23, 2006, the Federal Trade Commission granted early termination of the applicable waiting period under the HSR Act.

The merger may also be subject to review under the antitrust laws of foreign jurisdictions. To the extent applicable, the parties intend to file any required notifications under such foreign antitrust laws and observe any applicable waiting periods.

At any time before or after the merger, the Antitrust Division of the Department of Justice or the Federal Trade Commission, or the competition authorities of foreign governments, may challenge the merger on antitrust grounds. Private parties could take antitrust action under the antitrust laws, including seeking an injunction prohibiting or delaying the merger, divestiture or damages under certain circumstances. Additionally, at any time before or after the merger, notwithstanding the expiration or termination of the applicable waiting period, any state could take action under its antitrust laws as it deems necessary or desirable in the public interest. There can be no assurance that a challenge to the merger will not be made or that, if a challenge is made, Metrologic, Meteor Holding Corporation and Meteor Merger Corporation will prevail.

Under the merger agreement, we and Meteor Holding Corporation and Meteor Merger Corporation have each agreed to use commercially reasonable efforts to obtain all required governmental approvals in connection with the execution of the merger agreement and completion of the merger.

Except as noted above with respect to the required filings under the HSR Act and the antitrust laws of any applicable foreign jurisdiction and the filing of a certificate of merger in New Jersey at or before the effective date of the merger, we are unaware of any material federal, state or foreign regulatory requirements or approvals required for the execution of the merger agreement or completion of the merger.

55

**Fees and Expenses of the Merger**

The estimated fees and expenses to be incurred in connection with the consummation of the merger and related financings and other transactions contemplated by the merger agreement are as follows:

| Description | Amount |
|---|---|
| Financial advisory fees and expenses | $ 17,100,000 |
| Legal, accounting, tax and consulting fees and expenses | 3,800,000 |
| HSR Act filing fees | 125,000 |
| Securities and Exchange Commission filing fees | 39,497 |
| Financing fees and expenses | 5,675,000 |
| Directors and officers insurance | 200,000 |
| Special committee fees | 229,500 |
| Rating agency fees | 130,000 |
| Printing and mailing costs | 400,000 |
| Miscellaneous | 101,003 |
| Total | $ 27,800,000 |

Metrologic, as the surviving corporation, will be responsible for all of the fees and expenses described above if the merger is consummated. If the merger is not consummated, we would pay our own fees and expenses, which we estimate to be approximately $1.6 million. In addition, if the merger agreement is terminated under certain circumstances, we will be obligated to pay a termination fee of $18.25 million to Meteor Holding Corporation or its designee. Under other circumstances, Meteor Holding Corporation will be obligated to pay a termination fee of $9.125 million to Metrologic. See "Merger Agreement—Fees and Expenses."

**Litigation Related to the Merger**

On September 13, 2006, an action, titled Savarese v. Close, et. al., was filed in the Superior Court of New Jersey Law Division: Camden County against Metrologic and all of the members of Metrologic's board of directors as defendants. On September 14, 2006, an action, titled Wilkenfeld v. Knowles, et. al., was filed in the Superior Court of New Jersey Chancery Division: Camden County against Metrologic and all members of Metrologic's board of directors as defendants and another action, titled Marcin v. Metrologic Instruments, Inc., et. al., was filed in the Superior Court of New Jersey Chancery Division: Gloucester County against Metrologic, all of the members of Metrologic's board of directors, Francisco Partners and Elliott Associates, L.P., as defendants. On September 15, 2006, an action, titled Gerber v. Metrologic Instruments, Inc., et. al., was filed in the Superior Court of New Jersey Law Division: Camden County against Metrologic, all of the members of Metrologic's board of directors and Elliott Associates L.P., as defendants. On October 31, 2006, an amended class action complaint to the initial complaint, titled Wilkenfeld v. Knowles, et. al., was filed in the Superior Court of New Jersey Law Division: Camden County against Metrologic, all of the members of Metrologic's Board of Directors, Francisco Partners, II, LP, FP-Metrologic, LLC, Meteor Holding Corporation, Meteor Merger Corporation, Elliott Associates, LP, and Elliott International, LP. In these actions, plaintiffs purport to represent shareholders of Metrologic who are similarly situated with the plaintiffs.

The Savarese complaint alleges, among other things, that the merger consideration is inadequate, that certain defendants have timed and structured the transaction to allow themselves to capture the benefits of the Company's future potential without paying fair consideration to Metrologic's public shareholders, and that the directors breached their fiduciary duties by not making the requisite effort to obtain the best transaction available.

56

The Wilkenfeld complaint alleges, among other things, that the defendants failed to maximize value on a change in control of Metrologic and that the merger consideration deprives plaintiffs of the true and full value of the shares, that the proposed merger is an attempt to engage in a self-dealing transaction and to deny the plaintiffs an opportunity to share in the future success of Metrologic and that the directors breached their fiduciary duties because the terms of the merger were determined without an adequate investigation of strategic alternatives.

The Marcin complaint alleges, among other things, that the shareholders have been denied a fair process and arm's length negotiated transaction, that the directors have structured a preferential deal to the detriment of the shareholders, thus denying the shareholders any participation in the future potential of Metrologic, and have failed to maximize shareholder value. The complaint further alleges that certain defendants have used their positions of power and control to engage in self-dealing and have breached their fiduciary duties of loyalty and good faith owed to the plaintiff. Finally, the complaint alleges that other defendants have knowingly participated in these breaches of fiduciary duties.

The Gerber complaint alleges, among other things, that the share price of Metrologic's stock had been artificially depressed since the removal of Mr. Benny Noens, the Company's former Chief Executive Officer and President, on April 20, 2006 and subsequent appointment of C. Harry Knowles as the interim Chief Executive Officer and President and that the board of directors has been slow in searching for a replacement. According to the complaint, these actions have created a management vacuum that resulted in a drop in the stock price and enabled certain defendants to engage in self dealing. The complaint further alleges that the merger agreement places an artificial lid on the stock price, allowing certain defendants to capture the benefits of Metrologic's future potential without paying fair consideration to Metrologic's public shareholders, and that the directors breached their fiduciary duties to the plaintiff.

The amended Wilkenfeld complaint generally alleges that the defendants breached their fiduciary duties in entering into the merger (and other defendants aided and abetted the alleged breaches) and further alleges, among other things, that the proxy statement filed on October 5, 2006 allegedly fails to disclose material information to the Company's shareholders in connection with the shareholder meeting which has yet to be scheduled. The amended Wilkenfeld complaint seeks class certification and certain forms of equitable relief, including enjoining the consummation of the merger, and damages.

The amended Wilkenfeld complaint certifies that a joint stipulation will be submitted to the court that will consolidate, coordinate and/or transfer three other pending actions relating to the same subject matter into the Wilkenfeld action. The parties have agreed to such a stipulation, which provides for, among other things, expedited discovery and other pretrial proceedings.

The defendants believe that the allegations of all complaints are without merit and intend to vigorously contest the actions. There can be no assurance, however, that the defendants will be successful in the defense of these actions.

## Certain Financial Projections

On July 31, 2006, Metrologic provided Needham & Company with financial projections for 2006 through 2011 for use by Needham & Company in Needham & Company's financial analyses as summarized under "Special Factors – Opinion of Needham & Company, LLC." These financial projections, as well as revised projections dated August 16, 2006 and August 23, 2006, were also provided to Francisco Partners as described in "Special Factors – Background of the Merger." The projections do not give effect to the merger or the financing of the merger.

57

The following is a summary of the projections prepared by Metrologic on July 31, 2006.

| | Estimate | Projection | | | | |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (dollars in thousands) | | | |
| Sales | $ 222,583 | $ 272,263 | $ 335,879 | $ 409,547 | $ 494,237 | $ 601,917 |
| Net Income | $ 24,757 | $ 29,658 | $ 44,553 | $ 60,233 | $ 81,267 | $ 104,437 |
| EBITDA | $ 30,563 | $ 50,714 | $ 72,888 | $ 95,376 | $ 124,390 | $ 157,588 |

In preparing the July 31, 2006 projections, Metrologic management assumed revenue growth of 21%–23% annually, resulting in a 22% compound annual growth rate from 2006 to 2011; an improvement in gross margin, from 42% in 2006 to 48% in 2011; a steady decline in operating expenses as a percentage of revenue, from 31.5% in 2006 to 24% in 2011; and an improvement in EBITDA margin, from 14% in 2006 to 26% in 2011.

The following is a summary of the projections prepared by Metrologic on August 16, 2006.

| | Estimate | Projection | | | | |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (dollars in thousands) | | | |
| Sales | $ 222,583 | $ 267,086 | $ 326,893 | $ 391,851 | $ 478,438 | $ 571,344 |
| Net Income | $ 24,757 | $ 28,627 | $ 43,386 | $ 58,181 | $ 80,120 | $ 98,338 |
| EBITDA | $ 30,563 | $ 49,154 | $ 71,248 | $ 92,457 | 1$22,955 | $ 148,409 |

In preparing the August 16, 2006 projections, Metrologic management assumed revenue growth of 19%–22% annually, resulting in a 21% compound annual growth rate from 2006 to 2011; an improvement in gross margin, from 42% in 2006 to 49% in 2011; a steady decline in operating expenses as a percentage of revenue, from 31.5% in 2006 to 25% in 2011; and an improvement in EBITDA margin, from 14% in 2006 to 26% in 2011.

The following is a summary of the projections prepared by Metrologic on August 23, 2006.

| | Estimate | Projection | | | | |
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| --- | --- | --- | --- | --- | --- | --- |
| | | | (dollars in thousands) | | | |
| Sales | $ 222,583 | $ 254,538 | $ 301,826 | $ 359,834 | $ 426,281 | $ 501,923 |
| Net Income | $ 24,757 | $ 22,229 | $ 30,405 | $ 41,271 | $ 54,285 | $ 65,874 |
| EBITDA | $ 30,563 | $ 39,539 | $ 52,376 | $ 68,348 | $ 86,179 | $ 103,017 |

In preparing the August 23, 2006 projections, Metrologic management assumed revenue growth of 15%–19% annually, resulting in an 18% compound annual growth rate from 2006 to 2011; an improvement in gross margin, from 42% in 2006 to 46% in 2011; a steady decline in operating expenses as a percentage of revenue, from 31.5% in 2006 to 28% in 2011; and an improvement in EBITDA margin, from 14% in 2006 to 21% in 2011.

Other than periodically giving guidance to Wall Street, Metrologic does not, as a matter of course, publicly disclose projections of future revenues or earnings. The projections were not prepared with a view to public disclosure and are included in this proxy statement only because such information was made available to Francisco Partners in connection with their due diligence investigations of Metrologic and some of the projections were provided to Needham & Company for use by it in its financial analyses. The projections were not prepared with a view to compliance with published guidelines of the Securities and Exchange Commission or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information.

58

Metrologic's management developed the projections from financial and other information which was based in part on revenue assumptions and estimates. The projections also incorporate assumptions regarding expenses (based in part on detailed employee cost analyses) and capital expenditures. In compiling the budget information to develop the projections, Metrologic's management took into account growth rate and margin assumptions that were consistent with recent actual results and with current expectations in light of market conditions. These revenue assumptions and the assumptions made by Metrologic's management regarding growth rates and margins represent all of the material assumptions and estimates made in connection with the preparation of the projections.

In compiling the projections, Metrologic's management took into account historical performance, combined with estimates regarding revenues, operating income, EBITDA and capital spending. The projections were developed in a manner consistent with management's historical development of budgets and were not developed for public disclosure. Although the projections are presented with numerical specificity, these projections reflect numerous assumptions and estimates as to future events made by Metrologic's management that Metrologic's management believed were reasonable at the time the projections were prepared. In addition, factors such as industry performance and general business, economic, regulatory, market and financial conditions, all of which are difficult to predict and beyond the control of Metrologic may cause the projections or the underlying assumptions to be inaccurate. Accordingly, there can be no assurance that the projections will be realized, and actual results may be materially greater or less than those contained in the projections. The inclusion of this information should not be regarded as an indication that Francisco Partners, Needham & Company or any other recipient of this information considered, or now considers, it to be a reliable prediction of future results.

Metrologic does not intend to update or otherwise revise the projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events even in the event that any or all of the assumptions underlying the projections are shown to be in error.

## Provisions for Unaffiliated Shareholders

The special committee was charged with representing the interests of our unaffiliated shareholders and was actively involved in extended and numerous deliberations and negotiations regarding the merger on behalf of the unaffiliated shareholders. In this capacity, the special committee retained and received advice from Needham & Company, LLC, as financial advisor, and Ballard Spahr Andrews & Ingersoll, LLP, as legal advisor, and requested and received from Needham & Company an opinion that, as of September 11, 2006 and based upon and subject to the assumptions and other matters set forth in its opinion, the $18.50 in cash per share to be received by holders of shares of Metrologic common stock (other than the Rollover Investors) pursuant to the merger agreement was fair from a financial point of view. Metrologic has agreed to pay Needham & Company a maximum fee for its services of $1 million, none of which is contingent on the consummation of the merger. See "Special Factors—Background of Merger," "Special Factors—Reasons for the Special Committee's Recommendation" and "Special Factors—Opinion of Needham & Company, LLC." We did not make any provision in connection with the transaction to grant unaffiliated security holders access to our corporate files or to obtain counsel or appraisal services at our expense, and the special committee did not retain an unaffiliated representative to act solely on behalf of the unaffiliated shareholders for purposes of negotiating the terms of the merger or preparing a report concerning the fairness of the transaction.

59

## THE PARTIES TO THE MERGER

**Metrologic Instruments, Inc.**

Metrologic Instruments, Inc.
90 Coles Road
Blackwood, New Jersey 08012
(856) 228-8100

    We are a New Jersey corporation with our principal executive offices at 90 Coles Road, Blackwood, New Jersey 08012-2539. Our telephone number is (856) 228-8100. We were incorporated in New Jersey in 1969.

    We are experts in optical image capture and processing solutions. We utilize our expertise to design, manufacture and market sophisticated imaging and scanning solutions serving a variety of point-of-sale, commercial and industrial applications. Our solutions utilize a broad array of laser, holographic and vision-based technologies designed to provide superior functionality and a compelling value proposition for our customers. We are a vertically integrated manufacturer, producing most of our own optics, coatings and components in our manufacturing and design facilities in the United States and China. We have developed a broad portfolio of intellectual property that includes over 365 patents that we aggressively protect. We employ a direct sales force and have a broad network of distributors and value added resellers, or VARs, to serve our worldwide customers through offices in 18 countries.

**Meteor Holding Corporation**

Meteor Holding Corporation
c/o Francisco Partners
2882 Sand Hill Road, Suite 280
Menlo Park, California 94025

    Meteor Holding Corporation is a Delaware corporation that was incorporated on September 1, 2006 on behalf of Francisco Partners solely for the purpose of completing the merger and the relating financings and transactions. As of the date of this proxy statement, FP-Metrologic, LLC is the sole stockholder of Meteor Holding Corporation.

**Meteor Merger Corporation**

Meteor Merger Corporation
c/o Francisco Partners
2882 Sand Hill Road, Suite 280
Menlo Park, California 94025

    Meteor Merger Corporation is a New Jersey corporation that was incorporated on August 31, 2006 on behalf of Francisco Partners solely for the purpose of completing the merger and the relating financings and transactions. Meteor Merger Corporation has not participated in any activities to date other than activities incident to its formation and the transactions contemplated by the merger agreement. In connection with the merger, Meteor Merger Corporation will be merged with and into Metrologic Instruments, Inc. and its separate existence will cease. As of the date of this proxy statement, Meteor Holding Corporation is the sole shareholder of Meteor Merger Corporation.

60

# DECLARATION OF SETH D. RIGRODSKY

# Part 6

## CURRENT EXECUTIVE OFFICERS AND DIRECTORS OF THE COMPANY

Each of the directors and executive officers of Metrologic is a citizen of the United States, except Mr. Hsu, who is a citizen of Singapore, and Mr. Ryan, who is a citizen of Great Britain, and, except as provided below, has his or her principal business address and telephone at c/o Metrologic Instruments, Inc., 90 Coles Road, Blackwood, New Jersey 08012, (856) 228-8100.

The directors and executive officers of Metrologic as of October 31, 2006, the date they became director or executive officer, their current occupation and their material employment during the last five years are as follows:

| Name | Occupation or Employment |
|---|---|
| C. Harry Knowles | Mr. Knowles is the founder of the Company and has been Chairman of the board of directors since the Company's inception and the Company's interim Chief Executive Officer since May 2006. Mr. Knowles served as Chief Executive Officer from 1985 until June 2004. Mr. Knowles served as President of the Company from its inception through 1982 and from 1985 until February 2000. In addition, Mr. Knowles served as Chief Technical Officer with responsibility for all of the Company's research and development activities from 1982 to 1985. From 1988 until June 2004, Mr. Knowles also served as a Managing Director of Metrologic Instruments GmbH. Prior to founding the Company, Mr. Knowles was the general manager of Westinghouse Electric Corporation's integrated circuits division in Elkridge, Maryland. Mr. Knowles is married to Janet H. Knowles, the Vice President, Administration, Treasurer, Secretary and a director of the Company. |
| Richard C. Close | Mr. Close became a director of the Company in September 1999. Mr. Close was appointed Chairman of the board of directors of Adaptive Optics Associates, Inc., a former subsidiary of the Company, in April 2006. He is a private investor and also provides consulting and transition management services for companies in connection with merger and acquisition activities. From January 1997 until August 2000, Mr. Close served as President and General Manager of Polaroid Graphics Imaging LLC. Polaroid Graphics Imaging LLC was formerly a division of Polaroid Corporation, and is now a privately owned independent company. Mr. Close served as President and Chief Executive Officer of Computer Identics Corporation from 1993 until 1997. |
| Hsu Jau Nan | Mr. Hsu became a director of the Company in September 1999. Mr. Hsu is an owner and managing director of several manufacturing companies in Taiwan, Singapore, and China which, in the aggregate, employ over 5,000 people. From 1973 to 1983, Mr. Hsu was an Engineering Manager for General Electric's television operations. |
| Janet H. Knowles | Mrs. Knowles was a director of the Company from 1972 to 1984 and has served as a director since 1986. Mrs. Knowles served as Vice President, Administration from 1976 to 1983 and has served in that capacity since 1984, as Treasurer since 1994 and as Secretary since March 2006. Mrs. Knowles also served as Secretary from 1984 until July 2004. Mrs. Knowles is married to C. Harry Knowles, the Chairman of the board of directors and interim Chief Executive Officer of the Company. |

61

| | |
|---|---|
| John H. Mathias | Mr. Mathias became a director of the Company in September 1999. Mr. Mathias currently is President of Asia Technologies, LLC, a supplier of components to high tech industries in Southeast Asia and the United States. From 1981 to 2002, he was Chairman and Chief Executive Officer of The JPM Company, a publicly traded company that manufactured wire and cable assemblies at various locations throughout the world. The JPM Company filed a chapter 11 petition in the United States Bankruptcy Court for the District of Delaware on March 1, 2002. |
| Stanton L. Meltzer | Mr. Meltzer has been a director of the Company since 1987. Mr. Meltzer is a certified public accountant and since 1964 has been a principal in the firm of Gold, Meltzer, Plasky & Wise, a professional corporation of certified public accountants, located in Moorestown, New Jersey. He has chaired conferences, lectured and taught courses to accountants throughout the United States for the American Institute of Certified Public Accountants and other professional organizations. |
| William Rulon-Miller | Mr. Rulon-Miller became a director of the Company in December 1997. Mr. Rulon-Miller joined Janney Montgomery Scott LLC in 1979 and currently serves as Senior Vice President and Director of Investment Banking. He is a director of The Penn Janney Fund, Inc., and on the Investment Committee of the Co-Investment Fund 2000 and Liberty Venture Partners, all of which are private venture capital organizations. |
| Kevin J. Bratton | Mr. Bratton has served as the Company's Chief Financial Officer since July 1, 2002. Mr. Bratton was employed as the Chief Financial Officer of The JPM Company, a company that manufactured wire and cable assemblies at various locations throughout the world, from June 2000 through June 2002. The JPM Company filed a Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware on March 1, 2002. From July 1999 to May 2000, Mr. Bratton was the Director of External Reporting at The JPM Company. Prior to joining JPM, Mr. Bratton was a Vice President and Treasurer of IGI, Inc., a manufacturer of poultry biologics and veterinary pharmaceuticals. Mr. Bratton resigned effective November 3, 2006. |
| Gregory DiNoia | Mr. DiNoia has served as the Company's Vice President, North American Sales since March 2004. In January 2005, he took over responsibility for South America becoming Vice President, The Americas. Mr. DiNoia joined us in 1997 as the Midwest Account Manager and has served as a Strategic Account Manager and was promoted to Director of Strategic Retail & OEM Accounts in January 2001. Prior to joining Metrologic, he held several positions in sales and contract management. |
| Dale M. Fischer | Mr. Fischer has served as the Company's Director of International Marketing and Sales from 1990 to 1993 and has served as Vice President, International Sales since 1994. From 1989 to 1990, Mr. Fischer was Chairman of Great Valley Corporation, a worldwide marketing and product development company. From 1967 until 1988, Mr. Fischer held several positions with TRW Electronics Component Group ("TRW"), most recently as International Marketing, Sales and Licensing Director. Mr. Fischer was responsible for marketing and sales of TRW products in more than 50 countries and was responsible for the implementation of a joint venture in Japan and the establishment of seven technology and manufacturing licenses throughout the world. |

62

| Bruce L. Harrison | Mr. Harrison has served as the Company's Vice President and General Counsel since May 2006. Prior to joining the Company, Mr. Harrison was Senior Shareholder at the law firm of Capehart & Scatchard and was Capehart's Managing Shareholder from 1997 through 2000. While a shareholder of Capehart, Mr. Harrison served as outside New Jersey and employment counsel for Metrologic for almost 17 years. |
|---|---|
| Mark Ryan | Mark Ryan has served as the Company's Vice President, EMEA since August 2006. Mr. Ryan served as Managing Director EMEA for Metrologic Instruments GmbH from July 2004 to August 2006. Prior to that, he was Regional Manager for Metrologic Instruments UK Ltd. from January 2000 to July 2004 and Area Manager for Metrologic Instruments GmbH (UK, Beneluz and Scandinavia) from 1997 to 2000. Mr. Ryan joined Metrologic Instruments GmbH as a Channel Account Manager in 1994. |
| Joseph Sawitsky | Mr. Sawitsky has served as the Company's Executive Vice President, Operations since April 2006. Mr. Sawitsky served as Vice President, Manufacturing from November 1999 until March 2004 and was then promoted to Senior Vice President, Manufacturing and Operations until April 2006. He joined Metrologic in 1998 as the Production Manager. After serving in the Nuclear Submarine Force, he worked at ICI Composites from 1990 to 1994 and manufactured specialty polymer materials for the aerospace and industrial markets. From 1994 to 1998 he held several positions with Zenith Electronic Corporation making consumer electronic equipment. |
| Mark C. Schmidt | Mr. Schmidt has served as the Company's Executive Vice President, Strategic Initiatives since April 2006. Mr. Schmidt served as Vice President, Marketing from November 1999 until March 2004 and was then promoted to Senior Vice President, Marketing until April 2006. He has been employed by Metrologic since 1992. During his tenure, Mr. Schmidt has progressed from Optical Engineer to the position of POS Product Manager in 1995, and Marketing Manager in 1997. |

The following is biographical information for our current Chief Financial Officer, Michael Coluzzi, who was appointed to replace Kevin Bratton effective November 3, 2006:

| Michael Coluzzi | Mr. Coluzzi has served as the Company's Chief Financial Officer since November 3, 2006. Prior to that, Mr. Coluzzi was Corporate Controller of Metrologic since June 1, 2005 and served as Assistant Controller from November 2003 to May 2006. From August 1998 to November 2003, Mr. Coluzzi served as associate, senior associate and then manager of PricewaterhouseCoopers. |
|---|---|

During the past five years, none of Metrologic or our executive officers, directors or controlling persons have been convicted in a criminal proceeding (other than traffic violations or similar misdemeanors) or been a party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining that person or entity from future violations of, or prohibiting activities subject to, federal or state securities laws, or a finding of any violation of federal or state securities laws.

# THE SPECIAL MEETING

**Time, Place and Purpose of the Special Meeting**

This proxy statement is being furnished to our shareholders as part of the solicitation of proxies by our board of directors for use at the special meeting to be held on Wednesday, December 20, 2006, beginning at 10:00 a.m., local time, at Metrologic's principal executive offices at 90 Coles Road, Blackwood, New Jersey 08012. The purpose of the special meeting is for our shareholders to consider and vote on a proposal to approve the merger agreement, a proposal to adjourn the special meeting, if necessary, to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement and to act on such other business as may properly come before the special meeting. A copy of the merger agreement is attached to this proxy statement as Annex A. This proxy statement, the notice of the special meeting and the enclosed form of proxy are first being mailed to our shareholders on or about November 30, 2006.

**Record Date, Quorum and Voting Power**

The holders of record of Metrologic's common stock at the close of business on November 20, 2006, the record date for the special meeting, are entitled to receive notice of, and to vote at, the special meeting. As of the record date, there were 22,859,491 shares of our common stock issued and outstanding, all of which are entitled to be voted at the special meeting.

Each outstanding share of our common stock on the record date entitles the holder to one vote on each matter submitted to shareholders for a vote at the special meeting.

The holders of outstanding shares of our common stock on the record date, represented in person or by proxy at the special meeting and entitled to cast a majority of the votes, will constitute a quorum for purposes of the special meeting. A quorum is necessary to hold the special meeting. Once a share is represented at the special meeting, it will be counted for the purpose of determining whether there is a quorum at the special meeting and any adjournment of the special meeting. However, if a new record date is set for the adjourned special meeting, then we will provide notice of the adjourned meeting to each shareholder of record on the new record date and a new quorum will have to be established.

**Required Vote**

For us to complete the merger, a majority of the votes cast by the holders of our common stock present in person or represented by proxy at the special meeting and entitled to vote thereon must vote "FOR" the approval of the merger agreement. The approval of the merger agreement does not require the affirmative vote of a majority of the shares of our common stock held by our unaffiliated shareholders. The proposal to adjourn the special meeting, if necessary, to solicit additional proxies requires the affirmative vote of a majority of the votes cast by holders of our common stock present in person or represented by proxy and entitled to vote at the special meeting.

In order for your shares of our common stock to be included in the vote, if you are a shareholder of record, you must cause your shares to be voted by returning the enclosed proxy or by voting in person at the special meeting.

If your shares are held in "street name" by your broker, bank or other nominee you should instruct your nominee how to vote your shares using the instructions provided by such nominee. If you have not received such voting instructions or require further information regarding such voting instructions, contact your nominee and it can give you directions on how to vote your shares. A broker non-vote generally occurs when a broker, bank or other nominee holding shares on your behalf does not vote on a proposal because the nominee has not received your voting instructions and lacks discretionary power to vote the shares. Broker non-votes and abstentions will not count as votes cast on a proposal, but will count for the purpose of determining whether a quorum is present.

64

Broker non-votes and abstentions will have no effect with respect to the approval of the merger agreement and adjournment of the special meeting.

## Voting by Directors and Executive Officers

As of October 31, 2006, the directors and executive officers of Metrologic hold and are entitled to vote, in the aggregate, 9,087,284 shares of our common stock, representing approximately 39.8% of the outstanding shares of our common stock. These shares include shares owned by Mr. Knowles, Mrs. Knowles and charitable entities controlled by the Knowles. As of October 31, 2006, Mr. Knowles and Mrs. Knowles collectively own and are entitled to vote 39.5% of the outstanding shares of our common stock, which includes shares owned by the Janet H. and C. Harry Knowles Foundation, Inc. (17.7%), the Knowles Charitable Foundation (2.8%), the C. Harry Knowles Charitable Remainder Annuity Trust No. 1 (2.8%), which are charitable entities controlled by Mr. and/or Mrs. Knowles, as well as shares owned by the C. Harry Knowles Grantor Retained Annuity Trust No. 1 (less than 1%). In addition, certain trusts for the benefit of family members of Mr. and Mrs. Knowles collectively own 376,214, or 1.6%, of our outstanding shares of common stock.

Pursuant to the terms of the contribution and voting agreement described elsewhere in this proxy statement, Mr. Knowles and certain related parties, including trusts for the benefit of family members of Mr. and Mrs. Knowles, have agreed to vote or consent, or cause to be voted or consented, all shares of our common stock that he or they beneficially own or control in favor of approving the merger agreement. Pursuant to the terms of the contribution and voting agreement described elsewhere in this proxy statement, the Elliott Investors have also agreed to vote or consent, or cause to be voted or consented, all shares of our common stock that they beneficially own or control in favor of approving the merger agreement. As of October 31, 2006, the Elliott Investors collectively own and are entitled to vote 1,703,885 shares of our outstanding common stock representing approximately 7.5% of the outstanding shares of our common stock. The other directors and executive officers of Metrologic have informed us that they intend to vote all of their shares of our common stock "FOR" the approval of the merger agreement. If votes are cast with respect to all of our outstanding shares of common stock as of the record date, the approval of the merger agreement would require the affirmative vote of an additional 262,363 shares or 1.1% of our outstanding shares of common stock, other than those committed to vote in favor of the proposal pursuant to the contribution and voting agreements and those held by our directors and executive officers.

## Proxies; Revocation

If you submit a signed proxy, your shares will be voted at the special meeting in accordance with the instructions given. If no instructions are indicated on your signed proxy card, your shares will be voted "FOR" the approval of the merger agreement and "FOR" adjournment of the special meeting, if necessary, to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement, and in accordance with their judgment on any other matters properly brought before the special meeting for a vote.

You may revoke your proxy at any time before the vote is taken at the special meeting. To revoke your proxy, you must either advise our Corporate Secretary at our principal executive offices in writing or deliver a new proxy, in each case dated after the date of the proxy you wish to revoke, or attend the special meeting and vote your shares in person. Attendance at the special meeting will not by itself constitute revocation of a proxy.

If you have instructed your broker to vote your shares, the above-described options for revoking your proxy do not apply and instead you must follow the directions provided by your broker to change these instructions.

65

Metrologic does not expect that any matter other than the proposal to approve the merger agreement will be brought before the special meeting. If, however, an adjournment of the special meeting is necessary or if another matter is properly presented at the special meeting or any adjournment of the special meeting, the persons appointed as proxies will vote the shares in accordance with their judgment.

## Proxy Solicitation; Expenses of Proxy Solicitation

Metrologic will pay the cost of this proxy solicitation. In addition to soliciting proxies by mail, directors, officers and employees of Metrologic may solicit proxies personally and by telephone, facsimile, the Internet or other electronic means of communication. These persons will not receive additional or special compensation for such solicitation services. Metrologic will, upon request, reimburse brokers, banks and other nominees for their expenses in sending proxy materials to their customers who are beneficial owners and obtaining their voting instructions.

## Adjournments

Any adjournment may be made without notice if the time and place to which the special meeting is adjourned is announced at the special meeting, subject to applicable law. If the proxyholders are asked to vote for one or more adjournments of the special meeting for matters incidental to the conduct of the special meeting, such proxyholders will have the authority to vote in their discretion on such matters. However, if the proxyholders are asked to vote for one or more adjournments of the special meeting to solicit additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement, such proxyholders will only have the authority to vote on such matter as instructed by you or your proxy, or, if no instructions are provided on your signed proxy card, in favor of such adjournment. Any adjournment of the special meeting for the purpose of soliciting additional proxies will allow Metrologic shareholders who have already submitted their proxies to revoke them at any time prior to the closing of the vote.

66

## THE MERGER AGREEMENT (PROPOSAL NO. 1)

The summary of the material terms of the merger agreement below and elsewhere in this proxy statement may not contain all of the information about the merger agreement that is important to you. We encourage you to read carefully the merger agreement in its entirety, a copy of which is attached to this proxy statement as Annex A and which is incorporated by reference.

### Effective Time

The effective time of the merger will occur at the time that we file a certificate of merger with the Secretary of State of New Jersey (or at such later time as is specified in the certificate of merger) at or prior to the closing of the merger. The closing will occur (1) no later than the second business day after the conditions to the parties' respective obligations pursuant to the merger agreement have been satisfied or waived, or (2) such other date as the parties may agree in writing.

### Structure

At the effective time of the merger, Meteor Merger Corporation will merge with and into Metrologic. Upon completion of the merger, Meteor Merger Corporation will cease to exist as a separate entity and Metrologic will continue as the surviving corporation. All of Metrologic's and Meteor Merger Corporation's properties, interests, rights, privileges, powers and franchises, and all of their restrictions, disabilities, duties, debts and liabilities, will become those of the surviving corporation. Following the completion of the merger, Metrologic common stock will be delisted from the NASDAQ Global Select Market, will be deregistered under the Securities Exchange Act of 1934 and will no longer be publicly traded.

### Treatment of Stock, Options and Warrants

#### *Metrologic Common Stock*

At the effective time of the merger, each share of our common stock issued and outstanding immediately prior to the effective time of the merger will automatically be cancelled and converted into the right to receive $18.50 in cash, without interest and less applicable withholding taxes, other than Metrologic common stock:

- owned by Metrologic as treasury stock immediately prior to the effective time of the merger, all of which will be cancelled without any payment; and

- held by Meteor Holding Corporation or any direct or indirect wholly owned subsidiary of Meteor Holding Corporation or Metrologic immediately prior to the effective time of the merger, all of which will be cancelled without any payment.

#### *Metrologic Stock Options*

All options granted under Metrologic's 2004 Equity Incentive Plan will be automatically cancelled immediately prior to the effective time of the merger and will be converted into the right to receive an amount in cash, without interest and less applicable withholding taxes, equal to the product of:

- the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option, multiplied by

- the total number of shares of Metrologic common stock subject to each option, as of the effective time of the merger.

67

For options with exercise prices per share that are equal to or greater than $18.50, Metrologic will pay the holder $1.00 per award to effectuate the cancellation of such options.

Metrologic commenced an offer, pursuant to a Schedule TO filed on November 21, 2006, to holders of options granted under our 1994 Incentive Plan to cancel all of their options in exchange for a cash payment, without interest, equal to the product of (1) the total number of shares of Metrologic common stock subject to the option multiplied by (2) the excess of $18.50 over the exercise price per share of Metrologic common stock subject to such option, less any applicable taxes. All of the options held by employees who will be eligible to participate in the offer have exercise prices that are less than $18.50 per share. To the extent an option holder under Metrologic's 1994 Incentive Plan does not consent to the cancellation of his or her outstanding options, Metrologic will adjust all of such option holder's options prior to the effective time of the merger in a manner acceptable to Meteor Holding Corporation to the extent permitted under the terms of the plan.

### Metrologic Warrants

All warrants to acquire Metrologic common stock will, as of the effective time of the merger, become exercisable for an amount in cash per share of Metrologic common stock issuable upon exercise of the warrant, without interest, equal to $18.50.

### No Further Ownership Rights

From and after the effective time of the merger, the holders of certificates representing shares of Metrologic common stock immediately prior to the effective time will no longer have any rights as holders of our common stock. The merger consideration paid upon surrender of each certificate will be paid in full satisfaction of all rights pertaining to the shares of our common stock represented by that certificate.

## Exchange and Payment Procedures

As of the effective time of the merger, Meteor Holding Corporation will make available to a bank or trust company, which we refer to as the "paying agent," an amount of cash sufficient to pay the merger consideration to each holder of shares of our common stock. Promptly after the effective time of the merger, the paying agent will mail a letter of transmittal and instructions to you and the other Metrologic shareholders. The letter of transmittal and instructions will tell you how to surrender your Metrologic common stock certificates in exchange for the merger consideration.

You will not be entitled to receive the merger consideration until you surrender your Metrologic common stock certificate or certificates to the paying agent, together with a duly completed and executed letter of transmittal and any other documents as the paying agent may require. The merger consideration may be paid to a person other than the person in whose name the corresponding certificate is registered if the certificate is presented to the paying agent, accompanied by documents evidencing such transfer of ownership and the payment of transfer taxes.

No interest will be paid or will accrue on the cash payable upon surrender of the certificates. Each of Meteor Holding Corporation and the surviving corporation will be entitled to deduct and withhold any applicable taxes from the merger consideration and any payment made in connection with the cancellation of options and pay such withholding amount over to the applicable government entity.

At the effective time of the merger, our stock transfer books will be closed, and there will be no further registration of transfers of outstanding shares of our common stock. If, after the effective time of the merger, certificates are presented to Meteor Holding Corporation, the surviving corporation or the paying agent for transfer or any other reason, they will be cancelled and exchanged for the merger consideration.

None of Meteor Holding Corporation, Metrologic, the surviving corporation or the paying agent will be liable to any person for any cash delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. Any portion of the merger consideration deposited with the paying agent that remains undistributed to the holders of certificates evidencing shares of our common stock for 180 days after the effective time of the merger, will be delivered, upon demand, to Meteor Holding Corporation. Holders of certificates who have not surrendered their certificates within 180 days after the effective time of the merger may only look to Meteor Holding Corporation for the payment of the merger consideration.

If you have lost a certificate, or if it has been stolen or destroyed, you will be required to make an affidavit of that fact and possibly post a bond before you will be entitled to receive the merger consideration.

**Certificate of Incorporation and Bylaws**

The certificate of incorporation of the surviving corporation will be amended in its entirety as of the effective time of the merger, to read as set forth in an exhibit to the merger agreement. In addition, the bylaws of Meteor Merger Corporation, as in effect immediately prior to the effective date of the merger, will be the bylaws of the surviving corporation.

**Directors and Officers**

The directors of Meteor Merger Corporation immediately prior to the effective time of the merger will be the initial directors of the surviving corporation. The officers of Meteor Merger Corporation immediately prior to the effective time of the merger will be the initial officers of the surviving corporation.

**Representations and Warranties**

The merger agreement contains representations and warranties of Metrologic, Meteor Holding Corporation and Meteor Merger Corporation regarding aspects of their respective businesses, financial condition, subsidiaries and structure, as well as other facts pertinent to the merger. The assertions embodied in those representations and warranties were made for purposes of the merger agreement among Metrologic, Meteor Holding Corporation and Meteor Merger Corporation, a copy of which is attached hereto as Annex A and which is incorporated by reference into this proxy statement. The representations and warranties in the merger agreement are complicated and not easily summarized. You are urged to read carefully and in their entirety the sections of the merger agreement entitled "Representations and Warranties of the Company" and "Representations and Warranties of the Parent and Merger Sub" in Annex A to this proxy statement. The assertions embodied in the representations and warranties of the Company are qualified by information in a confidential disclosure letter that we provided to Meteor Holding Corporation in connection with the signing of the merger agreement. While Metrologic does not believe that the confidential disclosure letter contains information that securities laws require it to publicly disclose, other than information that has already been so disclosed, the disclosure letter does contain information that modifies, qualifies and creates exceptions to the representations and warranties of the Company set forth in the attached merger agreement. Accordingly, you should not rely on the representations and warranties of the Company as characterizations of the actual state of facts, since they are modified in important part by the underlying disclosure letter. Moreover, certain representations and warranties are subject to a contractual standard of materiality different from those generally applicable to shareholders or were used for the purpose of allocating risk between Metrologic, on the one hand, and Meteor Holding Corporation and Meteor Merger Corporation, on the other hand, rather than establishing matters as facts.

69

Our representations and warranties in the merger agreement relate to, among other things:

- our certificate of incorporation and bylaws and those of our significant subsidiaries;

- our and our subsidiaries' proper organization, good standing and corporate power to operate our businesses;

- our capitalization, including in particular the number of shares of our common stock, preferred stock, stock options and warrants outstanding and the amount of our debt outstanding;

- our corporate power and authority to enter into the merger agreement and to consummate the transactions contemplated by the merger agreement;

- the absence of any conflict with or violation of our organizational documents, certain contracts or applicable law as a result of entering into the merger agreement and consummating the merger;

- required consents and approvals of governmental entities in connection with the merger;

- the vote required by our shareholders in connection with the approval of the merger agreement and merger;

- our Securities and Exchange Commission filings since December 31, 2002, the financial statements contained therein and our internal and disclosure controls;

- the absence of liabilities, other than as set forth on our December 31, 2005 balance sheet, liabilities incurred in connection with the merger, ordinary course liabilities and liabilities that would not have a material adverse effect;

- the absence of certain changes and events since June 30, 2006, including the absence of a material adverse effect;

- taxes;

- real property owned and leased by us and our subsidiaries and title to assets;

- our intellectual property;

- our material contracts;

- employment matters affecting us, including matters relating to our employee benefit plans;

- the absence of litigation or outstanding court orders against us;

- environmental matters;

- our compliance with applicable statutes, laws, settlements, rules, orders, regulations and corporate policies;

- our possession of all permits and licenses necessary to carry on our business;

- labor matters;

- our insurance policies;

- receipt by the special committee of the board of directors of an opinion from Needham & Company, LLC;

- inapplicability of state anti-takeover laws to the merger;

- the absence of undisclosed broker's fees;

- transactions with affiliates;

70

- the accuracy and completeness of information about us included in this proxy statement; and

- the availability and completeness of any document referenced in the Company disclosure letter.

The merger agreement also contains customary representations and warranties made by Meteor Holding Corporation and Meteor Merger Corporation that are subject, in some cases, to specified exceptions and qualifications. The representations and warranties relate to, among other things:

- their proper organization, good standing and valid existence;

- their corporate power and authority to enter into the merger agreement and to consummate the transactions contemplated by the merger agreement;

- the absence of any conflict with or violation or breach of their organizational documents, certain agreements or applicable law as a result of entering into the merger agreement and consummating the merger;

- required consents and approvals of governmental entities as a result of the merger;

- the accuracy and completeness of information they have supplied for inclusion in this proxy statement;

- the operations of Meteor Merger Corporation;

- the absence of litigation or outstanding court orders against them;

- the debt commitment letter and the equity commitment letter delivered by Meteor Holding Corporation, including that the debt commitment letter and the equity commitment letter are in full force and effect, all commitment fees thereunder will be paid when due, the letters have not been amended or terminated and there is no breach thereunder; and

- the delivery by Meteor Holding Corporation of the contribution and voting agreements.

The representations and warranties of each of the parties to the merger agreement will expire upon completion of the merger.

## Conduct of Our Business Pending the Merger

Under the merger agreement, we have agreed that, subject to certain exceptions, between September 12, 2006 and the completion of the merger, we and our subsidiaries will:

- maintain our existence in good standing under applicable law;

- act and carry on our business in the ordinary and usual course of business consistent with past practice;

- pay or perform all material obligations when due;

- use commercially reasonable efforts to maintain and preserve our and our subsidiaries' business organization, assets and properties, to keep available the services of our current officers and employees and to preserve our business relationships with customers, strategic partners, suppliers, distributors and others with which we have business dealings and to maintain in full force and effect substantially the same levels of insurance coverage with respect to our and our subsidiaries' assets, operations and activities.

71

We have also agreed that during the same time period, and again subject to certain exceptions or unless Meteor Holding Corporation gives its prior written consent, we and our subsidiaries will not:

- declare, set aside or pay dividends or make any other distributions in respect of our stock or that of our subsidiaries;

- adjust, split, combine or reclassify our stock or that of our subsidiaries or issue any other securities in respect of shares of our capital stock or that of our subsidiaries;

- purchase, redeem or otherwise acquire any of our securities or those of our subsidiaries, other than as instructed by Meteor Holding Corporation;

- issue, deliver, sell, grant, pledge or amend the terms of any of our securities or those of our subsidiaries, other than issuance of shares pursuant to the exercise of stock options or warrants outstanding on the date of the merger agreement;

- amend or otherwise change our organizational documents or those of our subsidiaries;

- propose or adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of our subsidiaries;

- sell, license, mortgage, transfer, lease, assign, pledge, subject to any lien or otherwise dispose of or encumber any of our properties or assets or those of our subsidiaries, other than:

  - dispositions of obsolete inventory and sales of inventory in the ordinary course of business consistent with past practice, or

  - the execution and performance of a binding agreement for the sale of all of the issued and outstanding shares of capital stock of AOA;

- acquire any business, assets or securities, other than acquisitions of inventory and components in the ordinary course of business consistent with past practice, acquisitions of certain securities and acquisitions of assets with a purchase price that does not exceed $500,000 individually or $4,000,000 in the aggregate;

- sell, license, mortgage, transfer, lease, assign, pledge, subject to any lien or otherwise dispose of or encumber any of our intellectual property or that of our subsidiaries, except pursuant to certain existing contracts or non-exclusive licenses extended to customers in the ordinary course of business consistent with past practice;

- adopt, propose or implement any shareholder rights plan;

- incur or assume any indebtedness or issue any debt securities except under existing lines of credit to fund operations in the ordinary course of business consistent with past practice;

- assume, guarantee, endorse or otherwise become liable or responsible for obligations of any other person;

- make any loans, advances or capital contributions to or investments in any other person except for advances for travel and other miscellaneous expenses to employees or capital contributions to or investments in our subsidiaries, in each case in the ordinary course of business consistent with past practice;

- make any changes in accounting methods, procedures, principles or practices or change any assumption underlying, or method of calculating, any bad debt, contingency or other reserve, except in each case as required by a change in generally accepted accounting principles in the United States;

72

- alter, amend or create any obligations with respect to compensation, severance, benefits, change of control payments or any other payments to present or former employees, directors or affiliates of us, other than alterations or amendments with respect to non-officers and non-directors in the ordinary course of business consistent with past practice that do not involve severance or change of control payments or benefits and that, in the aggregate, do not result in a material increase in our benefits or compensation expense;

- increase benefits payable under any existing severance or termination pay policies or employment agreements;

- enter into or amend any collective bargaining agreement, employment, deferred compensation or other similar agreement with any of our directors, officers or employees or those of our subsidiaries;

- increase compensation, bonus or other benefits payable to any of our directors, officers or employees or those of our subsidiaries, other than annual increases to non-officer employees in the ordinary course of business consistent with past practices and as contemplated by the merger agreement;

- establish, adopt or amend any benefit plan or arrangement covering any of our directors, officers or employees or those of our subsidiaries;

- hire any new employees other than non-officer employees in the ordinary course of business consistent with past practice;

- make or change any material tax election, settle or compromise any material tax liability, amend any material tax return, change any method of tax accounting, enter into any material closing agreement with respect to any tax, surrender any right to claim a material tax refund, consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of any material taxes, file any material tax return without the consent of Meteor Holding Corporation or take any other similar action relating to the filing of any tax return or the payment of any tax;

- initiate, compromise or settle any material litigation or arbitration proceeding;

- enter into any joint venture, partnership or other similar arrangement;

- enter into any material contract, except for contracts for the sale of inventory in the ordinary course of business consistent with past practice, or terminate, amend, supplement or modify in any material respect any of our material contracts or those of our subsidiaries;

- cancel any debts or waive any claims or rights of substantial value, except for cancellations made or waivers granted with respect to claims other than indebtedness in the ordinary course of business consistent with past practice which do not exceed $250,000, in the aggregate;

- fail to manage and retain cash and cash equivalents and investments in marketable securities, accounts payable or accounts receivable in a manner consistent with past practice;

- take any action that would reasonably be expected to result in any of our representations or warranties in the merger agreement becoming false or inaccurate; and

- take any action or enter into any transaction, including any merger, acquisition, joint venture, disposition, lease, contract or debt or equity financing that could reasonably be expected to impair, delay or prevent Meteor Holding Corporation's ability to obtain financing.

73

**Financing**

Meteor Holding Corporation has agreed to use commercially reasonable efforts to fully satisfy, on a timely basis, all terms, conditions, representations and warranties contained in the debt commitment letter and the equity commitment letter relating to the financing for the merger. At our request, Meteor Holding Corporation will keep us informed with respect to all material activity concerning the status of financings contemplated by the commitment letters. Meteor Holding Corporation will notify us promptly, and in any event within 2 business days, if the debt commitment letter or the equity commitment letter with respect to the financing of the merger should expire or be terminated or any financing source notifies Meteor Holding Corporation that such source no longer intends to provide financing to Meteor Holding Corporation on the material terms set forth in the debt commitment letter or the equity commitment letter. We have agreed to provide Meteor Holding Corporation with cooperation reasonably requested by Meteor Holding Corporation in connection with its financing activities including, to the extent reasonable, participation in meetings, drafting and due diligence sessions, management presentations, "road shows" and meetings with rating agencies, preparing business projections and financial statements (including pro forma financial statements) and assisting with the preparation of materials for rating agency presentations, offering memoranda, private placement memoranda, bank information memoranda, prospectuses and similar documents, executing and delivering agreements and other documents in connection with such financings, including, among other things, pledge and security documents, credit agreement guarantees and other financing documents, taking all corporate actions reasonably requested by Meteor Holding Corporation to permit the consummation of the financings and obtaining customary comfort letters and consents of accountants.

For additional information regarding the expected financing of the merger, see "Special Factors—Financing of the Merger" and "Special Factors—Interests of Certain Persons in the Merger."

**No Solicitation of Transactions**

We have agreed that neither we, our subsidiaries nor our representatives will, directly or indirectly:

- solicit, initiate, encourage or induce the making, submission or announcement of, any inquiry, proposal or offer with respect to, or that could reasonably be expected to lead to, an acquisition proposal;

- furnish any non-public information relating to the Company or any of our subsidiaries or afford access to the business, properties, assets, books or records of the Company or our subsidiaries or take any other action knowingly intended to assist or facilitate any inquiries or the making of any proposal or offer that constitutes, or that could reasonably be expected to lead to, an acquisition proposal;

- participate or engage in discussions or negotiations with respect to, or that could reasonably be expected to lead to, an acquisition proposal;

- approve, endorse or recommend an acquisition proposal;

- enter into any letter of intent, memorandum of understanding, agreement in principle or contract contemplating or otherwise relating to an acquisition proposal; or

- terminate, amend or waive any rights under any standstill or other similar agreement.

For purposes of the merger agreement, "acquisition proposal" means any inquiry, proposal or offer:

  - relating to a merger, reorganization, consolidation, dissolution, sale of substantial assets, tender offer, exchange offer, recapitalization, liquidation, joint venture, share exchange or other business combination involving us or any subsidiaries,

74

- relating to the issuance of 20% or more of our outstanding voting securities, or
- to acquire in any manner, directly or indirectly, 20% or more of our outstanding capital stock or assets or that of our subsidiaries.

However, we are permitted to furnish information and participate in discussions or negotiations with a third party in connection with a bona fide written acquisition proposal received by our board of directors or special committee after the date of the merger agreement but prior to approval of the merger agreement by our shareholders, if and only to the extent that:

- we and our subsidiaries have complied with the provisions of the merger agreement relating to the non-solicitation of other transactions;
- the proposal was not solicited, initiated, encouraged, induced, participated in or otherwise facilitated by Metrologic, any of our subsidiaries or any of our representatives since May 31, 2006; and
- our board of directors or the special committee reasonably determines in good faith that the acquisition proposal is, or would reasonably be expected to lead to, a superior proposal;
- the board of directors or the special committee determines in good faith, after consultation with its outside legal counsel and financial advisor, that we are required by the fiduciary obligations of the board of directors or the special committee to do so;
- the Company provides written notice to Meteor Holding Corporation of its decision to take such action; and
- the information provided and any negotiations or discussions must be subject to a confidentiality agreement not less favorable to us than the confidentiality agreement signed with Francisco Partners II, L.P., which is an affiliate of Meteor Holding Corporation and Meteor Merger Corporation.

For purposes of the merger agreement, "superior proposal" means any unsolicited bona fide written proposal from a third party to acquire, directly or indirectly, more than 50% of the total outstanding voting securities of the Company or all of the assets of the Company, pursuant to a tender or exchange offer, a merger, a consolidation or a sale of our assets, which:

- the special committee or the board of directors determines in its good faith reasonable judgment (after consultation with its legal and financial advisors) to be (A) more favorable to the holders of Metrologic common stock from a financial point of view than the transactions contemplated by the merger agreement (including any proposal by Meteor Holding Corporation to amend the terms of the merger agreement), taking into account all the terms and conditions of such proposal and the merger agreement and (B) reasonably capable of being completed on the terms proposed within a reasonable time period, in each case taking into account all financial, regulatory, legal and other aspects of such proposal, and
- either has no financing condition or has a debt financing condition (and no other financing condition) and is accompanied by commitment letters no less favorable to the Company than the debt and equity commitment letters.

We have agreed to provide oral and written notice to Meteor Holding Corporation of receipt of any acquisition proposal, any inquiry with respect to or any request for nonpublic information in connection with any acquisition proposal as promptly as possible (but in any event within 24 hours) and the material terms and conditions of the acquisition proposal, inquiry or request and the identity of the person making the acquisition proposal, inquiry or request and to keep Meteor Holding Corporation informed on a

current basis of the status of the acquisition proposal, inquiry or request and any material modifications or developments, including copies of written acquisition proposals, inquiries or requests and written information relating thereto.

We have also agreed that neither the board of directors, the special committee nor any other committee of the board of directors will:

- withhold, withdraw or modify, or resolve or publicly propose to withhold, withdraw or modify, in a manner adverse to Meteor Holding Corporation or Meteor Merger Corporation, the recommendation of the board of directors or its special committee that shareholders vote in favor of the approval of the merger agreement;

- approve or recommend, or resolve or publicly propose to approve or recommend, any acquisition proposal;

- approve or recommend, or resolve or publicly propose to approve or recommend, or execute or enter into, any alternative acquisition agreement;

- approve or recommend, or resolve or publicly propose to approve or recommend, or execute or enter into, any agreement requiring it to abandon, terminate or fail to consummate the merger or the merger agreement or the transactions contemplated thereby;

- take any action necessary to render the provisions of any anti-takeover law inapplicable to any acquisition proposal; or

- approve or recommend, or resolve or publicly propose to approve or recommend, any position other than to recommend rejection of any acquisition proposal.

For purposes of the merger agreement, "alternative acquisition agreement" means any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement, stock purchase agreement, asset purchase agreement, option agreement or other similar agreement with respect to any acquisition proposal.

Notwithstanding our obligations under the merger agreement, in response to a superior proposal received by the special committee or our board of directors after the date of the merger agreement but prior to approval of the merger agreement by our shareholders, Metrologic, the board of directors or its special committee may (1) withhold, withdraw or modify in a manner adverse to Meteor Holding Corporation or Meteor Merger Corporation, the recommendation of the board of directors or its special committee that shareholders vote in favor of the approval of the merger agreement or (2) take certain other actions with respect to such change of recommendation immediately prior to or concurrent with the termination of the merger agreement in accordance with its terms, only if:

- such superior proposal did not result from a breach of our non-solicitation and related obligations under the merger agreement and we have complied with such obligations;

- our board of directors or its special committee reasonably determines in good faith, after consultation with outside counsel, that failure to do so would be a violation of the fiduciary obligations of the board of directors under applicable law; and

- in the event we terminate the merger agreement and enter into an alternative acquisition agreement, Metrologic pays a termination fee of $18,250,000 to Meteor Holding Corporation or its designee concurrently with the termination of the merger agreement.

Under the merger agreement, however, our board of directors, including the special committee, may not withhold, withdraw or modify its recommendation in response to the receipt of a superior proposal unless we have observed certain notice and negotiation provisions. In addition, our board of directors,

76

including the special committee, may not withhold, withdraw or modify its approval or recommendation other than in connection with a superior proposal to comply with its fiduciary duties unless we provide written notice to Meteor Holding Corporation at least three business days prior to such withdrawal or modification and negotiate with Meteor Holding Corporation in good faith during such three-day period.

## Indemnification

For a period of six years following the effective time of the merger, the surviving corporation will indemnify and hold harmless all past and present officers and directors of the company for acts or omissions occurring at or prior to the effective time of the merger to the fullest extent permitted by the New Jersey Business Corporation Act or any other applicable law or provided under our certificate of incorporation or bylaws, subject to applicable law.

The merger agreement requires that the surviving corporation maintain in effect, for a period of six years after the effective time of the merger, "tail" directors' and officers' liability insurance in an amount and scope at least as favorable as our existing policies or other insurance policies with respect to acts or omissions existing or occurring at or prior to the effective time. If a tail policy with such terms is not available at an annual cost not greater than 200% of our current annual premium, the surviving corporation must obtain a policy with as much comparable coverage available for a cost not exceeding 200% of the current annual premium paid by us.

The obligations described above regarding directors' and officers' indemnification and insurance must be assumed by any successor entity or assign of the surviving corporation as a result of any consolidation, merger or transfer of all or substantially all properties and assets.

## Resignations

We will use our reasonable best efforts to obtain and deliver to Meteor Holding Corporation the resignations of our directors and the directors of our subsidiaries, effective as of the effective time of the merger, except for those directors which Meteor Holding Corporation designates.

## Employee Benefits

Following the effective time of the merger, Meteor Holding Corporation has agreed that it will, or will cause the surviving corporation to:

- honor and provide for payment of all accrued obligations and benefits under all employee benefit plans identified by the Company in the Company's disclosure letter; and

- provide Metrologic employees as of the effective time of the merger with credit for past service with Metrologic for purposes of accrual of vacation time and, to the extent practicable and permitted under applicable benefit plans, for purposes of eligibility for participation and vesting under any employee benefit plan, program or arrangement established or maintained by Meteor Holding Corporation, the surviving corporation or any of their respective subsidiaries under which continuing employees may be eligible to participate on or after the effective time.

On and after September 13, 2006, no new offering periods commenced under our employee stock purchase plan. As of the close of business on the last business day prior to the effective time of the merger, the employee stock purchase plan will terminate and on such date all accumulated payroll deductions allocated to each participant's account will be returned to them.

From and after the effective time, the surviving corporation will have sole discretion over the hiring, promotion, retention, firing and other terms and conditions of employment of the continuing employees. The merger agreement will not prevent Meteor Holding Corporation or the surviving corporation from amending or terminating any employee benefit plan in accordance with its terms.

77

**Agreement to Take Further Action and to Use Commercially Reasonable Efforts**

Subject to the terms and conditions of the merger agreement, each party has agreed to use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective the merger and other transactions contemplated by the merger agreement as promptly as practicable. Among other things, each party has committed to use such efforts to cooperate with each other to:

- as promptly as practicable, obtain any consents, licenses, permits, waivers, approvals, authorizations and orders required to be obtained or made in connection with the authorization, execution and delivery of the merger agreement and the consummation of the transactions contemplated thereby;

- as promptly as practicable, make all necessary filings, notifications, and thereafter make any other required submissions with respect to the merger agreement and the merger required under applicable securities laws, the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and any related government request, and other applicable law and to furnish to each other all information required for any application or other filing to be made pursuant to the rules and regulations of any applicable law in connection with the transactions contemplated by the merger agreement;

- execute or deliver any additional documents necessary to consummate the transactions contemplated by the merger agreement and to carry out the purposes of the merger agreement; and

- to use commercially reasonable efforts to obtain any government clearances or approvals required to complete the merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and any other federal, state or foreign law, regulation or decree designed to prohibit, restrict or regulate actions for the purpose or effect of monopolization or restraint of trade, to respond to any government requests for information under any such antitrust law, and to contest and resist any action, including any legislative, administrative or judicial action, and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order that restricts, prevents or prohibits the consummation of the merger or any other transactions contemplated by the merger agreement under any such antitrust law.

With respect to any proceeding under or relating to any antitrust law, the parties have agreed to consult and cooperate with one another, and consider in good faith the views of one another, and provide to the other parties in advance, any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with such proceeding.

In the event that the United States Department of Justice or the United States Federal Trade Commission authorizes its staff to seek a preliminary injunction or restraining order to enjoin consummation of the merger, Meteor Holding Corporation will not be under any obligation to take any action described above.

**Conditions to Completion of the Merger**

The obligations of Meteor Holding Corporation, Meteor Merger Corporation and Metrologic to complete the merger are subject to the following conditions:

- approval of the merger agreement by the holders of a majority of the votes cast by the holders of the outstanding shares of our common stock on the record date at the special meeting at which a quorum is present;

- the expiration or termination of all waiting periods under applicable United States and foreign antitrust laws;

- receipt from all governmental authorities of all material authorizations, consents, orders and approvals and authorizations legally required to be obtained to consummate the merger; and

- absence of any order, executive order, stay, decree, judgment or injunction or statute, rule or regulation which would make the merger illegal or prohibit the consummation of the other transactions contemplated by the merger agreement.

The obligations of Meteor Holding Corporation and Meteor Merger Corporation to complete the merger are subject to the following additional conditions:

- the truth and correctness of our representations and warranties as of the date of the closing (or as of the date made in the case of representations and warranties made as of a specific date) without giving effect to any materiality qualification unless the failure, individually or in the aggregate, has not had and is not reasonably likely to have a material adverse effect on us or any of our subsidiaries or adversely affect our capitalization;

- the performance, in all material respects, by us of our obligations under the merger agreement;

- our delivery to Meteor Holding Corporation at closing of a certificate with respect to the satisfaction of the foregoing conditions relating to representations, warranties, covenants and agreements;

- the absence of any pending action or proceeding seeking to make the merger illegal or otherwise challenge, restrain or prohibit the consummation of the merger or the other transactions contemplated by the merger agreement, prohibit or limit the ability of Meteor Holding Corporation to vote, control, receive dividends with respect to or otherwise exercise ownership rights with respect to the stock of the surviving corporation or control or otherwise exercise ownership rights with respect to the business or operations of Metrologic or its subsidiaries, obtain material damages from Meteor Holding Corporation, rescind the transactions contemplated by the merger agreement following consummation, or compel Metrologic, Meteor Holding Corporation or any of their subsidiaries to dispose of or hold any significant portion of the business or assets of Metrologic, Meteor Holding Corporation or any or their respective subsidiaries as a result of the merger or any of the other transactions contemplated by the merger agreement;

- the absence of any state of facts, change, event, effect, condition, circumstance, occurrence or development that, individually or in the aggregate, has had or is reasonably likely to result in a material adverse effect;

- the contributions of common stock by the Rollover Investors to Meteor Holding Corporation pursuant to the contribution and voting agreements;

- the satisfaction of the financing condition described below; and

- the availability to Metrologic of unrestricted cash on hand and fully liquid cash equivalents of at least $90 million.

For purposes of the merger agreement, the financing condition is satisfied if Meteor Holding Corporation shall have obtained an amount of financing not less than the amount set forth in the debt commitment letter on terms and conditions as set forth therein (and as described elsewhere herein) or upon terms and conditions which are, in the reasonable judgment of Meteor Holding Corporation, at least as favorable to Meteor Holding Corporation as the terms and conditions set forth in the debt commitment letter.

79

# DECLARATION OF
# SETH D. RIGRODSKY

# Part 7

Our obligation to complete the merger is subject to the following additional conditions:

- the truth and correctness of Meteor Holding Corporation and Meteor Merger Corporation's representations and warranties, unless the failure, individually or in the aggregate, has not had, and is not reasonably likely to result in, a material adverse effect on the ability of Meteor Holding Corporation or Meteor Merger Corporation to consummate the transactions contemplated by the merger agreement;

- the performance, in all material respects, by Meteor Holding Corporation and Meteor Merger Corporation of their obligations under the merger agreement; and

- the delivery at closing by Meteor Holding Corporation of a certificate with respect to Meteor Holding Corporation's representations, warranties, covenants and agreements.

## Termination

The merger agreement may be terminated and the merger may be abandoned at any time prior to the effective time of the merger, whether before or after shareholder approval has been obtained, as follows:

- by mutual consent of Meteor Holding Corporation and Metrologic;

- by either Meteor Holding Corporation or Metrologic if:

  - the merger has not been consummated by March 31, 2007, so long as the failure of the terminating party to fulfill any obligation under the merger agreement is not the principal cause of the failure of the merger to be consummated by such date;

  - a governmental authority issues a nonappealable final order, decree or ruling or taken any other nonappealable final action that has the effect of permanently restraining, enjoining or otherwise prohibiting the merger or any other transaction contemplated by the merger agreement;

  - our shareholders do not vote to approve the merger agreement at the special meeting, provided that this right to terminate will not be available to us if we are in material breach of our obligations under the merger agreement related to other acquisition proposals, this proxy statement or the special meeting;

  - the terminating party is not in material breach of its obligations under the merger agreement and there is a breach of or failure to perform any representations, warranties, covenants or agreements in the merger agreement by the non-terminating party such that the closing conditions would not be satisfied, which breach has not been, or cannot be, cured within 30 days or which cannot reasonably be cured by March 31, 2007;

- by Meteor Holding Corporation, if:

  - we fail to include the recommendation of our board of directors that the shareholders vote in favor of approving the merger agreement in the proxy statement, or our board of directors or the special committee withdraws or modifies its recommendation for approval of the merger agreement or the merger or recommends or approves another acquisition proposal;

  - our board of directors authorizes, approves or recommends to our shareholders an acquisition proposal;

  - we are in breach of our obligations under the merger agreement related to the non-solicitation provisions of the merger agreement discussed elsewhere in this proxy statement;

80

- a tender offer or exchange offer for our outstanding shares by a third party commences and our board of directors or the special committee recommends that our shareholders tender their shares in such tender or exchange offer or within ten (10) business days after the commencement of such tender or exchange offer, our board of directors and the special committee fails to recommend rejection, or subsequently withdraws or modifies in any manner adverse to Meteor Holding Corporation or Meteor Merger Corporation a recommendation of rejection, of such offer;

  - Metrologic enters into an alternative acquisition agreement with respect to an acquisition proposal; or

  - any person or group, other than Meteor Holding Corporation or its affiliates, shall have acquired beneficial ownership of 40% or more of our outstanding common stock; or

- by Metrologic, prior to the special meeting, in connection with the withdrawal or modification by the board of directors or the special committee of their recommendation in order to enter into a definitive agreement with respect to an alternative acquisition proposal, provided that we have complied with the non-solicitation, notice and other applicable terms set forth in the merger agreement, including the payment of the termination fee.

## Fees and Expenses

We have agreed to pay Meteor Holding Corporation or its designee a termination fee of $18,250,000 if:

- Meteor Holding Corporation terminates the merger agreement because:

  - we fail to include the recommendation of our board of directors that the shareholders vote in favor of approving the merger agreement in the proxy statement, or our board of directors or the special committee withdraws or modifies or changes its recommendation for approval of the merger agreement or the merger or recommends or approves another acquisition proposal;

  - our board of directors authorizes, approves or recommends to our shareholders an acquisition proposal;

  - we are in material breach of our obligations under the merger agreement related to the non-solicitation of other transactions discussed elsewhere in this proxy statement;

  - a tender offer or exchange offer for our outstanding shares by a third party commences and our board of directors or the special committee recommends that our shareholders tender their shares in such tender or exchange offer or within ten (10) business days after the commencement of such tender or exchange offer, our board of directors and the special committee fails to recommend rejection, or subsequently withdraws or modifies in any manner adverse to Meteor Holding Corporation or Meteor Merger Corporation a recommendation of rejection, of such offer;

  - Metrologic enters into an alternative acquisition agreement with respect to an acquisition proposal; or

  - any person or group, other than Meteor Holding Corporation or its affiliates, shall have acquired beneficial ownership of 40% or more of our outstanding stock; or

- we terminate the merger agreement prior to the special meeting in connection with the withdrawal or modification by the board of directors or the special committee of their recommendation in order to enter into a definitive agreement with respect to an alternative acquisition proposal,

81

provided that we have complied with the non-solicitation, notice and certain other terms set forth in the merger agreement, including the payment of the termination fee;

- we or Meteor Holding Corporation terminate the merger agreement because (i) the merger has not been consummated by March 31, 2007, (ii) we or Meteor Holding Corporation terminate the merger agreement because the shareholders do not approve the merger agreement at the special meeting or (iii) Meteor Holding Corporation terminates the agreement because we have breached the agreement and fail to cure within 30 days of receiving notice of breach or if such breach can not be cured by March 31, 2007 and, in each of the previous cases, prior to such termination, an acquisition proposal has been made known to us or been publicly announced and within 12 months after the termination, Metrologic shall have entered into an alternative acquisition agreement with respect to an acquisition of Metrologic (which need not be the same acquisition proposal known or publicly announced prior to the termination).

For purposes of the merger agreement, "acquisition of Metrologic" means (1) a merger, reorganization, consolidation, dissolution, sale of substantial assets, tender offer, exchange offer, recapitalization, liquidation, dissolution, joint venture, share exchange or other business combination involving Metrologic or any of its subsidiaries, the issuance by Metrologic of 50% or more of its voting securities or the acquisition by any person or group of 50% or more of the capital stock or assets of Metrologic or any of its subsidiaries, other than the sale of AOA.

Meteor Holding Corporation has agreed to pay us a termination fee of $9,125,000 if the merger agreement is terminated on or after March 31, 2007 if all conditions to the Closing have been met other than the financing condition, provided that no fee shall be payable if the failure to satisfy the financing condition is due to certain market conditions or material adverse developments with respect to certain litigation.

**Material Adverse Effect**

For purposes of the merger agreement, the term "material adverse effect" shall mean, with respect to the Company, any state of facts, change, event, violation, inaccuracy, effect, condition, circumstance, occurrence or development (any such item, an "effect") that, individually or taken together with all other effects that have occurred prior to the date of determination of the occurrence of the material adverse effect, is or is reasonably likely to (i) be materially adverse to the business, operations, properties, condition (financial or otherwise), results of operations, assets or liabilities of the Company and its subsidiaries, taken as a whole or (ii) prevent or materially delay the performance by the Company of any of its obligations under the merger agreement or the consummation of the merger or the other transactions contemplated hereby; provided, however, that in no event shall any of the following occurring after the date of the merger agreement, in and of itself, be deemed to constitute a material adverse effect:

- a decline in the price of Metrologic common stock on the NASDAQ Global Select Market (it being understood that the facts and circumstances giving rise to such decline may be deemed to constitute and shall be taken into account in determining whether there has been a material adverse effect);

- any failure by the Company to meet published third party financial projections, in and of itself (it being understood that the facts and circumstances giving rise to such failure to meet published financial projections may be considered and shall be taken into account in determining whether there has been a material adverse effect);

- any effect resulting from general national or world economic conditions and any acts of war or terrorism, except to the extent that such effects disproportionately affect the Company and its subsidiaries in any significant respect relative to other participants in the industries or markets in which they operate;

82

- any effect resulting from any action outside the ordinary course of business of the Company and its subsidiaries required to be taken pursuant to the merger agreement (other than consummation of the merger);

- any stockholder class action litigation arising from allegations of a breach of fiduciary duty relating to the merger agreement; or

- any effect resulting from a change in generally accepted accounting principles.

## Amendment and Waiver

The merger agreement may be amended prior to the effective time of the merger by mutual agreement of the parties. However, after the merger agreement has been approved by our shareholders, no amendment will be made to the merger agreement except as allowed under applicable law. The merger agreement also provides that, at any time prior to the effective time of the merger, to the extent legally allowed, either party may extend the time for the performance of any obligations or other acts of the other party, waive any inaccuracies in the representations and warranties of the other party or waive compliance with any agreement of the other party or any condition to its own obligations contained in the merger agreement.

83

## OTHER AGREEMENTS RELATING TO OUR SECURITIES

**Contribution and Voting Agreements**

Set forth below is a summary of the material terms of the contribution and voting agreement, dated as of September 12, 2006, between Meteor Holding Corporation, on the one hand, and each of C. Harry Knowles, Janet H. Knowles, certain related family trusts and charitable entities, on the other hand and the contribution and voting agreement, dated as of September 12, 2006, between Meteor Holding Corporation, on the one hand, and Elliott Associates, L.P. and Elliott International, L.P., on the other hand. We refer to these agreements in the proxy statement as the "contribution and voting agreements." The summary of the material terms of the contribution and voting agreements below and elsewhere in this proxy statement may not contain all of the information about the contribution and voting agreements that is important to you. We encourage you to read carefully the contribution and voting agreements in their entirety, copies of which are attached to this proxy statement as Annex C-1 and Annex C-2, which are incorporated by reference into this document.

### *Contributions*

Pursuant to the contribution and voting agreements, immediately prior to the consummation of the merger:

- Mr. Knowles will contribute 1,571,320 shares of our common stock to Meteor Holding Corporation in exchange for 11,627,765 shares of Meteor Holding Corporation common stock, representing approximately 15% of the common stock, and 26,162 shares of Meteor Holding Corporation junior preferred stock, representing approximately 15% of the junior preferred stock. The number of shares of our common stock contributed by Mr. Knowles, and the number of shares of junior preferred stock and common stock of Meteor Holding Corporation issued in exchange therefor, will be adjusted as appropriate to allow Mr. Knowles to own 15% of the outstanding shares of junior preferred stock and 15% of the outstanding shares of common stock of Meteor Holding Corporation immediately following the closing of the merger;

- Elliott Associates, L.P. will contribute 681,553 shares of our common stock to Meteor Holding Corporation in exchange for 5,043,492 shares of Meteor Holding Corporation common stock, representing approximately 6.5% of the common stock, and 11,348 shares of Meteor Holding Corporation junior preferred stock, representing approximately 6.5% of the junior preferred stock; and

- Elliott International, L.P. will contribute 1,022,332 shares of our common stock to Meteor Holding Corporation in exchange for 7,565,257 shares of Meteor Holding Corporation common stock, representing approximately 9.8% of the common stock, and 17,022 shares of Meteor Holding Corporation junior preferred stock, representing approximately 9.8% of the junior preferred stock.

The consummation of the transactions contemplated by the contribution and voting agreements is conditioned on:

- the representations and warranties of Meteor Holding Corporation being true and correct in all material respects as of the closing;

- Meteor Holding Corporation's compliance in all material respects with its obligations under the contribution and voting agreements;

- the absence of any prohibition against the consummation of the transactions contemplated by the contribution and voting agreements by any applicable law, statute, rule, regulation, judgment or order of any governmental authority of competent jurisdiction;

- the filing of Meteor Holding Corporation's restated certificate of incorporation;
- the furnishing of funds by the Francisco Partners Investor in satisfaction of its obligations under the equity commitment letter and the execution by the Francisco Partners Investor of the stockholders agreement; and
- the satisfaction or waiver by Meteor Holding Corporation and/or Metrologic, as applicable, of all of the conditions to the consummation of the merger, other than the debt financing condition and the condition that the Rollover Investors make their contributions pursuant to the contribution and voting agreements.

### Voting and Exclusivity

Mr. Knowles, Mrs. Knowles and the related family trusts and charitable entities and the Elliott Investors each have agreed, severally and not jointly, to vote or consent, or cause to be voted or consented, all shares of our common stock that they beneficially own or control in favor of approving the merger agreement.

In addition, Mr. Knowles, Mrs. Knowles and the related family trusts and charitable entities and the Elliott Investors each have agreed, severally and not jointly, that they would not directly or indirectly solicit, initiate, encourage or induce the making of a competing acquisition proposal and would vote or consent, or cause to be voted or consented, all shares of our common stock that they beneficially own or control against any competing acquisition proposal. Notwithstanding the foregoing, after the termination of the merger agreement, the obligation of Mr. Knowles, Mrs. Knowles and the related family trusts and charitable entities to vote or consent shares of our common stock that they beneficially own or control against any competing acquisition proposal shall continue for up to 10 months following the termination with respect to the aggregate number of shares of our common stock equal to 35% of the total outstanding shares on the date the merger agreement is terminated.

### Transfer Restrictions

Except in certain circumstances, Mr. Knowles, Mrs. Knowles and the related family trusts and charitable entities and the Elliott Investors have agreed, severally and not jointly, not to sell, transfer or otherwise dispose of all shares of our common stock that they beneficially own or control or grant any proxies or deposit any such shares into any voting trust, or enter into any voting agreement, with respect to such shares. However, in the event that the merger agreement is terminated, Mr. Knowles, Mrs. Knowles and the related family trusts and charitable entities have agreed to the foregoing restrictions for up to an additional 10-month period, but may transfer up to 35% of all shares of our common stock that they beneficially own or control pursuant to Rule 144, or by operation of law pursuant to a merger that constitutes a competing acquisition proposal so long as such competing acquisition proposal is voted against.

### Fees and Expenses

In general, Meteor Holding Corporation shall reimburse Mr. Knowles, Mrs. Knowles and the related family trusts and charitable entities and Elliott Associates, L.P. and Elliott International, L.P. for their reasonable out-of-pocket expenses in connection with the contribution and voting agreements, any related agreements and the transactions contemplated thereby, but will not reimburse any party who fails to make a required contribution.

85

*Termination*

The contribution and voting agreements will automatically terminate upon termination of the merger agreement; provided that the obligation of Mr. Knowles, Mrs. Knowles and the related family trusts and charitable entities to vote or consent shares of our common stock that they beneficially own or control against any competing acquisition proposal with respect to 35% of the total outstanding shares on the date the merger agreement is terminated shall continue for up to 10 months following the termination.

## Confidentiality and Standstill Agreement

In connection with the negotiation of the transactions contemplated by the merger agreement, Francisco Partners II, L.P. entered into a letter agreement dated August 24, 2006 with Metrologic. Pursuant to the letter agreement, Francisco Partners II, L.P. agreed, among other things, to keep non-public information provided by us confidential and to certain restrictions on its ability to (a) propose or effect: acquisitions of securities or assets of Metrologic or any of its subsidiaries; tender or exchange offers, mergers or business combinations involving the Metrologic or any of its subsidiaries; recapitalizations, restructurings, liquidations, dissolutions, or other extraordinary transactions with respect to Metrologic or any of its subsidiaries; or the solicitation of proxies or consents to vote with respect to the voting securities of Metrologic; (b) form, join or in any way participate in a "group" (as defined under the Exchange Act); (c) take any action which might force Metrologic to make a public announcement regarding any of the types of matters set forth in (a) above; or (d) enter into any discussions or arrangements with or, assist, advise or encourage any third party with respect to any of the foregoing.

86

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA

The selected historical data presented below are derived from our consolidated financial statements, as adjusted for discontinued operations. Reclassifications have been made to the financial data for each of the five years in the period ended December 31, 2005 to reflect our current year divestiture of AOA and to conform the prior years to the current year presentation. The reclassification of the financial data included in our Annual Report on Form 10-K for the year ended December 31, 2005 is set forth in a Current Report on Form 8-K filed on November 21, 2006. The selected consolidated financial data set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2005, as modified by our Current Report on Form 8-K filed on November 21, 2006, and our Quarterly Report on Form 10-Q for the quarter ended September 30, 2006. These filings are attached to and incorporated by reference in this proxy statement as Annex D, Annex E and Annex G, respectively.

Historical results are not necessarily indicative of the results to be expected in the future.

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2001(2)(3) (Unaudited) | 2002(3) (Unaudited) | 2003(4) | 2004(5) | 2005(6) | 2005 (Unaudited) | 2006 (Unaudited) |
| | (in thousands, except per share data) | | | | | | |
| **Statement of Operations Data:(1)** | | | | | | | |
| Sales | $ 87,751 | $94,289 | $118,198 | $149,735 | $178,375. | $ 126,350 | $ 158,083 |
| Cost of sales | 67,245 | 60,061 | 65,214 | 75,631 | 94,593 | 66,033 | 89,763 |
| Gross profit | 20,506 | 34,228 | 52,984 | 74,104 | 83,782 | 60,317 | 68,320 |
| Selling, general and administrative expenses | 26,681 | 26,168 | 28,678 | 39,667 | 57,843 | 32,402 | 46,147 |
| Research and development expenses | 5,355 | 5,525 | 5,427 | 6,616 | 7,454 | 5,750 | 7,563 |
| Operating income (loss) | (11,530) | 2,535 | 18,879 | 27,821 | 18,485 | 22,165 | 14,610 |
| Other income (expenses) | (2,507) | (1,830) | 1,097 | 2,161 | 1,884 | 1,528 | 1,112 |
| Income (loss) from continuing operations before provision for income taxes | (14,037) | 705 | 19,976 | 29,982 | 20,369 | 23,693 | 15,722 |
| Provision (benefit) for income taxes from continuing operations | (5,373) | 218 | 6,717 | 9,707 | 4,113 | 8,532 | 5,382 |
| Income (loss) from continuing operations | (8,664) | 487 | 13,259 | 20,275 | 16,256 | 15,161 | 10,340 |
| Income from discontinued operation net of income taxes | 887 | 1,188 | 622 | 2,405 | 1,557 | 1,093 | 2,013 |
| Net income (loss) | $ (7,777) | $ 1,675 | $ 13,881 | $ 22,680 | $ 17,813 | $ 16,254 | $ 12,353 |
| **Basic earnings (loss) per Share:(7)** | | | | | | | |
| Earnings (loss) from continuing operations | $ (0.52) | $ 0.03 | $ 0.75 | $ 0.95 | $ 0.73 | $ 0.69 | $ 0.46 |
| Earnings from discontinued operation | 0.05 | 0.07 | 0.04 | 0.11 | 0.07 | 0.05 | 0.09 |
| | $ (0.47) | $ 0.10 | $ 0.79 | $ 1.06 | $ 0.80 | $ 0.74 | $ 0.55 |
| **Diluted earnings (loss) per Share:(7)** | | | | | | | |
| Earnings (loss) from continuing operations | $ (0.52) | $ 0.03 | $ 0.69 | $ 0.89 | $ 0.70 | $ 0.65 | $ 0.44 |
| Earnings from discontinued operation | 0.05 | 0.07 | 0.03 | 0.10 | 0.07 | 0.05 | 0.09 |
| | $ (0.47) | $ 0.10 | $ 0.72 | $ 0.99 | $ 0.77 | $ 0.70 | $ 0.53 |
| **Weighted average number of outstanding common shares and equivalents:(7)** | | | | | | | |
| Basic | 16,373 | 16,400 | 17,597 | 21,472 | 22,129 | 22,082 | 22,518 |
| Diluted | 16,373 | 16,471 | 19,383 | 22,974 | 23,113 | 23,101 | 23,144 |

87

| | 2001 | 2002 | As of December 31, 2003 | 2004 | 2005 | As of September 30, 2006 |
|---|---|---|---|---|---|---|
| | (Unaudited) | (Unaudited) | (Unaudited) | | | (Unaudited) |
| | | | (in thousands, except per share data) | | | |
| **Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | $ 557 | $ 1,202 | $ 16,242 | $ 36,340 | $ 49,463 | $ 44,809 |
| Marketable securities | — | — | $ 32,575 | $ 28,375 | $ 24,475 | $ 27,732 |
| Working capital | $ 20,606 | $ 13,407 | $ 74,112 | $ 83,318 | $ 92,283 | $ 131,503 |
| Total assets | $ 85,773 | $ 74,579 | $ 139,900 | $ 192,527 | $ 226,182 | $ 235,517 |
| Long-term debt | $ 27,465 | $ 14,431 | $ 320 | $ 2,015 | $ 3 | $ 3 |
| Total debt | $ 40,731 | $ 21,486 | $ 5,527 | $ 18,280 | $ 18,436 | $ 15,977 |
| Total shareholders' equity | $ 26,261 | $ 29,471 | $ 107,608 | $ 138,016 | $ 160,290 | $ 181,521 |
| Book value per share(8) | $ 1.60 | $ 1.80 | $ 5.17 | $ 6.34 | $ 7.18 | $ 7.97 |

(1) On January 8, 2001, we completed the acquisition of AOA. On October 2, 2006, we completed the sale of AOA and our results as presented under Statements of Operations Data include AOA as a discontinued operation for all current and prior periods.

(2) During the year ended December 31, 2001, cost of sales included special charges and other costs of $10.0 million that are not expected to recur in subsequent periods.

(3) On January 1, 2002, we adopted FAS 142 and discontinued the amortization of goodwill. The effect of this goodwill amortization increased the 2001 net loss per common share by $0.05 per share.

(4) During the year ended December 31, 2003, we recorded a gain of $2.2 million on the early extinguishment of debt and expenses of $463 incurred in connection with our efforts to refinance our bank debt.

(5) On September 24, 2004, we acquired Omniplanar, Inc. and our results of operations include the results of operations of Omniplanar, Inc. from that date forward.

(6) During the year ended December 31, 2005, selling, general and administrative costs includes a charge of $12.6 million related to the symbol litigation contingency.

(7) Weighted average number of common shares and per share amounts for 2001 and 2002 have been restated to reflect the 2003 stock splits.

(8) The number of common shares for 2001 and 2002 used in the book value per share calculation have been restated to reflect the 2003 stock splits.

On November 21, 2006, the Company filed a Current Report on Form 8-K/A, which included certain pro forma financial information relating to our current year divestiture of AOA. This filing is attached to and incorporated by reference in this proxy statement as Annex F.

## MARKET PRICES OF THE COMPANY'S COMMON STOCK

Our common stock is traded on the NASDAQ Global Select Market and trades under the symbol "MTLG." As of October 31, 2006, 22,858,443 shares of Metrologic common stock were outstanding. The following table sets forth, for the periods indicated, the high and low sales prices per share for our common stock on the NASDAQ Global Select Market.

|  | High | Low |
|---|---|---|
| **Year Ended December 31, 2004:** | | |
| First Quarter | $ 33.50 | $ 20.68 |
| Second Quarter | 25.75 | 13.81 |
| Third Quarter | 20.15 | 13.00 |
| Fourth Quarter | 21.84 | 14.50 |
| **Year Ended December 31, 2005:** | | |
| First Quarter | 24.12 | 18.22 |
| Second Quarter | 23.65 | 12.27 |
| Third Quarter | 18.77 | 12.33 |
| Fourth Quarter | 20.65 | 15.50 |
| **Year Ended December 31, 2006:** | | |
| First Quarter | $ 24.49 | $ 19.16 |
| Second Quarter | 23.23 | 14.07 |
| Third Quarter | 18.31 | 13.57 |
| Fourth Quarter through November 27, 2006 | 18.50 | 17.93 |

The closing sale price of our common stock on the NASDAQ Global Select Market on September 11, 2006, the last trading day before we announced that we had entered into the merger agreement, was $17.67 per share. On November 27, 2006, the last trading day before the date of this proxy statement, the closing price for our common stock on the NASDAQ Global Select Market was $18.33 per share. You are encouraged to obtain current market quotations for Metrologic common stock in connection with voting your shares.

## DIVIDEND POLICY

We have not paid cash dividends on our common stock since becoming a public company, and we do not intend to pay cash dividends in the foreseeable future. We currently intend to retain any earnings to further develop and grow our business. While this dividend policy is subject to periodic review by our board of directors, there can be no assurance that we will declare and pay dividends in the future.

## TRANSACTIONS IN THE COMPANY'S STOCK

On October 6, 2003, Metrologic made an underwritten public offering of 1,725,000 shares of common stock for $34.50 per share and received aggregate net proceeds of $56,166,000. We have not made any other underwritten public offerings of our common stock which would be required to be registered under the Securities Act of 1933 or exempt from registration under Regulation A during the past three years.

On October 23, 2006, Stanton Melzer made a charitable donation of 2,500 shares of common stock. Except for this transaction, there have not been any transactions in the common stock in the last 60 days by any of the following:

- us or any of our majority owned subsidiaries,
- any of our directors or officers,

89

- any person known by us to be the beneficial owner of more than five percent of our outstanding shares of common stock,

- the Elliott Entities, or

- Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor or Francisco Partners II, L.P.

None of the Company, C. Harry Knowles, Janet H. Knowles or their related family trusts and charitable entities, Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor or Francisco Partners II, L.P. have purchased the Company's common stock during the last two years. The officers and directors have not purchased any shares of common stock during the past two years. All common stock acquired by the officers and directors has been through the exercise of options or pursuant to the Employee Stock Purchase Plan.

90

## PERSONS OWNING MORE THAN FIVE PERCENT OF STOCK

The following table describes persons known to have beneficial ownership of more than 5% of Metrologic's common stock at October 31, 2006. Our knowledge (except as noted below) is based on reports filed with the Securities and Exchange Commission by each person or entity listed below. The number of shares beneficially owned by each entity or individual is determined under Securities and Exchange Commission rules, and the information is not necessarily indicative of beneficial ownership for any other purpose. Under such rules, beneficial ownership includes any shares as to which the entity or individual has sole or shared voting power or investment power and also any shares that the entity or individual has the right to acquire as of December 30, 2006 (60 days after October 31, 2006) through the exercise of any stock option or other right. Unless otherwise indicated, each person has sole voting and investment power (or shares such powers with his or her spouse) with respect to the shares set forth in the following table. For purposes of this proxy statement, beneficial ownership shall have the meaning set forth in this section.

| Name and Address of Beneficial Owner | Amount and Nature of Beneficial Ownership(1) | Percent of Class(1) |
| --- | --- | --- |
| C. Harry Knowles<br>425 E. Linden Street<br>Moorestown, NJ 08057 | 9,236,161(2) | 40.0% |
| Janet H. Knowles<br>425 E. Linden Street<br>Moorestown, NJ 08057 | 9,236,161(3) | 40.0% |
| Knowles Science Teaching Foundation<br>1000 North Church Street<br>Moorestown, NJ 08057 | 4,049,460(4) | 17.7% |
| Burgundy Asset Management Ltd.<br>181 Bay Street<br>Suite 4510 Bay Wellington Tower<br>Toronto, Ontario Canada M5J 2T3 | 1,973,900(5) | 8.6% |
| Elliott Associates, L.P.<br>712 Fifth Avenue<br>New York, NY 10019 | 681,553(6) | 3.0% |
| Elliott International, L.P.<br>712 Fifth Avenue<br>New York, NY 10019 | 1,022,332(6) | 4.5% |
| Reich & Tang Asset Management, LLC<br>600 Fifth Avenue<br>New York, NY 10020 | 1,145,000(7) | 5.0% |

(1) For purposes of calculating the number and percentage of shares beneficially owned, the number of shares of common stock deemed outstanding consists of 22,858,443, including restricted stock and stock purchased pursuant to our Employee Stock Purchase Plan, plus the number of shares underlying options and warrants held by the named person that are exercisable within 60 days of October 31, 2006. Unless otherwise indicated, each person has sole voting power with respect to shares shown as beneficially owned by such person.

(2) Includes 195,000 shares of common stock subject to a warrant held by Mr. Knowles and Mrs. Knowles that is currently fully exercisable, 7,290 shares of common stock subject to options held by each of Mr. and Mrs. Knowles that are exercisable or will become exercisable within 60 days of October 31, 2006, and 5,550,651 shares of common stock held by several charitable entities and trusts for which Mr. or Mrs. Knowles, or both, serve as officers or trustees and, as such, have or share voting

91

power and investment power over such shares and may accordingly be deemed to beneficially own such shares.

(3) Includes 5,550,651 shares of common stock held by several charitable entities and trusts for which Mr. or Mrs. Knowles, or both, serve as officers or trustees and, as such, have or share voting power and investment power over such shares and may accordingly be deemed to beneficially own such shares. Also includes 195,000 shares of common stock subject to a warrant held by Mr. Knowles and Mrs. Knowles that is currently fully exercisable and 7,290 shares of common stock subject to options held by each of Mr. Knowles and Mrs. Knowles that are exercisable or will become exercisable within 60 days of October 31, 2006. Mrs. Knowles, Vice President, Administration and Treasurer of the Company, is the wife of C. Harry Knowles, and therefore, may be deemed to have shared voting and investment power with respect to all other shares beneficially owned by Mr. Knowles.

(4) Mr. and Mrs. Knowles share voting power and investment power over these shares. The information provided for the Knowles Science Teaching Foundation is based in part on a Form 4 filed by it on March 31, 2006.

(5) Burgundy Asset Management has sole voting power and sole dispositive power over all shares reported as beneficially owned by it. The information provided for Burgundy Asset Management is based on a Schedule 13G filed by it on February 1, 2006.

(6) Elliott Associates, L.P. has the power to vote or direct the vote of, and to dispose or direct the disposition of, the shares of Common Stock beneficially owned by it. Elliott International, L.P. has the shared power with Elliott International Capital Advisors, Inc. to vote or direct the vote of, and to dispose or direct the disposition of, the shares of Common Stock owned by Elliott International, L.P. The information provided for Elliott Associates, L.P. and Elliott International, L.P. is based on an Amendment No. 1 to a Schedule 13D filed by it on September 13, 2006. Elliott Associates, L.P. and Elliott International, L.P. are under common management and may be deemed to be acting as a group (as such term is defined in the Exchange Act) with respect to shares of our common stock.

(7) Reich & Tang Asset Management, LLC has shared voting power and shared dispositive power over all shares reported as beneficially owned by it. The information provided for Reich & Tang Asset Management, LLC is based on a Scheduled 13G filed by it on August 24, 2006.

None of Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P., or, except as described above, the Elliott Entities, nor the directors, officers, managing members or general partners of such entities own shares of Metrologic as of the date hereof. However, as a result of the voting provisions set forth in the contribution and voting agreements, which are described in "Other Agreements Relating to our Securities— Contribution and Voting Agreements" and attached as Annex C-1 and Annex C-2 to this proxy statement, Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. may be deemed to beneficially own each of the shares indicated as beneficially owned by C. Harry Knowles, Elliott Associates, L.P. and Elliott International, L.P. in the above table. Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. are not entitled to any rights as a shareholder of Metrologic, and Meteor Holding Corporation, Meteor Merger Corporation, the Francisco Partners Investor and Francisco Partners II, L.P. disclaim beneficial ownership of the shares of common stock which are beneficially owned by C. Harry Knowles, Elliott Associates, L.P. and Elliott International, L.P.

92

## SECURITY OWNERSHIP BY MANAGEMENT

The following table sets forth certain information regarding the beneficial ownership of Metrologic's common stock as of October 31, 2006 by (i) each of Metrologic's directors; (ii) each named executive officer of Metrologic; and (iii) all executive officers and directors of Metrologic as a group. The address of each of the named executive officers and directors in the table below is set forth in the section entitled "Current Executive Officers and Directors of the Company."

| Name of Beneficial Owner | Shares Beneficially Owned(1) | Percent of Class(1) |
|---|---|---|
| Benny A. Noens(2) | 25,608 | * |
| Richard C. Close | 32,294(3) | * |
| Gregory DiNoia | 14,460(4) | * |
| Dale M. Fischer | 21,039(5) | * |
| C. Harry Knowles | 9,236,161(6) | 40.0% |
| Janet H. Knowles | 9,236,161(7) | 40.0% |
| John H. Mathias | 28,790(8) | * |
| Stanton L. Meltzer | 17,291(9) | * |
| Hsu Jau Nan | 87,290(10) | * |
| William Rulon-Miller | 24,140(11) | * |
| Mark Ryan | 5,860(12) | * |
| Joseph Sawitsky | 13,750(13) | * |
| Mark Schmidt | 29,123(14) | * |
| Jeffrey Yorsz(15) | 12,750(16) | * |
| Frank C. Zirnkilton, Jr.(17) | — | — |
| All executive officers and directors as a group (17 persons) | 9,566,256(18) | 41.0% |

\* Less than 1%.

(1) For purposes of calculating the number and percentage of shares beneficially owned, the number of shares of common stock deemed outstanding consists of 22,858,443, including restricted stock and stock purchased pursuant to our Employee Stock Purchase Plan, plus the number of shares underlying options and warrants held by the named person that are exercisable within 60 days of October 31, 2006. Unless otherwise indicated, each person has sole voting power with respect to shares shown as beneficially owned by such person.

(2) Mr. Noens resigned from the Company effective July 1, 2006.

(3) Includes 32,294 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(4) Includes 11,860 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(5) Includes 5,860 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(6) Includes 195,000 shares of common stock subject to a warrant held by Mr. Knowles and Mrs. Knowles that is currently fully exercisable, 7,290 shares of common stock subject to options held by each of Mr. Knowles and Mrs. Knowles that are exercisable or will become exercisable within 60 days of October 31, 2006, and 5,550,651 shares of common stock held by several charitable entities and trusts for which Mr. or Mrs. Knowles, or both, serve as officers or trustees and, as such, have or share voting power and investment power over such shares and may accordingly be deemed to beneficially own such shares.

93

(7) Includes 5,550,651 shares of common stock held by several charitable entities and trusts for which Mr. or Mrs. Knowles, or both, serve as officers or trustees and, as such, have or share voting power and investment power over such shares and may accordingly be deemed to beneficially own such shares. Also includes 195,000 shares of common stock subject to a warrant held by Mr. Knowles and Mrs. Knowles that is currently fully exercisable and 7,290 shares of common stock subject to options held by each of Mr. and Mrs. Knowles that are exercisable or will become exercisable within 60 days of October 31, 2006. Mrs. Knowles, Vice President, Administration and Treasurer of the Company, is the wife of C. Harry Knowles, and therefore, may be deemed to have shared voting and investment power with respect to all other shares beneficially owned by Mr. Knowles.

(8) Includes 27,290 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(9) Includes 13,290 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(10) Includes 63,290 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(11) Includes 16,040 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(12) Includes 5,860 shares of common stock subject to options that are or will become exercisable within 60 days of October 31, 2006.

(13) Includes 13,750 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(14) Includes 25,750 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(15) Mr. Yorsz ceased to be an executive officer of Metrologic effective October 1, 2006 due to the sale of AOA.

(16) Includes 12,750 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006.

(17) Mr. Zirnkilton resigned as an executive officer of Metrologic effective August 31, 2006.

(18) Includes 258,364 shares of common stock subject to options that are exercisable or will become exercisable within 60 days of October 31, 2006 and 195,000 shares of common stock subject to a warrant that is currently exercisable.

94

## ADJOURNMENT OF THE SPECIAL MEETING (PROPOSAL NO. 2)

Metrologic may ask its shareholders to vote on a proposal to adjourn the special meeting, if necessary, in order to allow for the solicitation of additional proxies if there are insufficient votes at the time of the special meeting to approve the merger agreement. **THE SPECIAL COMMITTEE AND THE BOARD OF DIRECTORS RECOMMEND THAT YOU VOTE "FOR" THE ADJOURNMENT PROPOSAL.**

## SHAREHOLDER PROPOSALS

In order to bring business before a shareholders' meeting, shareholders must give timely notice and make certain specified disclosures about (i) themselves, (ii) their ownership of shares in the Company, (iii) the reason for the proposal and (iv) their financial interest in the Company. The Company will not hold its 2007 Annual Meeting of Shareholders if the merger is completed. If a shareholder wishes to present a proposal at the 2007 Annual Meeting of Shareholders, the proposal must comply with the Company's Amended and Restated Certificate of Incorporation and must be received by the Company no later than May 8, 2007 nor sooner than March 16, 2007. In addition, any shareholder proposal intended for inclusion in the proxy material for the 2007 Annual Meeting of Shareholders must also be received in writing by the Company within a reasonable amount of time. The inclusion of any proposal in the proxy material will be subject to the applicable rules of the Securities and Exchange Commission. If any shareholder wishes to present a proposal to the 2007 Annual Meeting of Shareholders that is not included in the Company's proxy statement for that meeting and fails to submit that proposal to the Secretary of the Company within a reasonable amount of time, then the Company will be allowed to use its discretionary voting authority when the proposal is raised at the Annual Meeting, without any discussion of the matter in its proxy statement.

## OTHER MATTERS

We may send a single set of proxy materials and other shareholder communications to any household at which two or more shareholders reside. This process is called "householding." This reduces duplicate mailings, saves printing and postage costs as well as natural resources. Only one set of documents is delivered to each household unless the registrant has received contrary instructions.

If one set of these documents was sent to your household for the use of all Company shareholders in your household, and one or more of you would prefer to receive your own set, please contact our stock transfer agent, StockTrans, Inc., 44 West Lancaster Avenue, Ardmore, PA 19003, by telephone at (610) 649-7300 or by Internet at www.stocktrans.com and a separate copy will be promptly delivered to you.

In addition, (i) if any shareholder desires to receive a separate copy of the proxy statement or annual report in the future or (ii) if shareholders sharing an address desire to receive only a single copy of the proxy statement or annual report, then such shareholders should contact the bank, broker or other firm in whose name the shares are registered or contact the Company at its principal executive offices.

95

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We are required to file special, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission. You may read and copy any reports, proxy statements or other information that we file with the Securities and Exchange Commission at the following location of the Securities and Exchange Commission:

Public Reference Room
100 F Street, N.E.
Room 1580
Washington, D.C. 20549

Please call the Securities and Exchange Commission at 1-800-SEC-0330 for further information on the public reference room. You may also obtain copies of this information by mail from the Public Reference Section of the Securities and Exchange Commission, 100 F Street, N.E., Room 1580, Washington, D.C. 20549, at prescribed rates. Our public filings are also available to the public from document retrieval services and the Internet website maintained by the Securities and Exchange Commission at *www.sec.gov*.

No persons have been authorized to give any information or to make any representations other than those contained in this proxy statement and, if given or made, such information or representations must not be relied upon as having been authorized by us or any other person. This proxy statement is dated November 28, 2006. You should not assume that the information contained in this proxy statement is accurate as of any date other than that date, and the mailing of this proxy statement to shareholders shall not create any implication to the contrary.

By Order of the Board of Directors,

Janet H. Knowles
*Corporate Secretary*
November 28, 2006

96